| | | |
|---|---|---|
| OGLALA SIOUX TRIBAL COURT | ) | IN CIVIL COURT |
| OGLALA SIOUX TRIBE | ) SS. | PINE RIDGE |
| PINE RIDGE INDIAN RESERVATION | ) | |

LILLIAN "TONI" MONTILEAUX,                )
                                                              )          CASE NO. CIV. 21-0388
                  Petitioner,                                )
                                                              )          **NOTICE OF APPEAL**
v.                                                            )
                                                              )
MAZASKA OWECASO OTIPI FINANCIAL, INC.,  )
                                                              )
                  Respondent.                             )

TO LILLIAN "TONI" MONTILEAUX, PETITIONER, AND HER ATTORNEY OF RECORD, STEVEN SANDVEN:

NOTICE IS HEREBY GIVEN that Respondent/Appellant, Mazaska, hereby appeals to the Oglala Sioux Supreme Court, Oglala Sioux Tribe, Pine Ridge Indian Reservation, a portion of the Order and Memorandum Decision Denying Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction, which was signed by the Honorable Chief Judge, David Dillon, of Oglala Sioux Tribal Court on the 10th day of August 2022 and filed of record with the Oglala Sioux Tribal Court on the 10th day of August 2022. The Notice of Entry of Order was served on attorney for the Petitioner on September 12th, 2022.

Dated this 12th day of September 2022.

COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP

By: _____
Jonathan P. McCoy
*Attorneys for Respondent*
704 St. Joseph Street
P.O. Box 290
Rapid City, SD 57709
(605) 343-2410

Mazaska Complaint Exhibit 3
001

jmccoy@costelloporter.com

## CERTIFICATE OF SERVICE

On this the 12th day of September 2022, the undersigned hereby certifies that he served a copy of the foregoing document, NOTICE OF APPEAL, upon the person herein next designated, on the date below shown, by placing the same in the service indicated, first class postage prepaid, addressed as follows:

| | | |
|---|---|---|
| Steven D. Sandven | [  ] | U.S. Mail |
| 12294 Gold Mountain Loop | [  ] | Hand Delivery |
| Hill City, SD 57745 | [  ] | Facsimile |
| sdsandven@gmail.com | [  ] | Federal Express |
| *Attorney for Petitioner* | [X] | Email |

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: */s/ Jonathan P. McCoy*
    Jonathan P. McCoy
    *Attorneys for Respondent*
    704 St. Joseph Street
    P.O. Box 290
    Rapid City, SD 57709
    (605) 343-2410
    jmccoy@costellporter.com

**Mazaska Complaint Exhibit 3**
**002**

SUPREME COURT OF THE OGLALA SIOUX NATION

OGLALA SIOUX TRIBE

PINE RIDGE INDIAN RESERVATION

---

LILLIAN "TONI" MONTILEAUX,

              Petitioner/Appellee

v.

MAZASKA OWECASO OTIPI FINANCIAL, INC.,

              Respondent/Appellant

CIV. APP. NO. 22-_____

**APPELLANT'S BRIEF**

---

APPEAL FROM THE OGLALA SIOUX TRIBAL COURT
OGLALA SIOUX TRIBE
PINE RIDGE INDIAN RESERVATION

---

THE HONORABLE DAVE DILLON
Chief Judge OST Tribal Court

---

Steven D. Sandven
12294 Gold Mountain Loop
Hill City, SD 57745
sdsandven@gmail.com
**Counsel for Appellee**

Jonathan P. McCoy
Costello, Porter, Hill, Heisterkamp,
     Bushnell & Carpenter, LLP
PO Box 290
Rapid City, SD 57709
605.343.2410
**Counsel for Appellant**

---

NOTICE OF APPEAL FILED SEPTEMBER 12, 2022

---

Mazaska Complaint Exhibit 3
003

# TABLE TO CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii-iii |
| JURISDICTIONAL STATEMENT | 1 |
| STATEMENT OF THE LEGAL ISSUES | 1 |
| STATEMENT OF THE CASE AND FACTS | 2 |
| ARGUMENT | 3 |
| 1. The trial court incorrectly determined it has jurisdiction over the subject matter. | 3 |
| 2. The trial court incorrected determined that parties may consent to subject matter jurisdiction. | 6 |
| CONCLUSION | 8 |
| REQUEST FOR ORAL ARGUMENT | 8 |
| CERTIFICATION OF SERVICE | 8 |
| CERTIFICATE OF COMPLIANCE | 9 |
| CERTIFICATE OF PROOF OF FILING | 9 |
| APPENDICES | 11 |

i

Mazaska Complaint Exhibit 3
004

# TABLE TO AUTHORITIES

<u>Page</u>

**CASES:**

*Bosch v. Lamattina*, No. CV 08-0238 (JS) (AKT),
2008 U.S. Dist. LEXIS 124583 (E.D.N.Y. Aug. 4, 2008) ............................................ 1, 6

*Calvagno v. Bisbal*,
430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006) ...................................................... 1, 6

*Gully v. First Nat'l Bank in Meridian*,
299 U.S. 109, 112 (1936) ...................................................................... 1, 5

*Johnson v. New York State Martin Luther King, Jr. Institute for Nonviolence*,
13 F. Supp. 2d 306 (D.C.N.Y. 1998) ........................................................ 1,2, 7

*Lake v. First Nationwide Bank*,
156 F.R.D. 615, 619 (E.D.Pa 1994) ....................................................... 1, 2, 3, 7

*McGahey v. Giant Food, Inc.*,
300 F. Supp. 475, 477 (D.C. Md. 1969) ................................................... 1, 2, 6

*Merrell Dow Pharmaceuticals, Inc. v. Thompson*,
478 U.S. 804, 806 n.2, 809 n.6 (1986) ...................................................... 1, 3

*Midstates Excavating v. Farmers & Merchs. Bank & Tr.*,
410 N.W.2d 190, 194 (S.D. 1987) ............................................................ 1, 4

*Montana v. United States*,
450 U.S. 544 (1981) .......................................................................... 1, 3

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*,
308 U.S. 165 (1939) .......................................................................... 2, 6

*The Fair v. Kohler Die & Specialty Co.*,
228 U.S. 22, 25 (1913) ...................................................................... 1, 3

*Vega v. First Fed. Sav. & Loan Asso.*,
622 F.2d 918, 925 n.8. (6th Cir. 1980) ..................................................... 2, 7

*Walker v. Commercial Credit Corp.*,
192 B.R. 260, 265-66 (M.D. Ala. 1996) .................................................... 1, 5

Mazaska Complaint Exhibit 3
005

                                                                    Page

*Williams v. Berkshire Financial Group, Inc.*,
491 F. Supp. 2d 320 (E. D. NY 2007) ........................................................................   1, 6

**STATUTES:**

12 U.S.C. § 2601, et seq.

12 U.S.C. § 2605

12 U.S.C. § 2609

12 U.S.C. § 2614

Mazaska Complaint Exhibit 3
006

## JURISDICTIONAL STATEMENT

Appellant, Mazaska, accepts that this court has authority to hear the appeal arising from the Oglala Sioux Tribal Court, but does not waive its argument that the subject matter of the petitioner's case is not within the purview of the Oglala Sioux Nation tribal court jurisdiction.

## STATEMENT OF LEGAL ISSUES

1.    Whether the tribal court has original subject matter jurisdiction of the cause of action alleged by Petitioner under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601, *et seq.* The trial court held it did.

*Bosch v. Lamattina*, No. CV 08-0238 (JS) (AKT), 2008 U.S. Dist. LEXIS 124583 (E.D.N.Y. Aug. 4, 2008)

*Calvagno v. Bisbal*, 430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006)

*Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112 (1936)

*Johnson v. New York State Martin Luther King, Jr. Institute for Nonviolence*, 13 F. Supp. 2d 306 (D.C.N.Y. 1998)

*Lake v. First Nationwide Bank*, 156 F.R.D. 615, 619 (E.D.Pa 1994)

*McGahey v. Giant Food, Inc.*, 300 F. Supp. 475, 477 (D.C. Md. 1969)

*Midstates Excavating v. Farmers & Merchs. Bank & Tr.*, 410 N.W.2d 190, 194 (S.D. 1987)
*Montana v. United States*, 450 U.S. 544 (1981)

*Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 806 n.2, 809 n.6 (1986)

*The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)

*Walker v. Commercial Credit Corp.*, 192 B.R. 260, 265-66 (M.D. Ala. 1996)

*Williams v. Berkshire Financial Group, Inc.*, 491 F. Supp. 2d 320 (E. D. NY 2007)

1

Mazaska Complaint Exhibit 3
007

2.       Whether a party may consent to subject matter jurisdiction. The trial court

held that parties may consent to subject matter jurisdiction.

*Lake v. First Nationwide Bank*, 156 F.R.D. 615, 619 (E. D. Pa 1994)

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165 (1939)

*Vega v. First Fed. Sav. & Loan Asso.*, 622 F.2d 918, 925 n.8. (6th Cir. 1980)

*Johnson v. New York State Martin Luther King, Jr. Institute for Nonviolence*, 13 F. Supp. 2d 306 (D.C.N.Y. 1998)

*McGahey v. Giant Food, Inc.*, 300 F. Supp. 475, 477 (D.C. Md. 1969)

## STATEMENT OF CASE

Respondent/Appellant (Mazaska Owecaso Otipi Financial, hereinafter "Mazaska") is

dedicated to assisting and helping people of the Lakota Nation and Oglala Sioux Tribe

create opportunities for themselves by offering low interest credit loans to Oglala Sioux

Tribal members. Petitioner/Appellee ("Petitioner"), who seeks damages under federal law,

is one of those Lakota people served by Mazaska.

In 2010, Mazaska made three separate loans of money to Petitioner. These loans

were structured as balloon loans and secured by a leasehold mortgage. Petitioner agreed to

the terms of the loans, which she mortgaged to Mazaska by leasehold mortgage of Indian

Trust Land. Together, these documents comprise the security instrument central to this

case. The security instrument based in federal law under Titles 12 and 25 of the United

States Code. *Dec. of Sandven*, dated Oct. 31, 2021, exhibit 3. The United States Congress

established the Real Estate Settlement Procedures Act (RESPA), codified at 12 U.S.C. §

2601, *et seq.*, to guide lenders and creditors and protect consumers. In so doing, the

Congress created a federal cause of action, discussed *infra*, and established procedures in

2

Mazaska Complaint Exhibit 3
008

federal law to seek redress and preempt state law. Where there is no state law, the Congress established federal jurisdiction.

Petitioner followed this statutory scheme at first. In a letter dated May 19, 2021, Petitioner requested information subject to 12 U.S.C. § 2605(e)(2). *Dec. of Sandven*, ex. 8. Mazaska replied by letter dated June 4, 2021, pursuant to the federal statute. *Id*, at ex. 9. The Petitioner subsequently suddenly stopped adhering to the federal statute and commenced this lawsuit in tribal court despite seeking relief solely through 12 U.S.C. §§ 2605, 2609, and 2614. *Compl.*, at ¶¶ 10-13, 53.

## ARGUMENT

<u>I.</u>    <u>The trial court incorrectly determined it has jurisdiction over the subject matter.</u>

The subject matter of this case arises under the Real Estate Settlement Procedures Act, codified by the United States Congress at 12 U.S.C. § 2601, *et seq*, as alleged in Petitioner's complaint. It is undeniable that a Petitioner is master of the complaint. *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master of what law he will rely upon."); *see, Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 806 n.2, 809 n.6 (1986). In her complaint, Petitioner specifically sought relief by invoking the federal statue, RESPA:

> The Respondent has breached its contractual obligations by failing and refusing to properly account for the escrow funds as required by Section 2 of the Third Mortgage, unilaterally extending the maturity date as delineated in the Third Note, and not applying Petitioner's payments in accordance with the Third Mortgage.

Compl. at ¶ 53. *Dec. of Sandven*, ex. 3. Section 2 of the mortgage document directly invokes 12 U.S.C. § 2601 *et seq.* (RESPA):

3

Mazaska Complaint Exhibit 3 009

**Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full a sum ("Funds") for: [(a) – (f)]. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless *another law* that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items or otherwise *in accordance with applicable law.*

*Dec. of Sandven*, ex. 3. Section 2 (emphasis added). However, the trial court determined it had jurisdiction solely on factors related to personal jurisdiction under *Montana v. United States*, 450 U.S. 544 (1981), specifically that Mazaska had consented to tribal jurisdiction which is insufficient to establish subject matter jurisdiction. *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 619 (E.D.Pa 1994) ("[I]t is beyond question that parties may not create subject matter jurisdiction either by agreement or consent.").

      This is not a situation where Petitioner could have, but did not, raise federal claims. Rather, Petitioner's complaint is a direct allegation of violation of federal statute, specifically 12 U.S.C. §§ 1605 and 2609, as the essential element of her cause of action. Unlike other federal laws which provide exceptions to federal jurisdiction, RESPA does not. *See, Midstates Excavating v. Farmers & Merchs. Bank & Tr.*, 410 N.W.2d 190, 194 (S.D. 1987) (holding that within the Miller Act, 40 U.S.C. 270a-270d, Congress expressly excepted and removed tribal contracts from federal jurisdiction stating, "it becomes clear that the entire federal scheme removes contracts with tribes from the Miller Act irrespective of the fact that the money source is federal funds."). Since RESPA does not create an exception for tribal jurisdiction, "[i]t is the fact that an *action* is *founded* 'on a claim or right arising under'

4

Mazaska Complaint Exhibit 3
010

federal law that makes the action removeable . . . not the fact that an interpretation of federal law may affect or determine the outcome of the action." *Walker v. Commercial Credit Corp.*, 192 B.R. 260, 265-66 (M.D. Ala. 1996) (emphasis in original). Petitioner's alleged damages are founded on federal statute, which preempts lower law:

> Preemption of conflicting State laws. Notwithstanding any law or regulation of *any State*, a person who makes a federally related mortgage loan or a servicer shall be considered to have complied with the provisions of *any such State law or regulation* requiring notice to a borrower at the time of application for a loan or transfer of the servicing of a loan if such person or servicer complies with the requirements under this section regarding timing, content, and procedures for notification of the borrower.

12 U.S.C. § 2605(h) (emphasis added). And 12 U.S.C. § 2609(b) incorporates section 2605, intertwining the two sections. Finally,

> "[a]ny action pursuant to the provisions of [12 U.S.C. § 2605] may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, within 3 years in the case of a violation of [12 U.S.C. § 2605] . . . from the date of occurrence of the violation[.]"

12 U.S.C. § 2614.

The security instrument provided that "Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless *another law* that applies to the Funds sets a lesser amount." *Dec. of Sandven*, ex. 3 [emphasis added]. There is not "another law" that applies to this case. There is no comparable Oglala Sioux Tribe code, ordinance or statute equivalent to the federal statute. The RESPA is the only applicable and controlling law, and Petitioner's claim for damages will be supported or defeated based on the construction of that federal law. *Gully*

5

Mazaska Complaint Exhibit 3 011

*v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112 (1936). Furthermore, 12 U.S.C. § 2614 "authorizes an action, pursuant to the provision of [§ 2605], to be brought in the federal district court or in any other court of competent jurisdiction in which the property involved is located . . . and appears to be a valid basis for federal question jurisdiction." *Calvagno v. Bisbal*, 430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006) (retaining and establishing federal jurisdiction under RESPA); *see*, *Williams v. Berkshire Financial Group, Inc.*, 491 F. Supp. 2d 320 (E.D.N.Y. 2007) (accepting federal question jurisdiction pursuant to 12 U.S.C. § 2614, but dismissing the case on other grounds); *Bosch v. Lamattina*, No. CV 08-0238 (JS) (AKT), 2008 U.S. Dist. LEXIS 124583 (E.D.N.Y. Aug. 4, 2008).

Petitioner seeks damages arising solely from federal statute, the construction of which will support or defeat her claim and Mazaska's defenses. The requested relief does not arise from the security instrument itself because the statute exists apart from both the loan and the leasehold mortgage. Thus, but-for RESPA's incorporation into the security instrument, Petitioner's complaint contains no allegation for breach of contract. Therefore, despite the breach of contract claim, Petitioner's claim is not based on contract law, finding its weight solely in 12 U.S.C. §§ 2605 and 2609. Therefore, Petitioner, through her complaint, established federal question jurisdiction under 12 U.S.C. § 2614 by her complaint.

II.    <u>The trial court incorrectly determined that parties may consent to subject matter jurisdiction.</u>

"It is beyond question that parties may not create subject matter jurisdiction either by agreement or consent." *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 619 (E. D. Pa 1994); *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165 (1939). Nor can a court

6

create jurisdiction when none exists. *Johnson v. New York State Martin Luther King, Jr. Institute for Nonviolence*, 13 F. Supp. 2d 306 (D.C.N.Y. 1998) (holding that a federal court cannot create its own jurisdiction); *McGahey v. Giant Food, Inc.*, 300 F. Supp. 475, 477 (D.C. Md. 1969). Therefore, it does not matter whether Respondent Mazaska consented to tribal jurisdiction of its person, because neither Respondent nor Petitioner can consent or agree to subject matter jurisdiction.

In *Lake*, "both parties wish[ed] the [District] Court to exercise jurisdiction" in the matter involving RESPA. *Lake*, 156 F.R.D. at 619. And it was the District Court which *sua sponte* raised the issue of subject matter jurisdiction and concluded that federal jurisdiction existed. Specifically, 12 U.S.C. §§ 2607 and 2608 "explicitly establish[ ] federal jurisdiction[.]" *Id.* at 620. However, the Lakes alleged claims under 12 U.S.C. § 2610, and the District Court still found jurisdiction, determining the claim was "within the 'zone of interests' protected by [12 U.S.C. § 2610.]" *Id.* at 621-22.

Even apart from *Lake*, federal jurisdiction is proper under 12 U.S.C. § 2609, one of the statutes implicated by Petitioner in this case.

> As a threshold matter, [the Court] must determine whether the Real Estate Settlement Procedures Act creates a private cause of action for violations of 12 U.S.C. § 2609 and 12 U.S.C. § 2610. While the Act does not expressly provide for such a causes of action, we believe, based on the legislative history, that Congress intended to create a private remedy for violations of the Act. *See*, *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, (1979). *See also*, *Taylor v. Brighton Corporation*, 616 F.2d 256 (6th Cir. 1980).

*Vega v. First Fed. Sav. & Loan Asso.*, 622 F.2d 918, 925 n.8. (6th Cir. 1980). Petitioner disguises her claims under 12 U.S.C. §§ 2605 and 2609 as breach of contract claims. However, as discussed in section I, *supra*, her alleged claims only exist because of RESPA, not in addition to RESPA. As such, Petitioner's claim for damages rises directly from RESPA

7

Mazaska Complaint Exhibit 3
013

for which Congress explicitly established federal jurisdiction. Neither party can consent to jurisdiction within the Oglala Sioux Nation.

## CONCLUSION

If damages are ultimately awarded to the Plaintiff, they will be awarded pursuant to 12 U.S.C. § 2601, *et seq.*, as a result of Petitioner's control of the pleadings. The United States Congress established subject matter jurisdiction in the federal courts for claims arising under 12 U.S.C. §§ 2605, 2609, 2610, and 2614, apart from any security instrument or consent to personal jurisdiction. Therefore, based on the foregoing, this Court is requested to reverse the trial court and dismiss this case from tribal court for lack of subject matter jurisdiction.

## REQUEST FOR ORAL ARGUMENT

Mazaska requests the opportunity for oral argument to address the issues raised by this appeal.

Dated this 11th day of October 2022.

COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP

By:_____
Jonathan P. McCoy
*Attorneys for Appellant*
704 St. Joseph Street
P.O. Box 290
Rapid City, SD 57709
(605) 343-2410
jmccoy@costelloporter.com

## CERTIFICATE OF SERVICE

On this the 11th day of October 2022, the undersigned hereby certifies that he served a copy of the foregoing document upon the person herein next designated, on the date below shown, by placing the same in the service indicated, first class postage prepaid, addressed as follows:

8

Mazaska Complaint Exhibit 3
014

Steven D. Sandven                     [ ]  U.S. Mail
12294 Gold Mountain Loop              [ ]  Certified Mail
Hill City, SD 57745                   [ ]  Facsimile
sdsandven@gmail.com                   [ ]  Federal Express
*Attorney for Petitioner*             [X]  Email

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: */s/ Jonathan P. McCoy*
  Jonathan P. McCoy
  *Attorneys for Appellant*
  704 St. Joseph Street
  P.O. Box 290
  Rapid City, SD 57709
  (605) 343-2410
  jmccoy@costellporter.com

## CERTIFICATE OF COMPLIANCE

  The undersigned, counsel for Appellant, certifies that the brief contains 2,022 words and 10,518 characters without spaces, exclusive of the Table of Contents, Table of Authorities, Jurisdictional Statement, Statement of Legal Issues, Appendix and Certificates of Counsel, and certifies that the name and the version of the word processing software used to prepare the brief is Microsoft Word 10 using Cambria font 12 and left justification.

  Dated this 11th day of October 2022.

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: */s/ Jonathan P. McCoy*
  Jonathan P. McCoy
  *Attorneys for Appellant*
  704 St. Joseph Street
  P.O. Box 290
  Rapid City, SD 57709
  (605) 343-2410
  jmccoy@costellporter.com

## CERTIFICATE OF PROOF OF FILING

  The undersigned hereby certifies that he served an electronic copy in Word format and an original and one physical copy of the above and foregoing **APPELLANT'S BRIEF** on

Mazaska Complaint Exhibit 3
015

the Clerk of the Supreme Court by depositing the same this date in the United States mail, postage prepaid, at Rapid City, South Dakota, addressed as follows:

> Clerk of the Supreme Court
> <u>  Oglala Lakota Sioux Tribe  </u>
> <u>  P.O Box 127                        </u>
> <u>  Pine Ridge, SD 57770            </u>
> Email address: bintulmalik@oglalacourt.org

Dated this 11th day of October 2022.

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: <u> /s/ Jonathan P. McCoy            </u>
  Jonathan P. McCoy
  *Attorneys for Appellant*
  704 St. Joseph Street
  P.O. Box 290
  Rapid City, SD 57709
  (605) 343-2410
  jmccoy@costellporter.com

Mazaska Complaint Exhibit 3 016

## APPENDICES

                                                                        PAGE

1.    Complaint ........................................................................    A-1

2.    Declaration of Steven Sandven, Exhibit 3 ...................................    A-10

3.    Declaration of Steven Sandven, Exhibit 6 ...................................    A-60

4.    Declaration of Steven Sandven, Exhibit 9 ...................................    A-64

5.    Order of Tribal Court denying Respondent/Appellee Motion .................    A-65

Mazaska Complaint Exhibit 3 017

Filed on: 11-30-21

Docket No.: CIV-21-0288

Recorded on: —

By: _____

IN CIVIL COURT
PINE RIDGE
Clerk of Court/Deputy Clerk
Oglala Sioux Tribal Court

OGLALA SIOUX TRIBAL COURT    )
OGLALA SIOUX TRIBE           )SS.
PINE RIDGE INDIAN RESERVATION )

LILLIAN "TONI" MONTILEAUX,
                    Petitioner

vs.

MAZASKA OWECASO OTIPI FINANCIAL,
INC.,
                    Respondent

Case No. CIV-21-0288

**COMPLAINT
AND
DEMAND FOR JURY TRIAL**

Comes now, Lillian "Toni" Montileaux (hereinafter the "Petitioner"), by and through her attorney of record, Steven D. Sandven, and submits this Complaint against Mazaska Owecaso Otipi Financial, Inc. (hereinafter the "Respondent") for breach of contract and the covenant of good faith and fair dealing and would state as follows:

## NATURE OF THE ACTION

1.      By this action, Petitioner seeks, inter alia, (i) damages for Respondent's breach of the Parties' Mortgage agreement and Note; (ii) damages for Respondent's breach of the covenant of good faith and fair dealing; (iii) compensatory and punitive damages; and (iv) a full accounting of Petitioner's loan history by an independent party.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to Chapter 1, Section 1 of the Oglala Sioux Tribe's Law and Order Code.

3.      This Court has subject matter over this action pursuant to Section 10 of the Note:

1

Appellant Appendices A000001

Mazaska Complaint Exhibit 3 018

This Note shall be governed by the law of the Tribe upon which the leasehold interest in the land is located and applicable federal law. The courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims relating to or arising out of this Note.

4.     Venue is proper here as the property, parties, and legal issues which are the subject of this action are located on and inextricably tied with the Tribe and its sovereign territory.

## PARTIES

5.     Petitioner is a natural person who is, and was at all times relevant hereto, a resident of Oglala Lakota County. Petitioner's mailing address is P.O. Box 7020, Pine Ridge, South Dakota 57770.

6.     Respondent is a Native Community Development Financial Institution that provides housing loans and financial and homebuyer education training to members of the Tribe living on, or in communities adjacent to, the Pine Ridge Indian Reservation and enrolled members of other federally recognized tribes in South Dakota.

7.     Respondent was formally organized as a nonprofit corporation under the laws of the State of South Dakota on June 14, 2004. Declaration of Steven D. Sandven ("Sandven Decl.") Exhibit 1.

8.     Respondent's registered agent is Tawney Brunsch with an address of P.O. Box 1996, 108 Oglala Street, Pine Ridge, South Dakota 57770. Sandven Decl. Exhibit 2.

## ALLEGATIONS COMMON TO ALL COUNTS

9.     On July 7, 2010, the Parties executed a mortgage (One Hundred Eighty Day Redemption) for repayment of Petitioner's debt in the amount of $51,634.00 ("First Mortgage"). Sandven Decl. Exhibit 3.

10.     Section 2 of the First Mortgage required Petitioner to remit a monthly sum to

2

Mazaska Complaint Exhibit 3 019

cover the following:

(a) yearly taxes and assessments which may attain priority as a lien, if any;

(b) yearly leasehold payments or ground rents, if any;

(c) yearly hazard or property insurance premiums;

(d) yearly flood insurance premiums, if any;

(e) yearly mortgage insurance premiums, if any; and

(f) any sums payable in lieu of the payment of mortgage insurance premiums.

11.    Additionally, Section 2 requires Respondent to give Petitioner, without charge, an annual accounting of the escrow account, showing credits and debits to the fund and the purpose for which each debit to the funds was made. *Id.* Petitioner has never received an annual accounting.

12.    Section 2 of the First Mortgage mandates that "[i]f the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law." *Id.*

13.    Section 3 of the First Mortgage provides that payments are to be applied first to escrow items, second to interest due, third to principal, and finally to, late charges. *Id.*

14.    On July 7, 2010, Petitioner executed the "First Note" therein promising to pay Respondent $51,634.00, plus interest at a yearly rate of 7.50%. *Id.* at Section 2.

15.    According to the First Note, Petitioner was to make monthly payments in the amount of $439.94 which would include a monthly insurance escrow amount of $90.33. *Id.* at Section 3. Interest was to be paid before principal. *Id.*

16.    The maturity date was set for July 6, 2020. *Id.*

17.    On December 1, 2010, the Parties executed a second mortgage (One Hundred Eighty Day Redemption) for repayment of Petitioner's debt in the amount of $54,084.00

3

Mazaska Complaint Exhibit 3 020

("Second Mortgage"). *Id.*

18.    The Second Note provided that the loan was to be paid in monthly installments of $439.94 which included $90.33 for escrow items. *Id.*

19.    Provisions of the Second Mortgage were the same as contained within the First Mortgage. *Id.*

20.    The maturity date on the Second Mortgage was July 6, 2015. *Id.*

21.    On April 19, 2011, the Parties executed a third mortgage (One Hundred Eighty Day Redemption) for repayment of Petitioner's debt in the amount of $66,370.25 ("Third Mortgage"). *Id.*

22.    Under the Third Note, payments were to made in monthly installments of $553.60 which included $90.33 for escrow items. *Id.*

23.    The maturity date on the Third Mortgage was May 10, 2016. *Id.*

24.    Provisions of the Third Mortgage were the same as contained within the First and Second Mortgages. *Id.*

25.    None of the loan documents held the former mortgage and note was superseded or had been renewed.  Thus, it appears that Petitioner received three different loans representing a sum total of $155,882.92 when in fact she only received $67,441.16. Sandven Decl. Exhibit 4.

26.    The First Mortgage and Promissory Note represented a loan for $51,634.00. Sandven Decl. Exhibit 3. Respondent's records show a commitment in the amount of $50,000 with an actual advance to Petitioner in the amount of $45,731.76. Sandven Decl. Exhibit 4.

27.    Under the First Note, Petitioner paid principal in the amount of $778.62, $969.75 in interest, and $451.65 for escrow.

28.    The Second Note was for the amount of $54,084 with a maturity date reduced by

4

Appellant Appendices A000004

Mazaska Complaint Exhibit 3
021

six years to July 6, 2015. Sandven Decl. Exhibit 3. A new commitment of $17,441.16 was made by Respondent with an advance to Petitioner for $8,352.24. Sandven Decl. Exhibit 4.

29.     Petitioner paid principal in the amount of $372.13, $1,246.55 in interest, and $361.32 for escrow under the second note.

30.     The Third Note evidenced a debt in the amount of $66,370.25. Sandven Decl. Exhibit 3. No new commitment was issued but advances were made in the amount of $13,357.16. Sandven Decl. Exhibit 4.

31.     Under the Third Note, Petitioner paid principal in the amount of $28,761.94, $38,440.11 in interest, and $12,810.11 for escrow.

32.     On April 14, 2021, Respondent notified Petitioner that Loan No. 10-0019 was maturing on May 10, 2021 (the "Notice"). Sandven Decl. Exhibit 5. Petitioner had never agreed, nor had she been provided notice by the Respondent, that the maturity date was extended by six (6) additional years.

33.     The Notice informed Petitioner that her current loan balance was $37,878.67 (Principal $37,717.13, Interest $124.00 and Escrow $37.54). *Id.* If Respondent's calculations are correct, Plaintiff would be responsible for paying $122,926.35 in total for the $67,441.16 loan.

34.     On May 19, 2021, Petitioner requested an accounting of her loan history. Sandven Decl. Exhibit 6.

35.     Petitioner informed Respondent that her records demonstrated that she had made $85,047.68 in payments. *Id.*

36.     According to Respondent's own records, Petitioner received $67,441.16 in advances originating on July 7, 2010. *Id.* She consistently made scheduled payments and oftentimes paid more than what was due. *Id.*

5

Mazaska Complaint Exhibit 3 022

37.    The promissory notes dated July 7, 2010, December 1, 2010, and April 19, 2011, all provided that a monthly payment of $90.33 would be set aside for escrow. *Id*. However, the amounts set aside for escrow never equaled that amount after October 12, 2011. Petitioner argued, based thereon, that all amounts above and beyond $90.33 should have been applied to principal. *Id*.

38.    Commencing on March 1, 2016, Respondent's records show they deducted escrow fees bi-weekly instead of monthly as required by the promissory note. *Id*.

39.    Respondent also deducted $114.92 per month for approximately a year. *Id*. Said amount was raised to $151.75 the following year and raised again to $165.00 per month the year thereafter. *Id*.

40.    As there is no property tax on the real estate subject to the mortgage, escrow funds would solely be used to cover insurance. *Id*. According to Petitioner's records, premiums from 2015 through 2022 were as follows:

| | |
|---|---|
| 2015-2016 | $709.00 |
| 2016-2017 | $795.00 |
| 2017-2018 | $815.00 |
| 2018-2019 | $840.00 |
| 2019-2020 | $947.00 |
| 2020-2021 | $976.00 |
| 2021-2022 | $1,067.00 |

Respondent charged Petitioner $165.00 per month for the end period of 2015 and $118.16 for the first part of 2016.  Thus, for period 2016-2017, she overpaid $989.96. *See* Sandven Decl. at Exhibit 4. Petitioner was provided no information as to where the overpayment was applied, and Respondent's attempt at an accounting was unresponsive.

41.    Respondent's records noted several "escrow releases" totaling $9,186.00. *Id*. Petitioner was provided no information as to what the notations signified.

6

Appellant Appendices A000006

Mazaska Complaint Exhibit 3
023

42.     None of the promissory notes or the mortgages authorize Respondent to impose administrative fees on the transaction. *Id.* An amount of $663.11 for such fees was added to Petitioner's outstanding balance on April 19, 2011, and then deducted that same day. *Id.*

43.     Respondent failed to record any of the mortgages with the Bureau of Indian Affairs prior to their maturity dates. Sandven Decl. Exhibit 7.

44.     On June 1, 2021, an update on Petitioner's request for an accounting was requested from Respondent. Sandven Decl. Exhibit 8.

45.     On June 4, 2021, Respondent's legal counsel responded to Petitioner's request, but did not tell Petitioner an accounting would be forthcoming. Sandven Decl. Exhibit 9.

46.     On June 8, 2021, the undersigned provided notice to Respondent's legal representation that Petitioner intended to file a lawsuit if an accounting was not completed within fourteen (14) days. Sandven Decl. Exhibit 10.

47.     On June 15, 2021, Respondent's legal counsel requested a thirty (30) day extension for which to respond. Sandven Decl. Exhibit 11.

48.     On July 22, 2021, an update on the accounting was requested from Respondent's legal counsel. Sandven Decl. Exhibit 12.

49.     On September 30, 2021, Respondent's legal counsel provided insurance declarations and other documents said to comply with Section 2 of the mortgage. Sandven Decl. Exhibit 13.

50.     Petitioner has never agreed to extend the maturity date beyond May 10, 2016, nor did she agree to the interest rate imposed by Respondent after the maturity date had elapsed.

## CLAIMS

## COUNT I
### (BREACH OF CONTRACT)

7

Appellant Appendices A000007

Mazaska Complaint Exhibit 3
024

51.     Petitioner realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 50.

52.     The Mortgages and Notes constitute valid and binding contracts between Petitioner and Respondent.

53.     The Respondent has breached its contractual obligations by failing and refusing to properly account for the escrow funds as required by Section 2 of the Third Mortgage, unilaterally extending the maturity date as delineated in the Third Note, and not applying Petitioner's payments in accordance with the Third Mortgage.

54.     The Respondent is liable to Petitioner for all damages which Petitioner has sustained as a result of its breaches of the Third Mortgage and Third Note, together with costs, interest and attorneys' fees.

## COUNT II
## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

55.     Petitioner realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 54.

56.     The Mortgage and Note constitute contracts which required the Respondent to act in good faith and to deal fairly with Petitioner.

57.     The Respondent has breached the covenant of good faith and fair dealing under the Third Mortgage and Third Note by breaching the foregoing agreements.

58.     By virtue of the Respondent's breaches of the covenant of good faith and fair dealing, Petitioner has sustained damages.

59.     Respondent is liable to Petitioner for all damages sustained by Petitioner, together with costs, interest and attorneys' fees.

WHEREFORE, Petitioner demands:

8

Mazaska Complaint Exhibit 3
025

1.    That judgment be entered in her favor and against the Respondent as to Counts I and II, for all damages Petitioner has sustained, together with costs, interest and attorneys' fees;

2.    That this Court award Petitioner compensatory and punitive damages;

3.    That this Court order a full accounting of Petitioner's loan history by an independent party at the expense of Respondent.

4.    Petitioner be awarded such other and further relief as is proper and just.

PETITIONER DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated this 31st day of October, 2021.

                        STEVEN D. SANDVEN, Law Office PC

                        By:

                        STEVEN D. SANDVEN
                        Attorney for Petitioner
                        12294 Gold Mountain Loop
                        Hill City SD 57745
                        Telephone: 605 206-7400
                        Facsimile 605 206-7588
                        sdsandven@gmail.com

9

Mazaska Complaint Exhibit 3 026

OGLALA SIOUX TRIBAL COURT          )
OGLALA SIOUX TRIBE                 )SS.
PINE RIDGE INDIAN RESERVATION      )

IN CIVIL COURT
PINE RIDGE

LILLIAN "TONI" MONTILEAUX,
       Petitioner

vs.

MAZASKA OWECASO OTIPI FINANCIAL,
INC.,
       Respondent

Case No. CIV_____

**DECLARATION**
**OF**
**STEVEN D. SANDVEN. ESQ.**

STEVEN D. SANDVEN submits this declaration in support of Petitioner's Complaint:

1. I make this declaration based upon my own personal knowledge.

2. I am over the age of eighteen and if called to testify, I would testify consistent with this declaration.

3. Attached as Exhibit 1 is a true and correct copy the Certificate of Incorporation for Mazaska Owecaso Otipi Financial, Inc. ("Mazaska") dated June 14, 2004, and the entity's Annual Reports from 2004 to 2020.

4. Attached as Exhibit 2 is a true and correct of the 2021 Annual Report of Mazaska dated May 17, 2021.

5. Attached as Exhibit 3 is a true and correct copy of the Mortgage One Hundred Eighty Day Redemption dated May 11, 2011, the Note dated April 19, 2011, the Mortgage One Hundred Eighty Day Redemption dated July 7, 2010, the Note dated July 7, 2010, the Mortgage One Hundred Eighty Day Redemption dated December 1, 2010, and the Note dated December 1, 2010.

6. Attached as Exhibit 4 is a true and correct copy of the Loan Details Report dated April 19, 2021, received from Mazaska.

7. Attached as Exhibit 5 is a true and correct copy of correspondence from Amanda Standing Bear, Housing Specialist for Mazaska to Petitioner dated April 14, 2021.

1

Appellant Apprendices A000010

Mazaska Complaint Exhibit 3
027

8.     Attached as Exhibit 6 is a true and correct copy of correspondence from the undersigned to Amanda Standing Bear dated May 19, 2021.

9.     Attached as Exhibit 7 is a true and correct copy of email correspondence between staff from the Bureau of Indian Affairs and Mazaska dated December 1-2, 2020,

10.    Attached as Exhibit 8 is a true and correct copy of an email between the undersigned's office and Amanda Standing Bear dated June 1, 2021.

11.    Attached as Exhibit 9 is a true and correct copy of correspondence from Jonathan McCoy, attorney for Mazaska, to the undersigned dated June 4, 2021.

12.    Attached as Exhibit 10 is a true and correct copy of correspondence from my office to Mr. McCoy dated June 8, 2021.

13.    Attached as Exhibit 11 is a true and correct copy of correspondence from Mr. McCoy to the undersigned dated Jun 15, 2021.

14.    Attached as Exhibit 12 is a true and correct copy of email correspondence between the undersigned's office and Mr. McCoy dated July 22, 2021.

15.    Attached as Exhibit 13 is a true and correct copy is a true and correct copy of correspondence from Mr. McCoy to the undersigned dated September 30, 2021.

Dated this 31st day of October, 2021.

STEVEN D. SANDVEN, Law Office PC

By:

STEVEN D. SANDVEN
Attorney for Petitioner
12294 Gold Mountain Loop
Hill City SD 57745
Telephone: 605 206-7400
Facsimile 605 206-7588
sdsandven@gmail.com

2

Appellant Apprendices A000011

Mazaska Complaint Exhibit 3
028

# MORTGAGE
## ONE HUNDRED EIGHTY DAY REDEMPTION

**THIS MORTGAGE** ("Security Instrument") is given on <u>April 19, 2011</u>. The mortgagee (that is, the Borrower):

a)     Is, <u>Lillian  A. Montileaux</u>      or     COPY
b)     are <u>N/A</u>
c)     and <u>N/A</u>

("Borrower") This Mortgage is a Security Instrument given to MAZASKA OWECASO OTIPI FINANCIAL, INC., which is organized and existing under the laws of THE STATE OF SOUTH DAKOTA, and whose address is P?O. BOX 1996, PINE RIDGE, SOUTH DAKOTA, 57770 ("Lender").

Borrower owes Lender the principal sum of <u>Sixty Six Thousand-Three Hundred Seventy Dollars and Twenty Five Cents</u> (U.S. $<u>66,370.25</u>). This debt is evidenced by Borrower's note ("Note") dated the same date as this Security Instrument, which provides for monthly payment, with the full debt, if not paid earlier, due and payable on May 10, 2016.

This Security Instrument secures to Lender: <u>Mazaska Owecaso Otipi Financial, Inc</u>

(a)     the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note;
(b)     the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and [none]
(c)     the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in Shannon County, South Dakota, which has the address of: NWl/4SWl/4NEl/4NEl/4,S18-39-41,Shannon County, South Dakota (Property address) 10 acres.

THIS IS A PURCHASE MONEY SECURITY INSTRUMENT
TAX STATEMENTS SHOULD BE SENT TO:

MAZASKA OWECASO OTIPI FINANCIAL, INC, PO BOX 1996
PINE RIDGE, SOUTH DAKOTA, 57770,

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

EXHIBIT 3
Page 1 of 10

## UNIFORM COVENANTS

### BORROWER AND LENDER COVENANT AND AGREE AS FOLLOWS:

1.    **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of, and interest, on the debt evidenced by the Note and any prepayment and late charges due under the Note. There are no prepayment penalties on this Note.

2.    **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender. Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for:

(a)       yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property, if any;

(b)       yearly leasehold payments or ground rents on the Property, if any;

(c)       yearly hazard or property insurance premiums;

(d)       yearly flood insurance premiums, if any;

(e)       yearly mortgage insurance premiums, if any; and

(f)       any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums.

These items are called "Escrow items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Page 2 of 10

Appellant Apprendices A000013

Mazaska Complaint Exhibit 3 030

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied:

FIRST: to amounts payable under paragraph 2;
SECOND: to interest due;
THIRD: to principal due;
LAST: to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property, which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:

(a)  agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender;

(b)  contests in good faith the lien by, or defends against, enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or

(c)  secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

If Lender determines that any part of the Property is subject to a lien that may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval, which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and

Page 3 of 10

Appellant Apprendices A000014

Mazaska Complaint Exhibit 3
031

Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provision of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the property. Lender's actions may include paying any sums secured by a lien, which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Page 4 of 10

Appellant Apprendices A000015

Mazaska Complaint Exhibit 3 032

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternative mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or in accordance with applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction:

(a)     the total amount of the sums secured immediately before the taking, divided by
(b)     the fair market value of the Property immediately before the taking.

Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemner offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

Page 5 of 10

Appellant Apprendices A000016

Mazaska Complaint Exhibit 3
033

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceeding against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of, or preclude the exercise of, any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note:

(a)     is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument;

(b)     is not personally obligated to pay the sums secured by this Security Instrument; and

(c)     agrees that Lender and any other Borrowers may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then:

(a)     any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and

(b)     any sums already collected from Borrower that exceeded permitted limits will be refunded to Borrower.

Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law, and tribal law, and the law of the state in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

Page 6 of 10

Appellant Apprendices A000017

Mazaska Complaint Exhibit 3
034

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrowers fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument or applicable laws without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of:

(a)      5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or

(b)      entry of a judgment enforcing this Security Instrument.

Those conditions are that Borrower:

(a)      pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred;

(b)      cures any default of any other covenants or agreements;

(c)      pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' and legal fees; and

(d)      takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged.

Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The note will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Page 7 of 10

Appellant Apprendices A000018

Mazaska Complaint Exhibit 3
035

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

## NON-UNIFORM COVENANTS

### BORROWER AND LENDER FURTHER COVENANT AND AGREE AS FOLLOWS:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify:

| | |
|---|---|
| (a) | the default; |
| (b) | the action required to cure the default; |
| (c) | a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and |
| (d) | that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. |

The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' and legal fees and costs, including costs of title evidence.

In case of foreclosure of this Mortgage by action, the holder of the Certificate of Sale may apply to the Court for a reduction of the redemption period if the property has been abandoned by Mortgagor. If, after notice to the parties as the Court directs, the Court finds the property has been abandoned, the redemption period may be reduced by the Court to not less than sixty days from the date of recording the Certificate of Sale.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender shall sell the Property in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order:

Page 8 of 10

Appellant Apprendices A000019

Mazaska Complaint Exhibit 3
036

| | |
|---|---|
| (a) | to all expenses of the sale, including, but not limited to, reasonable attorneys' and legal fees; |
| (b) | to all sums secured by this Security Instrument; and |
| (c) | any excess to the clerk of the court subject to the order of the court. |

### NOTICE

**THE PARTIES AGREE THAT THE PROVISIONS OF THE STATE OF SOUTH DAKOTA'S ONE HUNDRED EIGHTY DAY REDEMPTION MORTGAGE ACT GOVERN THIS MORTGAGE**

**22. Releases.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**23. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**24. Area of the Property.** The Property is forty (40) acres or less in area.

**25. Rider to this Security Instrument.** If one or more riders are executed by Borrowers and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| X Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☐ Other(s) [specify] | | |

**26. Deficiency Judgment.** Borrower agrees to pay to Lender, in the event of foreclosure of this Mortgage, the difference between the net proceeds of foreclosure and sale and the total sums secured by this Mortgage, if the net proceeds of sale and foreclosure are less than the total sums then due and outstanding and secured by this Mortgage, and only if the Lender is the successful purchaser at such sale.

**27. Misrepresentation.** The Borrower understands that the sums secured by the Mortgage are derived from funding pursuant to the U. S. Department of Treasury Community Development Financial Institutions Fund and Regulations pertaining thereto. To induce the Lender to advance these sums, the Borrower has made several representations all as set forth in the Borrower's Mortgagor's Affidavit to even date herewith. If any of these representations are ascertained to be not true, the Lender may at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration. Such notice shall provide a period of not less than 30 days from the date of the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by law. If Lender waives the right to accelerate hereunder, such a waiver shall not constitute a waiver of the right to rescind, or any other remedy available to Lender.

Page 9 of 10

Appellant Apprendices A000020

Mazaska Complaint Exhibit 3
037

28. **Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable. This assignment of rents shall be effective until the payment of all sums secured by this Mortgage or, in the event of foreclosure, until the period of redemption expires. Regardless of extinguishment of the debt by a foreclosure sale, this assignment shall continue for the benefit of the purchaser at such sale.

Upon acceleration under paragraph 17 hereof accompanied by abandonment of the Property, Lender, in person, by agent, or by its appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Upon such acceleration not accompanied by abandonment, Lender shall be entitled, upon commencement of action for foreclosure or at any time prior to the expiration of any period of redemption following judicial sale, to have a receiver appointed by the Court, which receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receivers' fees, premiums on receiver's bonds and reasonable attorneys' and legal fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only of those or rents actually received.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with the Security Instrument.

_____  _____  4 May 2011
Lillian A Montileaux              Borrower    Date

_____  _____  May 11, 2011
Mazaska Owecaso Otipi Financial, Inc.    Lender    Date

STATE OF SOUTH DAKOTA
                                    SS.
COUNTY OF __Shannon__

On this the 11th day of __May__, 2011, before me, the undersigned officer, personally appeared_____ on behalf of _____, known to be or satisfactorily proven to be the person(s) whose name is/are subscribed to the within instrument and acknowledged that he/she/they are authorized to do so, and executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires: __03-20-2013__

Page 10 of 10

# NOTE

Date: April 19, 2011

Borrower:        Lillian A. Montileaux

Lender:          Mazaska Owecaso Otipi Financial, Inc.

Property Address: NW1/4, SW1/4, NE1/4, NE1/4 of Section 18, Township 39 N., Range 41
                 W. Shannon County, SD, 10 Acres.

## 1. BORROWER'S PROMISE TO PAY

In return for a loan by Lender to Borrower, Borrower promises to pay U.S. $66,370.25 (this
amount will be called "principal"), plus interest, to the order of the Lender. Lender is Mazaska
Owecaso Otipi Financial, Inc. Borrower understands that Lender may transfer this Note. Lender
and anyone who takes this Note by transfer and who is entitled to receive payments under this
Note is called "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.
Borrower will pay interest at a yearly rate of 7.50%.

## 3. PAYMENTS

Borrower will pay principal and interest by making payments each month of U.S. $553.60. This
includes a monthly insurance escrow amount of $90.33. Borrower will make such payments on
the 10th day of each month beginning on May 10, 2011. Borrower will make these payments
every month until all of the principal and interest and any other charges, described below, that
Borrower may owe under this Note are paid. Borrower's monthly payments will be applied to
interest before principal. If, on May 10, 2016, Borrower still owes amounts under this Note,
Borrower will pay all those amounts, in full, on that date, which is called the "maturity date."

Borrower will make such monthly payments at Mazaska Owecaso Otipi Financial, Inc. PO Box
1996, Pine Ridge, SD 57770 or at a different place if required in writing by Note Holder.

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If Note Holder has not received the full amount of any monthly payment by the end of fifteen
(15) calendar days after the date it is due, Borrower will pay a late charge to Note Holder. The
amount of the charge will be $25.00 Borrower will pay this late charge promptly, but only once
on any late payment.

Appellant Apprendices A000022

Mazaska Complaint Exhibit 3
039

**(B) Default**
If Borrower does not pay the full amount of each monthly payment on the date it is due, Borrower will be in default.

**(C) Notice of Default**
If Borrower is in default, Note Holder may send Borrower notice as provided in Section 8 below telling Borrower that if Borrower does not pay the overdue amount by a certain date, Note Holder may require Borrower to pay immediately the full amount of principal which has not been paid and all the interest that Borrower owes on that amount. That date must be at least 60 days after the date on which the notice is delivered to Borrower.

**(D) No Waiver by Note Holder**
Even if, at a time when Borrower is in default, Note Holder does not require Borrower to pay immediately in full as described above, Note Holder will still have the right to do so if Borrower is in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If Note Holder has required Borrower to pay immediately in full as described above, Note Holder will have the right to be paid back by Borrower for all of its reasonable costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE SECURED BY A LEASEHOLD MORTGAGE**
In addition to the protections given to Note Holder under this Note, a Leasehold Mortgage of even date herewith protects Note Holder from possible losses that might result if Borrower does not keep the promises made in this Note. That Mortgage describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts that Borrower owes under this Note.

**6. BORROWER'S RIGHT TO PREPAY**
Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When Borrower makes a prepayment, Borrower will tell Note Holder in writing that Borrower is doing so. A prepayment of all unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." Borrower may make a full prepayment or a partial prepayment without any penalty. Note Holder will use all of Borrower's prepayments to reduce the amount of principal that Borrower owes under this Note. If Borrower makes a partial prepayment, there will be no changes in the due dates or changes in the amounts of Borrower's monthly payment unless Note Holder agrees in writing to those changes. Borrower may make a full prepayment at any time. If Borrower chooses to make a partial prepayment, Note Holder may require Borrower to make the prepayment on the same day that one of the monthly payments is due.

**7. WAIVERS**
Borrower waives his or her rights to require Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"). Anyone else who agrees to

Appellant Apprendices A000023

Mazaska Complaint Exhibit 3 040

keep the promises made in this Note, or who agrees to make payments to Note Holder if Borrower fails to keep his or her promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons may include "guarantors, sureties and endorsers."

## 8. GIVING OF NOTICES

Any notice to Borrower in connection with this Note shall be deemed to have been given to Borrower upon delivering a copy of the notice directly to the Borrower or on the third day after the notice is mailed to Borrower by first class mail, unless the third day is a Saturday, Sunday, or legal holiday, in which case notice shall be deemed to have been given on the next day which is not a Saturday, Sunday or legal holiday as legal holiday is defined in the Federal Rules of Civil Procedure. If any other notice is required under the law governing this Note, the requirements of such governing law concerning notice shall be complied with. Any notice to Note Holder shall be deemed to have been given to Lender by mailing it by first class mail to Note Holder's address designated herein.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over Borrower's rights or obligations under this Note will have all of Borrower's rights and must keep all of Borrower's promises made in this Note. Note Holder may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of such persons may be required to pay all of the amounts owed under this Note.

## 10. GOVERNING LAW; SEVERABILITY

This Note shall be governed by the law of the Tribe upon which the leasehold interest in the land is located and applicable federal law. The courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims relating to or arising out of this Note. In the event that any provision or clause of this Note conflicts with applicable law, such conflict shall not affect other provisions of this Note which can be given effect without the conflicting provision. To this end, the provisions of this Note are declared to be severable.

## 11. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Borrower which exceeded permitted time limits will be refunded to Borrower. Note Holder may choose to make this refund by reducing the principal Borrower owes under this Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Mazaska Complaint Exhibit 3
041

_[signature]_
Borrower: Lillian A. Monitleaux

_[signature]_ May 11, 2011
Date

_[signature]_
Colleen Steele, Executive Director
Lender: Mazaska Owecaso Otipi Financial, Inc.

_[signature]_ May 11, 2011
Date

Appellant Apprendices A000025

Mazaska Complaint Exhibit 3 042

# MORTGAGE
## ONE HUNDRED EIGHTY DAY REDEMPTION

**THIS MORTGAGE** ("Security Instrument") is given on <u>July 7, 2010</u>. The mortgagee (that is, the Borrower):

a)      Is, <u>Lillian A. Montileaux</u> _____      or
b)      are <u>N/A</u>
c)      and <u>N/A</u>

("Borrower")  This Mortgage is a Security Instrument given to MAZASKA OWECASO OTIPI FINANCIAL, INC., which is organized and existing under the laws of THE STATE OF SOUTH DAKOTA, and whose address is P.O. BOX 1996, PINE RIDGE, SOUTH DAKOTA, 57770 ("Lender").

Borrower owes Lender the principal sum of <u>Fifty One Thousand Six Hundred thirty four dollars and no /cents</u> (U.S. $<u>51,634.00</u>). This debt is evidenced by Borrower's note ("Note") dated the same date as this Security Instrument, which provides for monthly payment, with the full debt, if not paid earlier, due and payable on July 7, 2021.

This Security Instrument secures to Lender: <u>Mazaska Owecaso Otipi Financial, Inc</u>

(a)      the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note;
(b)      the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and [none]
(c)      the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in Shannon County, South Dakota, which has the address of: NW1/4SW1/4NE1/4NE1/4,S18-39-41,Shannon County, South Dakota (Property address), 2.5 acres.

THIS IS A PURCHASE MONEY SECURITY INSTRUMENT
TAX STATEMENTS SHOULD BE SENT TO:

MAZASKA OWECASO OTIPI FINANCIAL, INC, PO BOX 1996
PINE RIDGE, SOUTH DAKOTA, 57770,

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Mazaska Owecaso Otipi Financial, Inc.                                          Page 1 of 11

Appellant Apprendices A000026

Mazaska Complaint Exhibit 3
043

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

## UNIFORM COVENANTS

### BORROWER AND LENDER COVENANT AND AGREE AS FOLLOWS:

1.    **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of, and interest, on the debt evidenced by the Note and any prepayment and late charges due under the Note. There are no prepayment penalties on this Note.

2.    **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for:

(a)        yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property, if any;
(b)        yearly leasehold payments or ground rents on the Property, if any;
(c)        yearly hazard or property insurance premiums;
(d)        yearly flood insurance premiums, if any;
(e)        yearly mortgage insurance premiums, if any; and
(f)        any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums.

These items are called "Escrow items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Mazaska Owecaso Otipi Financial, Inc.                                              Page 2 of 11

Mazaska Complaint Exhibit 3
044

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3.    **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied:

FIRST: to amounts payable under paragraph 2;
SECOND: to interest due;
THIRD: to principal due;
LAST: to any late charges due under the Note.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property, which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:

(a)    agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender;

(b)    contests in good faith the lien by, or defends against, enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or

(c)    secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

If Lender determines that any part of the Property is subject to a lien that may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval, which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be

Mazaska Owecaso Otipi Financial, Inc.                                          Page 3 of 11

Appellant Apprendices A000028

Mazaska Complaint Exhibit 3
045

lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provision of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the property. Lender's actions may include paying any sums secured by a lien, which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternative mortgage insurer approved by Lender. If

Mazaska Owecaso Otipi, Inc.                                                                 Page 4 of 11

Appellant Apprendices A000029

Mazaska Complaint Exhibit 3
046

substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or in accordance with applicable law.

9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction:

(a)      the total amount of the sums secured immediately before the taking, divided by
(b)      the fair market value of the Property immediately before the taking.

Any balance shall be paid to Borrower. In the even of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceeding against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of, or preclude the exercise of, any right or remedy.

Mazaska Owecaso Otipi, Inc.                                                              Page 5 of 11

Mazaska Complaint Exhibit 3
047

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note:

(a)     is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument;

(b)     is not personally obligated to pay the sums secured by this Security Instrument; and

(c)     agrees that Lender and any other Borrowers may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then:

(a)     any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and

(b)     any sums already collected from Borrower that exceeded permitted limits will be refunded to Borrower.

Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law, and tribal law, and the law of the state in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrowers fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument or applicable laws without further notice or demand on Borrower.

Mazaska Owecaso Otipi Financial, Inc.                                          Page 6 of 11

Appellant Apprendices A000031

Mazaska Complaint Exhibit 3
048

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of:

(a)     5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or

(b)     entry of a judgment enforcing this Security Instrument.

Those conditions are that Borrower:

Mazaska Owecaso Otipi Financial, Inc.                                            Page 7 of 11

Appellant Apprendices A000032

Mazaska Complaint Exhibit 3 049

        ~~pays Lender all sums which then would be due under this Security Instrument and the~~ Note as if no acceleration had occurred;

(b)        cures any default of any other covenants or agreements;

(c)        pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' and legal fees; and

(d)        takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged.

Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

    **19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The note will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

    **20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

    Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

    As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

## NON-UNIFORM COVENANTS

### BORROWER AND LENDER FURTHER COVENANT AND AGREE AS FOLLOWS:

Page 8 of 11

Appellant Apprendices A000033

Mazaska Complaint Exhibit 3
050

USI Partnership for Housing, Inc.
NAHASDA § 506

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify:

(a) the default;
(b) the action required to cure the default;
(c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and
(d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.

The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' and legal fees and costs, including costs of title evidence.

In case of foreclosure of this Mortgage by action, the holder of the Certificate of Sale may apply to the Court for a reduction of the redemption period if the property has been abandoned by Mortgagor. If, after notice to the parties as the Court directs, the Court finds the property has been abandoned, the redemption period may be reduced by the Court to not less than sixty days from the date of recording the Certificate of Sale.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender shall sell the Property in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order:

(a) to all expenses of the sale, including, but not limited to, reasonable attorneys' and legal fees;
(b) to all sums secured by this Security Instrument; and
(c) any excess to the clerk of the court subject to the order of the court.

## NOTICE

### THE PARTIES AGREE THAT THE PROVISIONS OF THE STATE OF SOUTH DAKOTA'S ONE HUNDRED EIGHTY DAY REDEMPTION MORTGAGE ACT GOVERN THIS MORTGAGE

22. **Releases.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. **Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

24. **Area of the Property.** The Property is forty (40) acres or less in area.

25. **Rider to this Security Instrument.** If one or more riders are executed by Borrowers and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be

Page 9 of 11

Appellant Apprendices A000034

Mazaska Complaint Exhibit 3
051

OST Partnership for Housing, Inc.
NAHASDA § 506

incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

☐ Adjustable Rate Rider      ☐ Condominium Rider              ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ Balloon Rider              ☐ Rate Improvement Rider         ☐ Second Home Rider
☐ Other(s) [specify]

 **26. Deficiency Judgment.** Borrower agrees to pay to Lender, in the event of foreclosure of this Mortgage, the difference between the net proceeds of foreclosure and sale and the total sums secured by this Mortgage, if the net proceeds of sale and foreclosure are less than the total sums then due and outstanding and secured by this Mortgage, and only if the Lender is the successful purchaser at such sale.

 **27. Misrepresentation.** The Borrower understands that the sums secured by the Mortgage are derived from funding pursuant to the U. S. Department of Treasury Community Development Financial Institutions Fund and Regulations pertaining thereto. To induce the Lender to advance these sums, the Borrower has made several representations all as set forth in the Borrower's Mortgagor's Affidavit to even date herewith. If any of these representations are ascertained to be not true, the Lender may at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable.

 If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration. Such notice shall provide a period of not less than 30 days from the date of the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by law. If Lender waives the right to accelerate hereunder, such a waiver shall not constitute a waiver of the right to rescind, or any other remedy available to Lender.

 **28. Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable. This assignment of rents shall be effective until the payment of all sums secured by this Mortgage or, in the event of foreclosure, until the period of redemption expires. Regardless of extinguishment of the debt by a foreclosure sale, this assignment shall continue for the benefit of the purchaser at such sale.

 Upon acceleration under paragraph 17 hereof accompanied by abandonment of the Property, Lender, in person, by agent, or by its appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Upon such acceleration not accompanied by abandonment, Lender shall be entitled, upon commencement of action for foreclosure or at any time prior to the expiration of any period of redemption following judicial sale, to have a receiver appointed by the Court, which receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receivers' fees, premiums on receiver's bonds and reasonable attorneys' and legal fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only of those or rents actually received.

Page 10 of 11

Appellant Apprendices A000035

Mazaska Complaint Exhibit 3
052

UST Partnership for Housing, Inc.
NAHASDA § 506

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with the Security Instrument.

_Lillian A Montileaux_ (Seal)       N/A _____ (Seal)
Lillian A Montileaux          Borrower       Mazaska Owecaso Otipi Financial    Lender

N/A _____ (Seal)
                  Borrower

STATE OF SOUTH DAKOTA
                                    SS.
COUNTY OF Shannon

On this the 7th day of July, 2010, before me, the undersigned officer, personally appeared _Lillian Montileaux_ on behalf of _Kirseth_, known to be or satisfactorily proven to be the person(s) whose name is/are subscribed to the within instrument and acknowledged that he/she/they are authorized to do so, and executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

(SEAL)                      _Sandra Bilbtyn_
                            Notary Public

                            My Commission expires
                            on Oct-04-2011

SANDRA BETTELYOUN
NOTARY PUBLIC
SOUTH DAKOTA

Page 11 of 11

Mazaska Complaint Exhibit 3
053

# NOTE

COPY

Date: July 7, 2010

Borrower:          Lillian Antoinette Montileaux

Lender:            Mazaska Owecaso Otipi Financial, Inc.

Property Address:  NW1/4SW1/4NE1/4NE1/4, S18-39-41
                   Shannon County, South Dakota 2.5 Acres

.............................................................................................................................................

## 1. BORROWER'S PROMISE TO PAY
In return for a loan by Lender to Borrower, Borrower promises to pay U.S. $51,634.00 (this amount will be called "principal"), plus interest, to the order of the Lender. Lender is Mazaska Owecaso Otipi Financial, Inc. Borrower understands that Lender may transfer this Note. Lender and anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 7.50%.

## 3. PAYMENTS
Borrower will pay principal and interest by making payments each month of U.S. $439.94. This includes a monthly insurance escrow amount of $90.33. Borrower will make such payments on the 7th day of each month beginning on August 6, 2010. Borrower will make these payments every month until all of the principal and interest and any other charges, described below, that Borrower may owe under this Note are paid. Borrower's monthly payments will be applied to interest before principal. If, on July 6, 2020, Borrower still owes amounts under this Note, Borrower will pay all those amounts, in full, on that date, which is called the "maturity date."

Borrower will make such monthly payments at Mazaska Owecaso Otipi Financial, Inc. PO Box 1996, Pine Ridge, SD. 57770 or at a different place if required in writing by Note Holder.

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments
If Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, Borrower will pay a late charge to Note Holder. The amount of the charge will be $25.00 Borrower will pay this late charge promptly, but only once on any late payment.

### (B) Default
If Borrower does not pay the full amount of each monthly payment on the date it is due, Borrower will be in default.

### (C) Notice of Default
If Borrower is in default, Note Holder may send Borrower notice as provided in Section 8 below telling Borrower that if Borrower does not pay the overdue amount by a certain date, Note Holder may require Borrower to pay immediately the full amount of principal which has not been paid and all the interest that Borrower owes on that amount. That date must be at least 60 days after the date on which the notice is delivered to Borrower.

### (D) No Waiver By Note Holder
Even if, at a time when Borrower is in default, Note Holder does not require Borrower to pay immediately in full as described above, Note Holder will still have the right to do so if Borrower is in default at a later time.

Appellant Apprendices A000037

Mazaska Complaint Exhibit 3
054

**(E) Payment of Note Holder's Costs and Expenses**
If Note Holder has required Borrower to pay immediately in full as described above, Note Holder will have the right to be paid back by Borrower for all of its reasonable costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE SECURED BY A LEASEHOLD MORTGAGE**
In addition to the protections given to Note Holder under this Note, a Leasehold Mortgage of even date herewith protects Note Holder from possible losses that might result if Borrower does not keep the promises made in this Note. That Mortgage describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts that Borrower owes under this Note.

**6. BORROWER'S RIGHT TO PREPAY**
Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When Borrower makes a prepayment, Borrower will tell Note Holder in writing that Borrower is doing so. A prepayment of all unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." Borrower may make a full prepayment or a partial prepayment without any penalty. Note Holder will use all of Borrower's prepayments to reduce the amount of principal that Borrower owes under this Note. If Borrower makes a partial prepayment, there will be no changes in the due dates or changes in the amounts of Borrower's monthly payment unless Note Holder agrees in writing to those changes. Borrower may make a full prepayment at any time. If Borrower chooses to make a partial prepayment, Note Holder may require Borrower to make the prepayment on the same day that one of the monthly payments is due.

**7. WAIVERS**
Borrower waives his or her rights to require Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to Note Holder if Borrower fails to keep his or her promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons may include "guarantors, sureties and endorsers."

**8. GIVING OF NOTICES**
Any notice to Borrower in connection with this Note shall be deemed to have been given to Borrower upon delivering a copy of the notice directly to the Borrower or on the third day after the notice is mailed to Borrower by first class mail, unless the third day is a Saturday, Sunday, or legal holiday, in which case notice shall be deemed to have been given on the next day which is not a Saturday, Sunday or legal holiday as legal holiday is defined in the Federal Rules of Civil Procedure. If any other notice is required under the law governing this Note, the requirements of such governing law concerning notice shall also be complied with. Any notice to Note Holder shall be deemed to have been given to Lender by mailing it by first class mail to Note Holder's address designated herein.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over Borrower's rights or obligations under this Note will have all of Borrower's rights and must keep all of Borrower's promises made in this Note. Note Holder may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of such persons may be required to pay all of the amounts owed under this Note.

**10. GOVERNING LAW; SEVERABILITY**
This Note shall be governed by the law of the Tribe upon which the leasehold interest in the land is located and applicable federal law. The courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims relating to or arising out of this Note. In the event that any provision or clause of this Note conflicts with applicable law, such conflict shall not affect other provisions of this Note which can be given effect without the conflicting provision. To this end, the provisions of this Note are declared to be severable.

Appellant Apprendices A000038

Mazaska Complaint Exhibit 3
055

## 11. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Borrower which exceeded permitted time limits will be refunded to Borrower. Note Holder may choose to make this refund by reducing the principal Borrower owes under this Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment.

_Lillian M. Monileaux_
Borrower: Lillian A. Monileaux

_July 7, 2010_
Date

_Pamela Red Cloud_
Lender: Mazaska Owecaso Otipi Financial, Inc.
By: Pamela Red Cloud, Loan Officer

Appellant Apprendices A000039

Mazaska Complaint Exhibit 3
056

# MORTGAGE
## ONE HUNDRED EIGHTY DAY REDEMPTION

**THIS MORTGAGE** ("Security Instrument") is given on <u>December 1, 2010</u>. The mortgagee (that is, the Borrower):

a)      Is, <u>Lillian A. Montileaux</u>      or
b)      are  <u>N/A</u>
c)      and  <u>N/A</u>

("Borrower")   This Mortgage is a Security Instrument given to MAZASKA OWECASO OTIPI FINANCIAL, INC., which is organized and existing under the laws of THE STATE OF SOUTH DAKOTA, and whose address is P.O. BOX 1996, PINE RIDGE, SOUTH DAKOTA, 57770 ("Lender").

Borrower owes Lender the principal sum of <u>Fifty-Four Thousand Eighty-Four dollars and no /cents</u> (U.S. $<u>54,084.00</u>). This debt is evidenced by Borrower's note ("Note") dated the same date as this Security Instrument, which provides for monthly payment, with the full debt, if not paid earlier, due and payable on July 7, 2015.

This Security Instrument secures to Lender: <u>Mazaska Owecaso Otipi Financial, Inc</u>

(a)      the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note;
(b)      the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and [none]
(c)      the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in Shannon County, South Dakota, which has the address of: NW1/4SW1/4NE1/4NE1/4,S18-39-41,Shannon County, South Dakota (Property address), 2.5 acres.

THIS IS A PURCHASE MONEY SECURITY INSTRUMENT .
TAX STATEMENTS SHOULD BE SENT TO:

MAZASKA OWECASO OTIPI FINANCIAL, INC, PO BOX 1996
PINE RIDGE, SOUTH DAKOTA, 57770,

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Page 1 of 11

Mazaska Owecaso Otipi Financial, Inc.

Appellant Apprendices A000040

Mazaska Complaint Exhibit 3
057

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

## UNIFORM COVENANTS

### BORROWER AND LENDER COVENANT AND AGREE AS FOLLOWS:

1.    **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of, and interest, on the debt evidenced by the Note and any prepayment and late charges due under the Note. There are no prepayment penalties on this Note.

2.    **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for:

(a)    yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property, if any;
(b)    yearly leasehold payments or ground rents on the Property, if any;
(c)    yearly hazard or property insurance premiums;
(d)    yearly flood insurance premiums, if any;
(e)    yearly mortgage insurance premiums, if any; and
(f)    any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums.

These items are called "Escrow items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Page 2 of 11

Mazaska Owecaso Otipi Financial, Inc.

Appellant Apprendices A000041

Mazaska Complaint Exhibit 3 058

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied:

FIRST: to amounts payable under paragraph 2;
SECOND: to interest due;
THIRD: to principal due;
LAST: to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property, which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:

(a)    agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender;
(b)    contests in good faith the lien by, or defends against, enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or
(c)    secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

If Lender determines that any part of the Property is subject to a lien that may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval, which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be

Page 3 of 11

Mazaska Owecaso Otipi Financial, Inc.

Mazaska Complaint Exhibit 3 059

lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

   6.  **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provision of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

   7.  **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the property. Lender's actions may include paying any sums secured by a lien, which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

   Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

   8.  **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternative mortgage insurer approved by Lender. If

Mazaska Owecaso Otipi, Inc.

Appellant Apprendices A000043

Mazaska Complaint Exhibit 3
060

substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or in accordance with applicable law.

9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction:

(a)         the total amount of the sums secured immediately before the taking, divided by
(b)         the fair market value of the Property immediately before the taking.

Any balance shall be paid to Borrower. In the even of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceeding against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of, or preclude the exercise of, any right or remedy.

Mazaska Owecaso Otipi, Inc.

Page 5 of 11

Appellant Apprendices A000044

Mazaska Complaint Exhibit 3
061

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note:

(a)      is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument;

(b)      is not personally obligated to pay the sums secured by this Security Instrument; and

(c)      agrees that Lender and any other Borrowers may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then:

(a)      any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and

(b)      any sums already collected from Borrower that exceeded permitted limits will be refunded to Borrower.

Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law, and tribal law, and the law of the state in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrowers fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument or applicable laws without further notice or demand on Borrower.

Page 6 of 11

Mazaska Owecaso Otipi Financial, Inc.

Mazaska Complaint Exhibit 3 062

**18. Borrower's Right to Reinstate**. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of:

(a)        5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or

(b)        entry of a judgment enforcing this Security Instrument.

Those conditions are that Borrower:

Mazaska Owecaso Otipi Financial, Inc.

Page 7 of 11

Appellant Apprendices A000046

Mazaska Complaint Exhibit 3
063

(a)    pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred;

(b)    cures any default of any other covenants or agreements;

(c)    pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' and legal fees; and

(d)    takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged.

Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The note will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

## NON-UNIFORM COVENANTS

### BORROWER AND LENDER FURTHER COVENANT AND AGREE AS FOLLOWS:

Page 8 of 11

Appellant Apprendices A000047

Mazaska Complaint Exhibit 3 064

**21. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify:

(a)     the default;
(b)     the action required to cure the default;
(c)     a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and
(d)     that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.

The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' and legal fees and costs, including costs of title evidence.

In case of foreclosure of this Mortgage by action, the holder of the Certificate of Sale may apply to the Court for a reduction of the redemption period if the property has been abandoned by Mortgagor. If, after notice to the parties as the Court directs, the Court finds the property has been abandoned, the redemption period may be reduced by the Court to not less than sixty days from the date of recording the Certificate of Sale.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender shall sell the Property in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order:

(a)     to all expenses of the sale, including, but not limited to, reasonable attorneys' and legal fees;
(b)     to all sums secured by this Security Instrument; and
(c)     any excess to the clerk of the court subject to the order of the court.

### NOTICE

**THE PARTIES AGREE THAT THE PROVISIONS OF THE STATE OF SOUTH DAKOTA'S ONE HUNDRED EIGHTY DAY REDEMPTION MORTGAGE ACT GOVERN THIS MORTGAGE**

**22. Releases.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**23. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**24. Area of the Property.** The Property is forty (40) acres or less in area.

**25. Rider to this Security Instrument.** If one or more riders are executed by Borrowers and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be

Page 9 of 11

Appellant Apprendices A000048

Mazaska Complaint Exhibit 3 065

incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

☐ Adjustable Rate Rider      ☐ Condominium Rider                ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider   ☐ Biweekly Payment Rider
☐ Balloon Rider              ☐ Rate Improvement Rider           ☐ Second Home Rider
☐ Other(s) [specify]

   **26. Deficiency Judgment.** Borrower agrees to pay to Lender, in the event of foreclosure of this Mortgage, the difference between the net proceeds of foreclosure and sale and the total sums secured by this Mortgage, if the net proceeds of sale and foreclosure are less than the total sums then due and outstanding and secured by this Mortgage, and only if the Lender is the successful purchaser at such sale.

   **27. Misrepresentation.** The Borrower understands that the sums secured by the Mortgage are derived from funding pursuant to the U. S. Department of Treasury Community Development Financial Institutions Fund and Regulations pertaining thereto. To induce the Lender to advance these sums, the Borrower has made several representations all as set forth in the Borrower's Mortgagor's Affidavit to even date herewith. If any of these representations are ascertained to be not true, the Lender may at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable.

   If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration. Such notice shall provide a period of not less than 30 days from the date of the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by law. If Lender waives the right to accelerate hereunder, such a waiver shall not constitute a waiver of the right to rescind, or any other remedy available to Lender.

   **28. Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable. This assignment of rents shall be effective until the payment of all sums secured by this Mortgage or, in the event of foreclosure, until the period of redemption expires. Regardless of extinguishment of the debt by a foreclosure sale, this assignment shall continue for the benefit of the purchaser at such sale.

   Upon acceleration under paragraph 17 hereof accompanied by abandonment of the Property, Lender, in person, by agent, or by its appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Upon such acceleration not accompanied by abandonment, Lender shall be entitled, upon commencement of action for foreclosure or at any time prior to the expiration of any period of redemption following judicial sale, to have a receiver appointed by the Court, which receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receivers' fees, premiums on receiver's bonds and reasonable attorneys' and legal fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only of those or rents actually received.

Page 10 of 11

Appellant Apprendices A000049

Mazaska Complaint Exhibit 3 066

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with the Security Instrument.

_Lillian A Montileaux_ (Seal)
Lillian A Montileaux          Borrower

_N/A_____ (Seal)
Mazaska Owecaso Otipi Financial    Lender

_N/A_____ (Seal)
                    Borrower

STATE OF SOUTH DAKOTA
                         SS.
COUNTY OF Shannon

On this the 1st day of Dec., 2010, before me, the undersigned officer, personally appeared Lillian Toi Montileaux on behalf of self, known to be or satisfactorily proven to be the person(s) whose name is/are subscribed to the within instrument and acknowledged that he/she/they are authorized to do so, and executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_Cheryce Cullison_
Notary Public

My
Expires - 1-22-14

(SEAL) CHERYCE M. CULLISON
NOTARY SEAL PUBLIC
STATE OF SOUTH DAKOTA

Page 11 of 11

Appellant Apprendices A000050

Mazaska Complaint Exhibit 3
067

# NOTE

COPY

Date: December 1, 2010

| | |
|---|---|
| Borrower: | Lillian Antoinette Montileaux |
| Lender: | Mazaska Owecaso Otipi Financial, Inc. |
| Property Address: | NW1/4, SW1/4, NE1/4, NE1/4 of Section 18, Township 39 N., Range 41 W. Shannon County, SD, 2.5Acres. |

......................................................................................................................................................

## 1. BORROWER'S PROMISE TO PAY

In return for a loan by Lender to Borrower, Borrower promises to pay U.S. $54,084.00 (this amount will be called "principal"), plus interest, to the order of the Lender. Lender is Mazaska Owecaso Otipi Financial, Inc. Borrower understands that Lender may transfer this Note. Lender and anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 7.50%.

## 3. PAYMENTS

Borrower will pay principal and interest by making payments each month of U.S. $439.94. This includes a monthly insurance escrow amount of $90.33. Borrower will make such payments on the 7th day of each month beginning on August 6, 2010. Borrower will make these payments every month until all of the principal and interest and any other charges, described below, that Borrower may owe under this Note are paid. Borrower's monthly payments will be applied to interest before principal. If, on July 6, 2015, Borrower still owes amounts under this Note, Borrower will pay all those amounts, in full, on that date, which is called the "maturity date."

Borrower will make such monthly payments at Mazaska Owecaso Otipi Financial, Inc. PO Box 1996, Pine Ridge, SD. 57770 or at a different place if required in writing by Note Holder.

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, Borrower will pay a late charge to Note Holder. The amount of the charge will be $25.00 Borrower will pay this late charge promptly, but only once on any late payment.

### (B) Default

Mazaska Complaint Exhibit 3
068

If Borrower does not pay the full amount of each monthly payment on the date it is due, Borrower will be in default.

**(C) Notice of Default**
If Borrower is in default, Note Holder may send Borrower notice as provided in Section 8 below telling Borrower that if Borrower does not pay the overdue amount by a certain date, Note Holder may require Borrower to pay immediately the full amount of principal which has not been paid and all the interest that Borrower owes on that amount. That date must be at least 60 days after the date on which the notice is delivered to Borrower.

**(D) No Waiver By Note Holder**
Even if, at a time when Borrower is in default, Note Holder does not require Borrower to pay immediately in full as described above, Note Holder will still have the right to do so if Borrower is in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If Note Holder has required Borrower to pay immediately in full as described above, Note Holder will have the right to be paid back by Borrower for all of its reasonable costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE SECURED BY A LEASEHOLD MORTGAGE**
In addition to the protections given to Note Holder under this Note, a Leasehold Mortgage of even date herewith protects Note Holder from possible losses that might result if Borrower does not keep the promises made in this Note. That Mortgage describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts that Borrower owes under this Note.

**6. BORROWER'S RIGHT TO PREPAY**
Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When Borrower makes a prepayment, Borrower will tell Note Holder in writing that Borrower is doing so. A prepayment of all unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." Borrower may make a full prepayment or a partial prepayment without any penalty. Note Holder will use all of Borrower's prepayments to reduce the amount of principal that Borrower owes under this Note. If Borrower makes a partial prepayment, there will be no changes in the due dates or changes in the amounts of Borrower's monthly payment unless Note Holder agrees in writing to those changes. Borrower may make a full prepayment at any time. If Borrower chooses to make a partial prepayment, Note Holder may require Borrower to make the prepayment on the same day that one of the monthly payments is due.

**7. WAIVERS**
Borrower waives his or her rights to require Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to Note Holder if

Appellant Apprendices A000052

Mazaska Complaint Exhibit 3 069

Borrower fails to keep his or her promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons may include "guarantors, sureties and endorsers."

**8. GIVING OF NOTICES**
Any notice to Borrower in connection with this Note shall be deemed to have been given to Borrower upon delivering a copy of the notice directly to the Borrower or on the third day after the notice is mailed to Borrower by first class mail, unless the third day is a Saturday, Sunday, or legal holiday, in which case notice shall be deemed to have been given on the next day which is not a Saturday, Sunday or legal holiday as legal holiday is defined in the Federal Rules of Civil Procedure. If any other notice is required under the law governing this Note, the requirements of such governing law concerning notice shall also be complied with. Any notice to Note Holder shall be deemed to have been given to Lender by mailing it by first class mail to Note Holder's address designated herein.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over Borrower's rights or obligations under this Note will have all of Borrower's rights and must keep all of Borrower's promises made in this Note. Note Holder may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of such persons may be required to pay all of the amounts owed under this Note.

**10. GOVERNING LAW; SEVERABILITY**
This Note shall be governed by the law of the Tribe upon which the leasehold interest in the land is located and applicable federal law. The courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims relating to or arising out of this Note. In the event that any provision or clause of this Note conflicts with applicable law, such conflict shall not affect other provisions of this Note which can be given effect without the conflicting provision. To this end, the provisions of this Note are declared to be severable.

**11. LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit: and (ii) any sums already collected from Borrower which exceeded permitted time limits will be refunded to Borrower. Note Holder may choose to make this refund by reducing the principal Borrower owes under this Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Appellant Apprendices A000053

Mazaska Complaint Exhibit 3
070

Borrower: Lillian A. Monitleaux

Date

Lender: Mazaska Owecaso Otipi Financial, Inc.
By: Whitney Zephier, Loan Officer

Mazaska Complaint Exhibit 3
071

# STEVEN D. SANDVEN
L A W   O F F I C E   P C

**PRINCIPAL**
Steven D. Sandven

*Admitted in South Dakota,*
*Minnesota & Washington D.C.*

12294 Gold Mountain Loop
Hill City, South Dakota 57745
605 206-7400 (w)
605 206-7588 (f)
SDSandven@gmail.com
www.SandvenLaw.com

*VIA EMAIL: AMANDA@MAZASKACDFI.ORG*

May 19, 2021

Amanda Standing Bear
Mazaska
Owecaso Otipi Financial, Inc.
P.O. Box 1996
Pine Ridge, SD 57770

     Re:   Lillian Toni Montileaux (Loan 10-0019)

Dear Ms. Standing Bear:

My law office represents Ms. Montileaux who asked us to review the payment history on Loan 10-0019 as promulgated by your institution. Your correspondence dated April 14, 2021, claims that Ms. Montileaux has an outstanding loan balance of $37,717.13 due in full on May 10, 2021. As this memorandum will explain, our accounting does not reconcile with Mazaska's calculations.

*Miscellaneous Matters*

As a matter of respect for your institution, my client would like to point out several issues that Mazaska should consider remedying.

First, according to Patti YellowBoy, Bureau of Indian Affairs ("BIA"), a number of Mazaska's mortgages, including Ms. Montileaux's, have not been recorded with the BIA.

Second, Ms. Montileaux's relationship with the bank involves three promissory notes and three mortgages. None of these loan documents give any indication that they supersede or renew a previous existing note or mortgage. Accordingly, it appears that Ms. Montileaux received three different loans representing a sum total of $155,882.92 when in fact she only received $67,441.16. In the future, Mazaska should consider modifying the original note and mortgage so that its documentation accurately reflects the transaction.

*Records Are Inconsistent*

On July 7, 2010, Ms. Montileaux executed a mortgage and promissory note for $51,634.00 with a maturity date of July 7, 2021. Mazaska's records note a commitment in the amount of $50,000

1        EXHIBIT 6

Appellant Apprendices A000055

Mazaska Complaint Exhibit 3
072

under the first note with an advance to Ms. Montileaux in the amount of $45,731.76. Records indicate that Ms. Montileaux paid principal in the amount of $778.62, $969.75 in interest, and $451.65 for escrow – all under the first note.

On December 1, 2010, a second note was executed for the amount of $54,084 with a maturity date now reduced by six years to July 6, 2015. Records indicate a new commitment of $17,441.16 with an advance to Ms. Montileaux for $8,352.24. Records indicate that Ms. Montileaux paid principal in the amount of $372.13, $1,246.55 in interest, and $361.32 for escrow under the second note.

On April 19, 2011, a third note was executed evidencing a debt in the amount of $66,370.25 with a maturity date of May 10, 2016. Records indicate no new commitment was issued but advances were made in the amount of $13,357.16. Under the third note, Ms. Montileaux paid principal in the amount of $28,761.94, $38,440.11 in interest, and $12,810.11 for escrow. The maturity date on the final note has long since passed.

In contrast to Mazaska's records, Ms. Montileaux's records show she has made $85,047.68 in payments. According to the Loan documents, payments are to be applied in the following order: (1) escrow; (2) interest; and then (3) principal. Ms. Montileaux received $67,441.16 in advances originating on July 7, 2010. She consistently made scheduled payments and oftentimes paid more than what was due.[1] As explained more fully in the following section, escrow payments were miscalculated which in turn meant Mazaska did not deduct the correct amounts from the loan principal.

*Escrow Payments*

According to Section 2 of the Loan Agreement, funds were to be set aside in escrow to cover the following expenses:

1. Yearly taxes and assessments;
2. Yearly leasehold payments or ground rents;
3. Yearly hazard or property insurance premiums;
4. Yearly flood insurance premiums;
5. Yearly mortgage insurance premiums; and
6. Loss reserve payments as provided by Section 8 of the mortgage.

The promissory note dated July 7, 2010, provides that a monthly payment of $90.33 would be set aside for escrow. The notes dated December 1, 2010, and April 19, 2021, do not amend this amount.

There are several issues with Mazaska's handling of Ms. Montileaux's escrow account.

First, if you look at Mazaska's payment history, the amounts set aside for escrow payments were never $90.33 after October 12, 2011. As such, all amounts above and beyond that amount should have been applied to interest and principal.

---

[1] Prepayments are to be applied directly to principal.

2

Mazaska Complaint Exhibit 3 073

Secondly, commencing on March 1, 2016, Mazaska deducted escrow fees bi-weekly instead of monthly as required by the promissory note.[2]

Thirdly, for approximately a year, Mazaska deducted $114.92 per month for escrow, the following year the amount was raised to $151.75 and then raised again to $165.00 per month. The promissory note does not authorize Mazaska to unilaterally increase the escrow amount to anything beyond $90.33 per month. The proper procedure, as contemplated by the parties' written agreement, was to make the appropriate deduction each month. If, at the end of the year, the amount in escrow was insufficient to cover outstanding balances, Mazaska was mandated to notify the borrower of the deficit and arrange for payment. *See* Section 2 of the Mortgage. No one from Mazaska ever contacted Ms. Montileaux as to such a deficit.

Next, as there is no property tax on the real estate subject to the mortgage, escrow funds would solely be used to cover insurance. Premiums from 2015 through 2022 were as follows:

| | |
|---|---|
| 2015-2016 | $709.00 |
| 2016-2017 | $795.00 |
| 2017-2018 | $815.00 |
| 2018-2019 | $840.00 |
| 2019-2020 | $947.00 |
| 2020-2021 | $976.00 |
| 2021-2022 | $1,067.00 |

Assume Mazaska had properly collected escrow funds at $90.33 per month in 2015-2016.[3] Ms. Montileaux would have paid $1,083.96 for the year – $374.96 more than the actual cost of the 2015-2016 premium. Ms. Montileaux is requesting information as to where the excess payments were applied.

Finally, on December 31, 2019, your records noted several "escrow releases" totaling $9,186.00. The outstanding balance due on the loan did not change. Ms. Montileaux is requesting an explanation as to why this notation was made.

***Loan Documents Do Not Authorize Imposition of Administrative Fees***

None of the promissory notes or the mortgages authorize Mazaska to impose administrative fees on the transaction, and yet, an amount of $663.11 for such fees was added to Ms. Montileaux's outstanding balance on April 19, 2011, and then deducted that same day. Further, on December 31, 2010, Mazaska's payment history notates a "Doubtful" action in the amount of $1,348.59 which did not affect the outstanding balance. Ms. Montileaux is requesting information on the purpose of these transactions.

***Conclusion***

---

[2] According to Section 2 of the mortgage agreement, Ms. Montileaux was entitled to receive, at no charge, an annual accounting of the escrow funds. This accounting has not been provided.

[3] Since Mazaska rarely collected $90.33 per month, the illustration must be changed to reflect the actual amount collected in order to calculate the excess.

3

Appellant Apprendices A000057

Mazaska Complaint Exhibit 3 074

Based upon the foregoing irregularities, Ms. Montileaux is requesting that Mazaska stay all action until a full accounting has been conducted. During the stay, Ms. Montileaux will continue to make scheduled payments.

Please contact me if there are any questions.

Sincerely,

Steven Sandven

4

Appellant Apprendices A000058

Mazaska Complaint Exhibit 3 075

COSTELLO, PORTER, HILL, HEISTERKAMP,
BUSHNELL & CARPENTER, LLP

ATTORNEYS AT LAW

KENNETH L. HEISTERKAMP
GENE R. BUSHNELL
EDWARD C. CARPENTER
DONALD A. PORTER
JOSEPH R. LUX
HEATHER LAMMERS BOGARD¹
JESS M. PEKARSKI

¹Also available at Spearfish office
115 N. 7ᵗʰ Street, Suite 3
Spearfish, SD 57783
▸ Also admitted in North Dakota
^ Also admitted in Wyoming
^Also admitted in Nebraska

200 SECURITY BUILDING
704 ST. JOSEPH STREET
MAILING ADDRESS P. O. BOX 290
RAPID CITY, SD 57709

Telephone: (605) 343-2410
Fax: (605) 343-4262

PHILLIP R. STILES
JONATHAN P. McCOY*
MICHAEL F. STEVE*^
KRISTEN E. BASHAM
REECE R. WEBER

J.M. COSTELLO
1923-2007

WILLIAM G. PORTER
1926-2004

June 4, 2021

*Via email only to sdsandven@gmail.com*

Steven D. Sandven
12294 Gold Mountain Loop
Hill City, SD 57745

        Re:    Lillian Tony Montileaux
              Our file no. 132354

Dear Mr. Sandven:

My office represents Mazaska Owecaso Otipi Financial, Inc. ("Mazaska") and we are in receipt of your letter dated May 19, 2021, and appreciate the concern communicated. However, the loan documents appear to be valid, which allow for a brief response here.

As you know, there is a balloon rider to the April 19, 2011, loan documents which authorized 1% origination fees. Those fees were $663.70 and are accounted for accurately.

In addition, the loans are in the nature of collateral real estate mortgages, for a total face value of $66,370.25, but may also fluctuate in total amount loaned. Mazaska has agreed there is only a single loan and each of the mortgages and notes dated December 1, 2010, and April 19, 2011, should be treated as extensions to the July 7, 2010 loan.

Ms. Montileaux has been a good customer and Mazaska looks forward to receipt of Ms. Montileaux's payments and will consider extending the loan.

                           Respectfully,

                           Jonathan P. McCoy

CC:    Client

                    EXHIBIT 9

Appellant Apprendices A000059

Mazaska Complaint Exhibit 3
076

# STEVEN D. SANDVEN
## LAW OFFICE PC

PRINCIPAL
Steven D. Sandven

*Admitted in South Dakota,*
*Minnesota & Washington D.C.*

12294 Gold Mountain Loop
Hill City, South Dakota 57745
605 206-7400 (w)
605 206-7588 (f)
SDSandven@gmail.com
www.SandvenLaw.com

*VIA EMAIL: AMANDA@MAZASKACDFI.ORG*

May 19, 2021

Amanda Standing Bear
Mazaska
Owecaso Otipi Financial, Inc.
P.O. Box 1996
Pine Ridge, SD 57770

Re:    Lillian Toni Montileaux (Loan 10-0019)

Dear Ms. Standing Bear:

My law office represents Ms. Montileaux who asked us to review the payment history on Loan 10-0019 as promulgated by your institution. Your correspondence dated April 14, 2021, claims that Ms. Montileaux has an outstanding loan balance of $37,717.13 due in full on May 10, 2021. As this memorandum will explain, our accounting does not reconcile with Mazaska's calculations.

*Miscellaneous Matters*

As a matter of respect for your institution, my client would like to point out several issues that Mazaska should consider remedying.

First, according to Patti YellowBoy, Bureau of Indian Affairs ("BIA"), a number of Mazaska's mortgages, including Ms. Montileaux's, have not been recorded with the BIA.

Second, Ms. Montileaux's relationship with the bank involves three promissory notes and three mortgages. None of these loan documents give any indication that they supersede or renew a previous existing note or mortgage. Accordingly, it appears that Ms. Montileaux received three different loans representing a sum total of $155,882.92 when in fact she only received $67,441.16. In the future, Mazaska should consider modifying the original note and mortgage so that its documentation accurately reflects the transaction.

*Records Are Inconsistent*

On July 7, 2010, Ms. Montileaux executed a mortgage and promissory note for $51,634.00 with a maturity date of July 7, 2021. Mazaska's records note a commitment in the amount of $50,000

1          EXHIBIT 6

Appellant Appendices A000060

Mazaska Complaint Exhibit 3
077

under the first note with an advance to Ms. Montileaux in the amount of $45,731.76. Records indicate that Ms. Montileaux paid principal in the amount of $778.62, $969.75 in interest, and $451.65 for escrow – all under the first note.

On December 1, 2010, a second note was executed for the amount of $54,084 with a maturity date now reduced by six years to July 6, 2015. Records indicate a new commitment of $17,441.16 with an advance to Ms. Montileaux for $8,352.24. Records indicate that Ms. Montileaux paid principal in the amount of $372.13, $1,246.55 in interest, and $361.32 for escrow under the second note.

On April 19, 2011, a third note was executed evidencing a debt in the amount of $66,370.25 with a maturity date of May 10, 2016. Records indicate no new commitment was issued but advances were made in the amount of $13,357.16. Under the third note, Ms. Montileaux paid principal in the amount of $28,761.94, $38,440.11 in interest, and $12,810.11 for escrow. The maturity date on the final note has long since passed.

In contrast to Mazaska's records, Ms. Montileaux's records show she has made $85,047.68 in payments. According to the Loan documents, payments are to be applied in the following order: (1) escrow; (2) interest; and then (3) principal. Ms. Montileaux received $67,441.16 in advances originating on July 7, 2010. She consistently made scheduled payments and oftentimes paid more than what was due.[1] As explained more fully in the following section, escrow payments were miscalculated which in turn meant Mazaska did not deduct the correct amounts from the loan principal.

### Escrow Payments

According to Section 2 of the Loan Agreement, funds were to be set aside in escrow to cover the following expenses:

1. Yearly taxes and assessments;
2. Yearly leasehold payments or ground rents;
3. Yearly hazard or property insurance premiums;
4. Yearly flood insurance premiums;
5. Yearly mortgage insurance premiums; and
6. Loss reserve payments as provided by Section 8 of the mortgage.

The promissory note dated July 7, 2010, provides that a monthly payment of $90.33 would be set aside for escrow. The notes dated December 1, 2010, and April 19, 2021, do not amend this amount.

There are several issues with Mazaska's handling of Ms. Montileaux's escrow account.

First, if you look at Mazaska's payment history, the amounts set aside for escrow payments were never $90.33 after October 12, 2011. As such, all amounts above and beyond that amount should have been applied to interest and principal.

---

[1] Prepayments are to be applied directly to principal.

2

Mazaska Complaint Exhibit 3 078

Secondly, commencing on March 1, 2016, Mazaska deducted escrow fees bi-weekly instead of monthly as required by the promissory note.[2]

Thirdly, for approximately a year, Mazaska deducted $114.92 per month for escrow, the following year the amount was raised to $151.75 and then raised again to $165.00 per month. The promissory note does not authorize Mazaska to unilaterally increase the escrow amount to anything beyond $90.33 per month. The proper procedure, as contemplated by the parties' written agreement, was to make the appropriate deduction each month. If, at the end of the year, the amount in escrow was insufficient to cover outstanding balances, Mazaska was mandated to notify the borrower of the deficit and arrange for payment. *See* Section 2 of the Mortgage. No one from Mazaska ever contacted Ms. Montileaux as to such a deficit.

Next, as there is no property tax on the real estate subject to the mortgage, escrow funds would solely be used to cover insurance. Premiums from 2015 through 2022 were as follows:

| | |
|---|---|
| 2015-2016 | $709.00 |
| 2016-2017 | $795.00 |
| 2017-2018 | $815.00 |
| 2018-2019 | $840.00 |
| 2019-2020 | $947.00 |
| 2020-2021 | $976.00 |
| 2021-2022 | $1,067.00 |

Assume Mazaska had properly collected escrow funds at $90.33 per month in 2015-2016.[3] Ms. Montileaux would have paid $1,083.96 for the year – $374.96 more than the actual cost of the 2015-2016 premium. Ms. Montileaux is requesting information as to where the excess payments were applied.

Finally, on December 31, 2019, your records noted several "escrow releases" totaling $9,186.00. The outstanding balance due on the loan did not change. Ms. Montileaux is requesting an explanation as to why this notation was made.

*Loan Documents Do Not Authorize Imposition of Administrative Fees*

None of the promissory notes or the mortgages authorize Mazaska to impose administrative fees on the transaction, and yet, an amount of $663.11 for such fees was added to Ms. Montileaux's outstanding balance on April 19, 2011, and then deducted that same day. Further, on December 31, 2010, Mazaska's payment history notates a "Doubtful" action in the amount of $1,348.59 which did not affect the outstanding balance. Ms. Montileaux is requesting information on the purpose of these transactions.

*Conclusion*

---

[2] According to Section 2 of the mortgage agreement, Ms. Montileaux was entitled to receive, at no charge, an annual accounting of the escrow funds. This accounting has not been provided.
[3] Since Mazaska rarely collected $90.33 per month, the illustration must be changed to reflect the actual amount collected in order to calculate the excess.

3

Mazaska Complaint Exhibit 3 079

Based upon the foregoing irregularities, Ms. Montileaux is requesting that Mazaska stay all action until a full accounting has been conducted. During the stay, Ms. Montileaux will continue to make scheduled payments.

Please contact me if there are any questions.

Sincerely,

Steven Sandven

4

Mazaska Complaint Exhibit 3 080

COSTELLO, PORTER, HILL, HEISTERKAMP,
BUSHNELL & CARPENTER, LLP

ATTORNEYS AT LAW

KENNETH L. HEISTERKAMP
GENE R. BUSHNELL
EDWARD C. CARPENTER
DONALD A. PORTER
JOSEPH R. LUX
HEATHER LAMMERS BOGARD†
JESS M. PEKARSKI

†Also available at Spearfish office
115 N. 7th Street, Suite 3
Spearfish, SD 57783
§ Also admitted in North Dakota
* Also admitted in Wyoming
^Also admitted in Nebraska

200 SECURITY BUILDING
704 ST. JOSEPH STREET
MAILING ADDRESS P. O. BOX 290
RAPID CITY, SD 57709

Telephone: (605) 343-2410
Fax: (605) 343-4262

PHILLIP B. STILES
JONATHAN P. McCOY*
MICHAEL F. STIEVE*§
KRISTEN R. BASHAM
REECE R. WEBER

J.M. COSTELLO
1923-2007

WILLIAM G. PORTER
1926-2004

June 4, 2021

*Via email only to sdsandven@gmail.com*

Steven D. Sandven
12294 Gold Mountain Loop
Hill City, SD 57745

Re:    Lillian Tony Montileaux
       Our file no. 132354

Dear Mr. Sandven:

My office represents Mazaska Owecaso Otipi Financial, Inc. ("Mazaska") and we are in receipt of your letter dated May 19, 2021, and appreciate the concern communicated. However, the loan documents appear to be valid, which allow for a brief response here.

As you know, there is a balloon rider to the April 19, 2011, loan documents which authorized 1% origination fees. Those fees were $663.70 and are accounted for accurately.

In addition, the loans are in the nature of collateral real estate mortgages, for a total face value of $66,370.25, but may also fluctuate in total amount loaned. Mazaska has agreed there is only a single loan and each of the mortgages and notes dated December 1, 2010, and April 19, 2011, should be treated as extensions to the July 7, 2010 loan.

Ms. Montileaux has been a good customer and Mazaska looks forward to receipt of Ms. Montileaux's payments and will consider extending the loan.

Respectfully,

Jonathan P. McCoy

CC:    Client

EXHIBIT 9

Mazaska Complaint Exhibit 3
081

OGLALA SIOUX TRIBAL COURT        )        IN CIRCUIT COURT
OGLALA SIOUX TRIBE               )SS
PINE RIDGE INDIAN RESERVATION    )        PINE RIDGE

_____
                                 )
**LILIAN "TONI" MONTILEAUX**     )        CIV 21-0388
                                 )
        Petitioner,              )
                                 )
vs.                              )        **ORDER AND MEMORANDUM
                                 )        DECISION DENYING RESPONDENT'S
**MAZASKA OWECASCO OTIPI**       )        MOTION TO DISMISS FOR LACK OF
**FINANCIAL, INC.,**             )        SUBJECT MATTER JURISDICTION**
                                 )
        Respondent.              )
_____ )

        This Court, having considered the arguments, evidence, and briefs from both parties,

hereby holds as follows:

### Facts and Procedural History

        This matter is a breach of contract action involving a series of mortgages

executed between Lillian Montileaux ("Petitioner Montileaux"), as the mortgagee,

and Mazaska Owecaso Otipi Financial, Inc. ("Respondent Mazaska"), as the

mortgagor.  Pursuant to the mortgages, Petitioner Montileaux received certain cash

advances from Respondent Mazaska.  As collateral for its loans, Respondent

Mazaska received a security interest in leasehold property Petitioner Montileaux

holds within the exterior bounds of Pine Ridge Indian Reservation ("Pine Ridge

Reservation") in Oglala Lakota County, South Dakota.[1]  The majority of the

_____

[1] The question of whether the security interest was properly filed and/or perfected is
not currently before this Court.

1

Appellant Appendices A000065

Mazaska Complaint Exhibit 3
082

allegations in Petitioner Montileaux's *Complaint and Demand for Jury Trial* ("*Complaint*") appear to stem from alleged financial irregularities with Petitioner Montileaux's account.[2] Given that this Court must first determine whether it possesses jurisdiction over this matter, it recounts only the facts necessary to determine its jurisdiction and leaves the underlying merits for another day.

On December 12, 2021, Petitioner Montileaux served Respondent Mazaska with a *Summons* and *Complaint*, instituting this lawsuit. The *Complaint* raises two, albeit it intertwined, counts: breach of contract and breach of the implied covenant of good faith and fair dealing. Within thirty days of receiving the *Summons*, Respondent Mazaska answered the *Complaint* on the merits and alleged several affirmative defenses. None of the affirmative defenses challenge jurisdiction, subject matter or otherwise.[3]

---

[2] As part of its prayer for relief, Petitioner Montileaux appears to request that this Court order Respondent Mazaska to hire an expert to audit her account. Given that this opinion addresses only jurisdiction, this request is not yet ripe. The Court invites Petitioner Montileaux to file a Motion and supportive belief articulating her basis for her belief that Respondent Mazaska must undertake this expense.

[3] Some courts demand that affirmative defenses be plead affirmatively. *Farmers Coop. Elevator Co. v. Johnson*, 90 S.D. 36, 237 N.W.2d 671 (1976) ("Our law requires that [affirmative defenses] be pleaded as a defense *affirmatively*.") (emphasis in original). However, it is equally well established that alleged defects in subject matter jurisdiction can be raised at any time and even by this Court sua sponte. *Barnes v. Matzner*, 2003 S.D. 42, ¶ 11, 661 N.W.2d 372, 375. For this reason, despite the absence of an affirmative defense on that basis, any defects related to subject matter jurisdiction are properly before this Court. The related question of whether Respondent Mazaska consented to the jurisdiction of this Court under *Montana v. United States* by filing a pleading on the merits and requesting that this Court issue a scheduling order before raising the jurisdictional defect is

2

Mazaska Complaint Exhibit 3
083

On April 11, 2022, three months after Respondent Mazaska answered the *Complaint*, Respondent Mazaska moved this Court for an order dismissing this action for lack of subject matter jurisdiction. It argued, among other things, that it was a non-Indian and therefore, beyond the adjudicatory authority of this Court. Petitioner Montileaux resisted the *Motion*, contending that Respondent Mazaska's activities on Pine Ridge and certain language in the contracts demonstrate that Respondent Mazaska has consented to the jurisdiction of this Court. For the following reasons, this Court concludes it has jurisdiction over Respondent Mazaska.

## Analysis and Decision

The Constitution of the Oglala Sioux Tribe (the "Tribe") provides that this Court "shall have the power to issue all remedies in law and in equity including injunctive and declaratory relief and all writs including attachment and mandamus." Article V, Section 2. In accordance with these provisions, generally speaking, this Court is vested with the same judicial powers enjoyed by any other court of general jurisdiction. *Bingham Farms Trust v. City of Belle Fourche*, 2019 S.D. 50, ¶ 14, 932 N.W.2d 916, 920 (holding that courts of general jurisdiction may "hear all civil actions.").[4] Petitioner Montileaux's *Complaint* claims that

---

addressed in Section II, *infra*. *See* 450 U.S. 544, 565, 101 S. Ct. 1245, 1258, 67 L. Ed. 2d 493, 510 (1981).

[4] Although not bound by authority handed down by the South Dakota Supreme Court and other courts, this Court relies upon authorities that it finds persuasive when determining the disposition of this *Motion*.

3

Mazaska Complaint Exhibit 3
084

Defendant Mazaska breached a series of contracts. There can be no question that this Court is competent to preside over a breach of contract action.[5]

The more complex question is whether this Court has adjudicatory jurisdiction over Respondent Mazaska, a South Dakota corporation, under *Montana v. United States*, 450 U.S. 544, 565, 101 S. Ct. 1245, 1258, 67 L. Ed. 2d 493, 510 (1981). Keeping in mind that the Tribe is a sovereignty with a "distinct, independent political communit[y]," the question of whether a tribal court has civil jurisdiction over a party to a lawsuit normally requires consideration of two questions. *See, e.g., Montana*, 450 U.S. at 565, 101 S. Ct. at 1258; *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L. Ed. 483 (1832) (acknowledging the inherent nature of tribal sovereignty). The first inquiry is whether Respondent Mazaska is a member-Indian or a non-Indian. *Id.* If Respondent Mazaska is a member-Indian, this Court unquestionably has jurisdiction over it. *Nevada v. Hicks*, 533 U.S. 353, 361-62, 121 S. Ct. 2304, 150 L. Ed. 2d 398 (2001) ("Our cases make clear than the Indians' right to make their own laws and be governed by them.") If Respondent

---

[5] Respondent Mazaska argues that because the promissory note and mortgage might implicate a federal question, this Court has no authority to consider this matter on the merits. Respondent Mazaska makes this argument on the mistaken premise that courts of general jurisdiction are not permitted to analyze or interpret federal laws when considering the merits of a breach of contract action. O.S.T. Const. Art. V., § 2. Importantly, Respondent Mazaska has failed to provide this Court any authority to suggest that the existence of an arguably relevant federal statute renders federal jurisdiction exclusive in this instance. Absent such authority, this Court is not persuaded by this argument.

4

Mazaska Complaint Exhibit 3 085

Mazaska is a non-Indian, however, the question becomes whether it has consented to tribal jurisdiction. *Montana*, 450 U.S. at 565, 101 S. Ct. at 1258. Consideration of these factors establishes that this Court has authority to preside over this matter.

## I.    RESPONDENT MAZASKA IS A NON-INDIAN.

This Court begins, as the United States Supreme Court has commanded, with determining whether Respondent Mazaska is a member-Indian or a non-Indian. This inquiry requires an analysis of Respondent's Mazaska's corporate structure. Neither party disputes that Respondent Mazaska is a corporation duly organized and existing under the laws of the State of South Dakota. Nor, however, is there a dispute that it has only four officers and five directors, all of whom appear to be members of the Tribe.[6] In light of this, the question becomes whether a corporation is a member-Indian if it is duly organized under state law but comprises largely—if not exclusively—of tribal members. This Court concludes that Respondent Mazaska is a non-Indian regardless of its member-Indian officers and directors.

It is commonly understood that corporations are considered artificial persons capable of contracting in their own names. *See, e.g., Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001) (corporations

---

[6] More specifically, Respondent Mazaska has the following principal officers: Tanya Fiddler (President); Kadem Fisher (Vice President); Irving Provost Sr. (Secretary); Tawney Brunsch (Treasurer). All of these individuals, along with Karen Pourier, also serve as directors.

5

Appellant Appendices A000069

Mazaska Complaint Exhibit 3 086

are artificial persons). They can be fined. 18 U.S.C. 3571(c). They can be placed on probation. *United States v. J. C. Ehrlich Co.*, 372 F. Supp. 768 (D. Md. 1974). They can be ordered to pay restitution. *FTC v. E.M.A. Nationwide Inc.*, 767 F.3d 611, 619, 636-37 (6th Cir. 2014) (affirming restitution against multiple corporate defendants). Corporations are also able to continue to exist separate from the individuals who compose them. *Maimondies Med. Ctr. v. United States*, 809 F.3d 85, 87 (2d Cir. 2015). Because it is universally understood that corporations are not equal to the sum of their parts, this Court concludes that Respondent Mazaska is a citizen of the State of South Dakota regardless of the tribal membership of its officers, directors, and shareholders. Therefore, Respondent Mazaska is a non-Indian.

This Court does not break new ground in handing down this ruling. Courts in at least two jurisdictions—the state of North Dakota and the United States District Court for the District of South Dakota—have reached the same conclusion. *See, e.g., Airvator, Inc. v. Turtle Mountain Mfg. Co.*, 329 N.W.2d 596, 602-03 (N.D. 1983); *FTC v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 2013 U.S. Dist. LEXIS 44151, 2013 WL 1309437 (holding that Indian owned LLCs were South Dakota companies). *See also Arrow Midstream Holdings, LLC v. 3 Bears Constr., LLC.*, 873 N.W.2d 16, 20 (N.D. 2015) (applying the same holding to a North Dakotan LLC). The analysis that the North Dakota Supreme Court conducted in *Airvator* is instructive.

6

Mazaska Complaint Exhibit 3 087

In *Airvator*, the plaintiff sued Turtle Mountain Manufacturing Co. ("Turtle Mountain"), a North Dakota corporation, in state court for breach of contract. 329 N.W.2d at 597. Turtle Mountain promptly moved the trial court to dismiss, arguing that 51% of its shareholders comprised of member-Indians, making it a member-Indian and therefore, not subject to the jurisdiction of North Dakota state courts. *Id.* at 599. Turtle Mountain advanced this argument even though it was incorporated under the laws of the State of North Dakota. *Id.* at 597.

Following a lengthy analysis related to the independent identity of corporations, the North Dakota Supreme Court rejected Turtle Mountain's argument that it should be considered a member-Indian simply because a majority of its shareholders were tribal members. *Id.* at 602. Similar to the analysis engaged in by this Court, the North Dakota Supreme Court reflected on the broad authority corporations have to conduct business independent of their officers, directors, and shareholders. *Id.* at 603. For instance, the court noted corporations can transfer and acquire property in their own names. *Id.* It also observed that not only can corporations be sued, they can affirmatively maintain lawsuits. *Id.* For these reasons and several others, the court ultimately classified the corporation as a non-Indian.[7]

---

[7] *But see Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 157, n.13, 93 S. Ct. 1267, 36 L.Ed.2d 114 (1973). In that action, the United States Supreme Court held, in an unrelated context, that "the question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business[.]" *Id.* This case is distinct from *Mescalero* because it neither involves taxation nor a tribal entity.

7

Appellant Appendices A000071

Mazaska Complaint Exhibit 3
088

This Court finds the North Dakota Supreme Court's analysis in *Airvator* instructive and follows its lead. *Airvator*, 329 N.W.2d at 602–03. *See also Payday Fin., LLC*, 935 F. Supp. 2d at 926. Therefore, Respondent Mazaska is a non-Indian even though many, if not all, of its officers, directors, and shareholders are member-Indians.

II.  **RESPONDENT MAZASKA CONSENTED TO TRIBAL JURISDICTION UNDER THE FIRST *MONTANA* EXCEPTION.**

Given that Respondent Mazaska is a non-Indian, the next question is whether this Court has civil jurisdiction over it. Generally, "[t]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565, 101 S. Ct. at 1258, 67 L. Ed. 2d at 510. This ordinarily means tribal courts are without authority to hear disputes in which a non-Indian is a named defendant. *Id.* There are, however, two exceptions to this principle, colloquially referred to as the "*Montana* exceptions." First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.*[8] Second, "[a]

---

Although somewhat unclear, a tribal entity might be afforded more latitude to conduct business in the name of a corporation due to the inherent sovereignty of tribes.

[8] While this Court is mindful of Respondent Mazaska's general point that ordinarily a court cannot create jurisdiction where it otherwise would not exist, the *Montana* decision is more akin to personal jurisdiction and explicitly holds that in the context

8

Appellant Appendices A000072

Mazaska Complaint Exhibit 3
089

tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* As it concerns the first exception—i.e., the "consent" exception—the Eighth Circuit Court of Appeals has instructed that "the operative question . . . is whether the [Plaintiff's or Petitioner's] claim has a sufficient nexus to the consensual relationship" created between the non-Indian and the Tribe or its members. *Attorney's Process and Investigation Services, Inc. v. Sac & Fox Tribe of Mississippi in Iowa,* 609 F.3d 927, 941 (8th Cir. 2010).[9]

    With these standards in mind, this Court concludes that Respondent Mazaska has consented to tribal court jurisdiction in three ways:  (i) contractually; (ii) through its litigation conduct; and (iii) through its decision to conduct substantially all of its business on tribal territory with tribal members.   Beginning with the first

---

of federal Indian law, non-Indians can consent to the jurisdiction of tribal courts. *Montana,* 450 U.S. at 565, 101 S. Ct. at 1258. *Smith v. Salish Kootenai College,* 434 F.3d 1127, 1138 (9th Cir. 2006) (acknowledging similarities between personal jurisdiction and the *Montana* analysis).

[9] Respondent Mazaska also argues that the first *Montana* exception cannot apply because, in its mind, the "Tribe is not alleged to have regulated any aspect of the financing arrangement between Petitioner and Mazaska through taxation, licensing, or other means."  Respondent Mazaska misunderstand the *Montana* test, which explicitly provides "[a] tribe may regulate, through taxation, licensing, or *other means,* the activities *of nonmembers who enter consensual relationships with* the tribe or *its members.*" *Montana,* 450 U.S. at 565, 101 S. Ct. at 1258, 67 L. Ed. 2d at 510.  The Tribe need not regulate the financial documents for Respondent Mazaska to consent to tribal adjudicatory jurisdiction.

9

Appellant Appendices A000073

Mazaska Complaint Exhibit 3 090

reason, there is no question that Respondent Mazaska contractually consented to tribal jurisdiction; it executed three promissory notes that contain language explicitly subjecting it to this Court's jurisdiction. These notes—executed on July 7, 2010, December 1, 2010, and May 11, 2011, respectively—explicitly provide that "[t]he courts of the Tribe shall have <u>sole</u> and <u>exclusive jurisdiction</u> with respect to <u>all controversies</u> or <u>claims</u> <u>*related to or arising out of* this Note</u>."[10] Likewise, the mortgage agreements—also dated July 7, 2010, December 1, 2010, and May 11, 2011—explicitly reference each promissory note and state, "This Security Instrument shall be governed by federal law, and tribal law, and the law of the state in which the Property is located."

It is difficult to imagine a stronger connection between the allegations in the *Complaint* and Respondent Mazaska's consent to jurisdiction than the one that is presented here. *See Sac & Fox Tribe*, 609 F.3d at 941. Petitioner Montileaux has claimed that Respondent Mazaska has breached financial contracts it executed with her. These alleged breaches stem from the very financial documents that include clauses that explicitly submit Respondent Mazaska to tribal jurisdiction. There is little question that this scenario comfortably fits within the Eighth Circuit test,

---

[10] It is presumed that Respondent Mazaska, as the financial institution, drafted these provisions, further strengthening this Court's belief that Respondent Mazaska has consented to this Court's jurisdiction.

10

Mazaska Complaint Exhibit 3
091

namely, that "the claim [have] a sufficient nexus to the consensual relationship." *Id.*

It is also quite likely that the contractual language at issue here is the precise circumstance that the United States Supreme Court had in mind when crafting the first *Montana* exception. By *Montana*'s own terms, tribal courts are allowed to exercise jurisdiction over non-Indians when they "enter consensual relationships with the tribe or <u>its members</u>, <u>through</u> commercial dealing, <u>contracts</u>, leases, or other arrangements." *Montana*, 450 U.S. at 565, 101 S. Ct. at 1258, 67 L. Ed. 2d at 510 (emphasis added). *See, e.g., Warn v. Eastern Band of Cherokee Indians*, 858 F. Supp. 524 (W.D. N.C. 1994) (holding that because a lease agreement between the parties provided that disputes would be resolved in tribal court, non-Indians had consented to jurisdiction). For this reason alone, it is apparent to this Court that it may proceed to adjudicate this matter on the merits.

There is a second reason why this Court has jurisdiction; namely, Respondent Mazaska's litigation conduct. As noted previously, Respondent Mazaska did not challenge jurisdiction in its initial pleadings; rather, it answered the *Complaint* on its merits and proceeded to request that this Court afford it affirmative relief, i.e., requesting entry of a scheduling order. As one court observed, the "'consensual relationship' analysis under *Montana* resembles the Court's Due Process Clause analysis for purposes of personal jurisdiction." *Smith v. Salish Kootenai College*, 434 F.3d 1127, 1138 (9th Cir. 2006). Therefore, if the "defendant *himself* [takes

11

Mazaska Complaint Exhibit 3 092

action] that creates a 'substantial connection'" with the forum, the first *Montana*

exception is deemed satisfied. *Id. (emphasis in original).*

This Court concludes that Defendant Mazaska's decision to answer the

Complaint on its merits and file a *Stipulation and Proposed Scheduling Order*

requesting entry of a scheduling order amounted to Respondent Mazaska taking

action that "create[d] a substantial connection" with this forum. Indeed, in reliance

on Plaintiff Montileaux's and Defendant Mazaska's joint request, this Court

executed the *Order Granting Joint Stipulation for Scheduling Order.* By requesting

that this Court enter such an order, Respondent Mazaska implicitly agreed to abide

by the adjudicatory authority of this Court to enforce that order. This, in the

Court's mind, is also enough to establish a consensual relationship with the Tribe.

*Montana*, 450 U.S. at 565, 101 S. Ct. at 1258, 67 L. Ed. 2d at 510.[11]

Finally, in concluding that civil jurisdiction exists, this Court considers

Respondent Mazaska's substantial connection to the Tribe and its members

persuasive. This is not a situation in which "a defendant who [is] not [a] tribal

member" is being asked "to defendant themselves against ordinary claims in an

---

[11] The Court is aware of the authority that suggests that certain types of defensive
litigation conduct are insufficient to create consent under the first *Montana*
exception. *See, e.g., Town Pump, Inc. v. LaPlante,* 394 Fed. Appx. 425, 2010 U.S.
App. LEXIS 18607. To the extent that this unpublished case, and the cases on
which it relies, are arguably applicable, this Court concludes that they are
unpersuasive. Even if persuasive, the clauses in the contracts, standing alone, vest
this Court with jurisdiction.

12

Mazaska Complaint Exhibit 3
093

unfamiliar court." *Smith*, 434 F.3d at 1131. Respondent Mazaska is familiar with tribal protocols—it conducts substantially all, if not all, of its business on tribal territory. Not only is its sole office located within the confines of the Pine Ridge Reservation, but it also specifically requested that the Executive Committee of the Tribal Council pass a resolution to set aside a building in Pine Ridge where the corporation could conduct business.[12] Equally noteworthy, as noted previously, Respondent Mazaska made the conscious choice to enter into contracts with a member of the Tribe. In those contracts, it explicitly agreed to be bound by this Court's authority. As a financial institution with advanced contractual bargaining power, it is possible that it drafted the very provisions it now seeks to repudiate. Additionally, it does not escape this Court's notice that the subject of the mortgage is Petitioner Montileaux's leasehold interest in tribal trust land. For these reasons, this Court has no pause in holding that it has jurisdiction to consider this matter on its merits.

---

[12] In that same resolution, the Executive Committee defined Respondent Mazaska as "a mortgage lending agency" providing "services on the Pine Ridge Indian Reservation."

13

Appellant Appendices A000077

Mazaska Complaint Exhibit 3 094

## Conclusion

[¶19.]        For the foregoing reasons, it is hereby **ORDERED** that the

*Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction is* **DENIED.**

Dated this 10th day of August, 2022.

                                            **BY THE COURT:**

                                            _____
                                            David Dillon, Chief Judge
                                            Oglala Sioux Tribal Court

ATTEST:

_____
Clerk of Court/Deputy Clerk
(SEAL)

14

Mazaska Complaint Exhibit 3
095

SUPREME COURT OF THE OGLALA SIOUX NATION

OGLALA SIOUX TRIBE

PINE RIDGE INDIAN RESERVATION

---

LILLIAN "TONI" MONTILEAUX,
        Petitioner/Appellee

vs.

MAZASKA OWECASO OTIPI FINANCIAL, INC.,
        Respondent/Appellant

Supreme Court Case No. _____

APPELLEE'S BRIEF

---

Appeal from the Oglala Sioux Tribal Court
Oglala Sioux Tribe
Pine Ridge Indian Reservation

---

The Honorable Dave Dillon
Chief Judge
Oglala Sioux Tribal Court

---

Steven D. Sandven
Attorney for Petitioner/Appellee
12294 Gold Mountain Loop
Hill City SD 57745

Jonathan C. McCoy
Attorney for Respondent/Appellant
704 South St. Joseph Street
P.O. Box 290
Rapid City SD 57709

---

NOTICE OF APPEAL FILED SEPTEMBER 12, 2022

---

Mazaska Complaint Exhibit 3
096

# TABLE OF CONTENTS

Page #

JURISDICTIONAL STATEMENT ……………………………………………. 1

LEGAL ISSUES ……………………………………………………………. 1

STATEMENT OF THE CASE AND FACTS ……………………………….. 2

(POINT I) THE TRIBAL COURT HAS SUBJECT MATTER JURISDICTION
BECAUSE THE REAL ESTATE SETTLEMENT ACT DOES NOT
APPLY TO MS. MONTILEAUX'S BREACH OF CONTRACT CLAIM……… 3

(POINT II) THE TRIBAL COURT HAS SUBJECT MATTER JURISDICTION
PURSUANT TO *MONTANA V. UNITED STATES*……………………………. 5

(POINT III) THE *MONTANA V. UNITED STATES* ANALYSIS DOES NOT
APPLY WHEN TRIBAL LAND IS INVOLVED……………………………… 7

CONCLUSION ……………………………………………………………... 8

CERTIFICATE OF SERVICE …………………………………………….... 8

Mazaska Complaint Exhibit 3
097

## TABLE OF AUTHORITIES

Page #

*Supreme Court*

*Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 654, 121 S. Ct. 1825, 149 L. Ed. 2d 889 (2001) ............................................................     7

*Jackson Transit Auth. v. Local Division 1285*, 457 U.S. 15, 29, 72 L. Ed. 2d 639, 102 S. Ct. 2202 (1982) ......................................     5

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144-45, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982) ............................................................     7

*Montana v. United States*, 450 U.S. 544 (1981) ...............................   5-7

*Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 841, 109 S. Ct. 1519, 103 L. Ed. 2d 924 (1989) ..............................................................     5

*South Dakota v. Bourland*, 508 U.S. 679, 689 (1993) .........................     7

*Circuit Courts*

*Knighton v. Cedarville Rancheria of N. Paiute Indians*, 922 F.3d 892 (9th Cir. 2019) .....................................................................     6

*Mabe v. G.C. Servs. Limited Partnership*, 32 F.3d 86, 88 n.2 (4th Cir. 1994) .......................................................................     5

*Oliver v. Trunkline Gas Co.*, 796 F.2d 86, 89 (5th Cir. 1986) .................     5

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. McKee*, 32 F.4th 1003 (10th Cir. 2022) ...................................................................     6

*Water Wheel Camp Rec. Area, Inc. v. Larance*, 642 F.3d 802, 818 (9th Cir. 2011)......................................................................     6

*United States Code*

12 U.S.C. 2601 *et seq* .....................................................................     4

15 U.S.C. 1602(g)............................................................................     4

*CFR*

12 CFR 1024.5(a) ...........................................................................     4

Mazaska Complaint Exhibit 3
098

*Other Sources*

*Cohen's Handbook of Federal Indian Law* § 4.01[2][e], 220 (Nell Jessup Newton et al. eds., 2005) .......................................................... 7

Mazaska Complaint Exhibit 3
099

## JURISDICTIONAL STATEMENT

Respondent/Appellant has appealed from an Order and Memorandum Decision of the Honorable Dave Dillon of the Oglala Sioux Tribal Court, dated August 10, 2022, which denied the motion of Appellant to dismiss Petitioner/Appellee's Complaint for lack of subject matter jurisdiction. This Court has jurisdiction over this matter pursuant to Chapter 1, Section 1 of the Oglala Sioux Tribe's Law and Order Code and Section 10 of the three (3) Promissory Notes executed between the parties on July 7, 2010, December 1, 2010, and April 19, 2011, which provides:

> This Court has subject matter over this action pursuant to Section 10 of the Note: This Note shall be governed by the law of the Tribe upon which the leasehold interest in the land is located and applicable federal law. The courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims relating to or arising out of this Note.

## LEGAL ISSUES

1.    Whether the Tribal Court has original subject matter jurisdiction of the cause of action alleged by Petitioner under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*  The Court held it had subject matter jurisdiction. However, Petitioner/Appellee did not allege a cause of action under the RESPA. This is a mischaracterization of the facts by Respondent/Appellant.

RESPA, 12 U.S.C. 2601 et seq.;

12 CFR 1024.5(a);

15 U.S.C. 1602(g);

*Gardner v. United States*, 211 F.3d 1305, 1310, 341 U.S. App. D.C. 247 (D.C. Cir. 2000);

*Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 841, 109 S. Ct. 1519, 103 L. Ed. 2d 924 (1989);

1

Mazaska Complaint Exhibit 3
100

*Jackson Transit Auth. v. Local Division 1285*, 457 U.S. 15, 29, 72 L. Ed. 2d 639, 102 S. Ct. 2202 (1982);

*Mabe v. G.C. Servs. Limited Partnership*, 32 F.3d 86, 88 n.2 (4th Cir. 1994); and

*Oliver v. Trunkline Gas Co.*, 796 F.2d 86, 89 (5th Cir. 1986).

    2.   Whether a party may consent to subject matter jurisdiction. The Tribal Court held that *Montana v. United States*, 450 U.S. 544, 565 (1981), applied to determine the existence of subject matter jurisdiction.

*Montana v. United States*, 450 U.S. 544 (1981);

*Knighton v. Cedarville Rancheria of N. Paiute Indians*, 922 F.3d 892 (9th Cir. 2019);

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. McKee*, 32 F.4th 1003 (10th Cir. 2022);

*Water Wheel Camp Rec. Area, Inc. v. Larance*, 642 F.3d 802, 818 (9th Cir. 2011):

## STATEMENT OF THE CASE AND FACTS

Petitioner/Appellee, Lillian "Toni" Montileaux ("Ms. Montileaux"), is an enrolled member of the Oglala Sioux Tribe who lives within the boundaries of the Pine Ridge Indian Reservation.  Respondent/Appellant is a Native Community Development Financial Institution ("Mazaska") that provides housing loans and financial and homebuyer education training to members of the Tribe living on, or in communities adjacent to, the Pine Ridge Indian Reservation and enrolled members of other federally recognized tribes in South Dakota. Mazaska operates its business from land lying entirely within the boundaries of the Pine Ridge Indian Reservation. The land is leased to Mazaska by the Oglala Sioux Tribe.

On July 7, 2010, the Parties executed a mortgage (One Hundred Eighty Day Redemption) for repayment of Petitioner's debt in the amount of $51,634.00 ("First Mortgage").[1]  Section 2

---

[1] Sandven Decl. Exhibit 3 attached to the Complaint.

2

Mazaska Complaint Exhibit 3 101

requires Mazaska to give Ms. Montileaux, without charge, an annual accounting of the escrow account.[2]  Ms. Montileaux has never received an annual accounting.  On July 7, 2010, Ms. Montileaux executed the "First Note" therein promising to pay Mazaska $51,634.00, plus interest at a yearly rate of 7.50%.[3]  The Note provided for Tribal Court jurisdiction.

On December 1, 2010, the Parties executed a second mortgage (One Hundred Eighty Day Redemption) for repayment of Petitioner's debt in the amount of $54,084.00 ("Second Mortgage").[4] Again, the Note provided for Tribal Court jurisdiction.

On April 19, 2011, the Parties executed a third mortgage (One Hundred Eighty Day Redemption) for repayment of Ms. Montileaux's debt in the amount of $66,370.25 ("Third Mortgage").[5]  Provisions of the Third Mortgage were the same as contained within the First and Second Mortgages.[6]  All three agreements – which Mazaska drafted - explicitly provided that Tribal Court had jurisdiction.

On or about October 14, 2021, Ms. Montileaux filed a complaint in Tribal Court for breach of contract and breach of the covenant of good faith and fair dealing. Specifically, Ms. Montileaux asserted that Mazaska had misapplied her payments and demanded an accounting – not of just the escrow funds – but the entire loan. She asserts she had paid more toward the loan balance than shown by the records of Mazaska.

**POINT I**

**THE TRIBAL COURT HAS SUBJECT MATTER JURISDICTION BECAUSE THE REAL ESTATE SETTLEMENT ACT DOES NOT APPLY TO MS. MONTILEAUX'S BREACH OF CONTRACT CLAIM.**

---

[2] *Id.*
[3] *Id.* at Section 2.
[4] *Id.*
[5] *Id.*
[6] *Id.*

3

Mazaska Complaint Exhibit 3
102

Mazaska asserts that the subject matter of this dispute arises under RESPA because Ms.
Montileaux invoked the federal statute by referring in her complaint to Section 2 of the mortgage
document which provides:

> Lender may, at any time, collect and hold funds in an amount not to exceed the maximum
> amount of Lender for a federally related mortgage loan may require for Borrower's
> escrow account under the federal Real Estate Settlement Procedures Act of 1974 as
> amended from time to time, 12 U.S.C. Section 2601 *et. seq.* ("RESPA"), unless another
> law that applies to the Funds sets a lesser amount.

RESPA, 12 U.S.C. 2601 et seq., requires lenders, mortgage brokers, or servicers of home loans
to provide borrowers with disclosures regarding the nature and costs of the real estate settlement
process. According to 12 CFR 1024.5(a), RESPA is applicable to all "federally related mortgage
loans," which must satisfy several criteria – one of which is that the loan must be made by a
lender, creditor, or dealer.  None of these categories apply to Mazaska.

Mazaska does not qualify as a lender which includes financial institutions either regulated
by, or whose deposits or accounts are insured by, any agency of the federal government.
Mazaska is a non-regulated Loan Fund.[7] RESPA covers any creditor that makes or invests in
residential real estate loans aggregating more than $1,000,000 per year. *See* Section 103(g) of the
Consumer Credit Protection Act (15 U.S.C. 1602(g)). Mazaska does not qualify as a creditor.[8]
Finally, a "dealer" is defined in Regulation X to mean a seller, contractor, or supplier of goods or
services. Mazaska does not fall into this category.  Because, Mazaska does not constitute a
"lender", "dealer" or "creditor", RESPA is not applicable to the transaction with Ms.
Montileaux. Accordingly, a federal question does not exist.

Further, Section 2 of the mortgage document only references RESPA – it does not adopt

---

[7] *See* Appellee's Memorandum in Opposition, Exhibits 2 and 3.
[8] *Id.* Exhibit 4.

4

Mazaska Complaint Exhibit 3
103

the legislation. Parties cannot agree to federal question jurisdiction where it does not otherwise exist. *Gardner v. United States*, 211 F.3d 1305, 1310, 341 U.S. App. D.C. 247 (D.C. Cir. 2000). Additionally, even if a contract incorporates standards included in federal law, or a party might have a defense under federal law to a breach of contract action, claims brought to enforce the contract do not inherently raise federal questions. *E.g., Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 841, 109 S. Ct. 1519, 103 L. Ed. 2d 924 (1989); *Jackson Transit Auth. v. Local Division 1285*, 457 U.S. 15, 29, 72 L. Ed. 2d 639, 102 S. Ct. 2202 (1982)(the mandatory incorporation of federal standards into a contract does not automatically create federal subject matter jurisdiction in a contract action based on an alleged breach of those standards); *Mabe v. G.C. Servs. Limited Partnership*, 32 F.3d 86, 88 n.2 (4th Cir. 1994) (presence of a federal statutory standard in a private contract does not create federal question jurisdiction); *Oliver v. Trunkline Gas Co.*, 796 F.2d 86, 89 (5th Cir. 1986) ("We are aware of no case in which any court . . . has held that a private contract can give rise to federal question jurisdiction simply by 'incorporating' some federal regulatory standard that would not have been binding on the parties by its own force.")

The parties' agreements refer to RESPA solely for calculating the maximum amount Mazaska may collect for escrow. It does not by itself establish subject matter jurisdiction in federal court. Mazaska arguments are convoluted at best and do not serve as justification to strip the Tribal Court of jurisdiction.

## POINT II

### THE TRIBAL COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO *MONTANA V. UNITED STATES*

Next, Mazaska argues that the Tribal Court erred in determining it had jurisdiction over this matter pursuant to *Montana v. United States*, 450 U.S. 544 (1981), because parties cannot

5

Mazaska Complaint Exhibit 3
104

consent to subject matter jurisdiction.[9] To the contrary, federal, Tribal and state courts have been

determining the existence of a Tribe's subject matter jurisdiction pursuant to the Montana test for

decades.  *See Knighton v. Cedarville Rancheria of N. Paiute Indians*, 922 F.3d 892 (9th Cir.

2019):

> Tribal Court had subject matter jurisdiction over a tribe's claims against a nonmember
> employee because the tribe had authority to regulate the nonmember employee's conduct
> pursuant to its inherent power to exclude nonmembers from tribal lands and the tribe had
> regulatory authority over the nonmember employee's conduct under either of the
> two *Montana* exceptions because the conduct that the tribe sought to regulate through tort
> law arose directly out of the consensual employment relationship, and the significant
> financial harm to the tribe caused by the employee's conduct imperiled the subsistence of
> the tribal community. Once the authority to regulate nonmember conduct existed, it made
> no difference whether the tribe adjudicated the employee's conduct through the personnel
> manual or through tort law.

*See also Ute Indian Tribe of the Uintah & Ouray Rsrv. v. McKee*, 32 F.4th 1003 (10th Cir.

2022)(Because neither *Montana* exception applied to a property owner's alleged conduct, the

district court correctly determined that the tribal court lacked subject-matter jurisdiction over the

water dispute between a tribe and the owner, a nonmember); *Water Wheel Camp Rec. Area, Inc.*

*v. Larance*, 642 F.3d 802, 818 (9th Cir. 2011):

> Subject matter jurisdiction, on the other hand, concerns the authority of a court to hear
> cases of a particular subject matter and usually has nothing to do with the individual
> actions of the parties. But under *Montana's* first exception, a tribe's exercise of subject
> matter jurisdiction over a non-Indian defendant depends on the existence of a "consensual
> relationship" between the non-Indian defendant and the tribe or its members. Thus, the
> nature and extent of an individual defendant's actions come into play.
> there is no distinction between regulation and adjudication, at least in terms of analyzing
> a tribe's subject matter jurisdiction under the exceptions carved out in *Montana*.

As the foregoing illustrates, the Tribal Court correctly analyzed the *Montana* exceptions to

determine that it had subject matter jurisdiction over Ms. Montileaux's cause of action.

---

[9] Appellant Brief at p. 4.

Mazaska Complaint Exhibit 3
105

## POINT III

## THE *MONTANA V. UNITED STATES* ANALYSIS DOES NOT APPLY WHEN TRIBAL LAND IS INVOLVED.

A simple point that the lower court did not address is that when Tribal land is involved the Montana analysis does not apply. *Montana* limited the tribe's ability to exercise its power to exclude only as applied to the regulation of ***non-Indians on non-Indian land***, not on tribal land. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144-45, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982) (recognizing a tribe's inherent authority to exclude non-Indians from tribal land, without applying *Montana*).[10] Mazaska is a non-profit entity organized under the laws of the State of South Dakota. By its own admission, it is dedicated "to creating homeownership opportunities for the ***Lakota people***" and offers products to create homeownership on the ***Reservation***."[11] (Emphasis added). On March 16, 2012, the Oglala Sioux Tribe Executive Committee, taking into consideration its "partnership" with Respondent, authorized the entity to use tribal land for

---

[10] *See also Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 654, 121 S. Ct. 1825, 149 L. Ed. 2d 889 (2001) (holding that the Navajo Nation's power to tax, derived in part from its power to exclude, should be considered under *Montana* because, unlike in *Merrion*, the incidence of the tax fell "upon non-members on non-Indian fee land"); *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993)(noting that *Montana* established that "when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands"); *Merrion*, 455 U.S. at 144-45 ("Nonmembers who lawfully enter tribal lands remain subject to the tribe's *power* to exclude them. . . . When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its *ultimate* power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry." (emphasis in original)); *Montana*, 450 U.S. at 557 (recognizing a tribe's inherent authority to condition the entry of non-Indians on tribal land as a separate matter from whether a tribe may condition the entry of non-Indians on non-Indian land); *Cohen's Handbook of Federal Indian Law* § 4.01[2][e], 220 (Nell Jessup Newton et al. eds., 2005) (explaining that "[b]ecause the exclusionary power is a fundamental sovereign attribute intimately tied to a tribe's ability to protect the integrity and order of its territory and the welfare of its members, it is an internal matter over which the tribes retain sovereignty"); *cf. Atkinson Trading Co.*, 532 U.S. 645, 121 S. Ct. 1825, 149 L. Ed. 2d 889 (holding that the Navajo Nation's power to exclude did not allow it to tax non-Indians on *non-Indian* fee land (emphasis added)).
[11]

7

Mazaska Complaint Exhibit 3 106

twenty-five (25) years with an annual rent of $100.00.[12] Because Mazaska conducts its business on Tribal land, the Tribal Court has jurisdiction over this dispute.

## CONCLUSION

In summation, Mazaska provides services to the Lakota to enable them to purchase homes on the Pine Ridge Reservation – all from a building located on Tribal land leased to Mazaska by the Oglala Sioux Tribe. Mazaska entered into three mortgage agreements with Ms. Montileaux, an enrolled member of the Oglala Sioux Tribe, which is secured by Tribal land. Mazaska drafted the mortgage agreements and by its own accord incorporated Tribal Court jurisdiction into each one of those documents. Clearly, the Tribal Court has jurisdiction over this dispute. As such, the decision of the lower court must be affirmed.

Dated: November 10, 2022.

By _____
    Steven D. Sandven

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of November, 2022, a true and correct copy of the foregoing Appellee's Brief was sent via US mail and email to:

>       Jonathan C. McCoy
>       704 South St. Joseph Street
>       P.O. Box 290
>       Rapid City SD 57709
>       jmccoy@costelloporter.com

_____
Steven D. Sandven

---

[12] Appellee's Memorandum in Opposition Exhibit 1.

8

Mazaska Complaint Exhibit 3
107

SUPREME COURT OF THE OGLALA SIOUX NATION

OGLALA SIOUX TRIBE

PINE RIDGE INDIAN RESERVATION

---

LILLIAN "TONI" MONTILEAUX,

            Petitioner/Appellee

v.

MAZASKA OWECASO OTIPI FINANCIAL, INC.,

            Respondent/Appellant

CIV. APP. NO. 22-_____

**APPELLANT'S REPLY**

---

APPEAL FROM THE OGLALA SIOUX TRIBAL COURT
OGLALA SIOUX TRIBE
PINE RIDGE INDIAN RESERVATION

---

THE HONORABLE DAVE DILLON
Chief Judge OST Tribal Court

---

Steven D. Sandven
12294 Gold Mountain Loop
Hill City, SD 57745
sdsandven@gmail.com
**Counsel for Appellee**

Jonathan P. McCoy
Costello, Porter, Hill, Heisterkamp,
    Bushnell & Carpenter, LLP
PO Box 290
Rapid City, SD 57709
605.343.2410
**Counsel for Appellant**

---

NOTICE OF APPEAL FILED SEPTEMBER 12, 2022

---

Mazaska Complaint Exhibit 3
108

# TABLE TO AUTHORITIES

<u>Page</u>

**CASES:**

*Calvagno v. Bisbal,*
430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006)                                              2

*Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, Afl-Cio-Clc,*
457 U.S. 15, 21 n.6 (1982)                                                           1

*Montana v. United States*,
450 U.S. 544 (1981)                                                                  3

*Okla. Tax Comm'n v. Graham*,
489 U.S. 838, 840-41 (1989)                                                          2

*Oliver v. Trunkline Gas Co.*,
796 F.2d 86, 87 n.1 (5th Cir. 1986)                                                  2

*United States v. Am. Horse*,
352 F. Supp. 2d 984, 990 (D.N.D. 2005)                                               3

*United States v. Big Crow*, No. CIV 15-5008,
2016 U.S. Dist. LEXIS 26491, at *3 (D.S.D. Mar. 2, 2016)                             1

*United States v. Hump*,
515 F. Supp. 3d 1015, 1020 (D.S.D. 2021)                                             3

*Walker v. Commercial Credit Corp.*,
192 B.R. 260, 265-66 (M.D. Ala. 1996)                                                1

*Williams v. Berkshire Financial Group, Inc.*,
491 F. Supp. 2d 320 (E.D.N.Y. 2007)                                                  2

**STATUTES:**

12 U.S.C. § 2601, et seq.
12 U.S.C. § 2605
12 U.S.C. § 2609
12 U.S.C. § 2610
12 U.S.C. § 2614

Mazaska Complaint Exhibit 3
109

# TABLE TO AUTHORITIES

Page

**CASES:**

*Calvagno v. Bisbal,*
430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006)                                    2

*Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, Afl-Cio-Clc,*
457 U.S. 15, 21 n.6 (1982)                                                 1

*Montana v. United States,*
450 U.S. 544 (1981)                                                        3

*Okla. Tax Comm'n v. Graham,*
489 U.S. 838, 840-41 (1989)                                                2

*Oliver v. Trunkline Gas Co.,*
796 F.2d 86, 87 n.1 (5th Cir. 1986)                                        2

*United States v. Am. Horse,*
352 F. Supp. 2d 984, 990 (D.N.D. 2005)                                     3

*United States v. Big Crow,* No. CIV 15-5008,
2016 U.S. Dist. LEXIS 26491, at *3 (D.S.D. Mar. 2, 2016)                   1

*United States v. Hump,*
515 F. Supp. 3d 1015, 1020 (D.S.D. 2021)                                   3

*Walker v. Commercial Credit Corp.,*
192 B.R. 260, 265-66 (M.D. Ala. 1996)                                      1

*Williams v. Berkshire Financial Group, Inc.,*
491 F. Supp. 2d 320 (E.D.N.Y. 2007)                                        2

**STATUTES:**

12 U.S.C. § 2601, et seq.
12 U.S.C. § 2605
12 U.S.C. § 2609
12 U.S.C. § 2610
12 U.S.C. § 2614

Mazaska Complaint Exhibit 3
110

## JURISDICTIONAL STATEMENT

Appellant, Mazaska, relies on the Jurisdictional Statement in its Appellant's Brief, but does not waive its argument that the subject matter of the petitioner's case is not within the jurisdiction of the Oglala Sioux Nation tribal court.

## STATEMENT OF CASE

Appellant relies on its Statement of Case as provided in its Appellant's Brief. However, Appellant disagrees with statements asserting facts made by Appellee and will address them in the argument below.

## ARGUMENT

I.    <u>Federal law establishes subject matter jurisdiction. Thus, this case is not about interpreting a federal statute.</u>

Appellee argues both that parties cannot consent to subject matter jurisdiction, *Appellee's Brief* at 5, and that parties can consent to subject matter jurisdiction, *id.* at 5-6. These contradictory arguments demonstrate the jurisdictional issue of this case does not comfortably fit the mold for simple breach of contract.

Congress included federal jurisdiction within the statutory scheme of the Real Estate Settlement Procedures Act ("RESPA"). 12 U.S.C. § 2614. Federal jurisdiction exists if the complaint is drawn so as to claim a right to recover under the Constitution and laws of the United States. *Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, Afl-Cio-Clc*, 457 U.S. 15, 21 n.6 (1982); *Walker v. Commercial Credit Corp.*, 192 B.R. 260, 265-66 (M.D. Ala. 1996). Furthermore, "[u]nder a facial challenge, the reviewing court examines the complaint to determine if the plaintiff has satisfactorily alleged grounds for subject matter jurisdiction." *United States v. Big Crow*, No. CIV 15-5008, 2016 U.S. Dist. LEXIS 26491, at *3 (D.S.D. Mar. 2, 2016). Appellee's requested relief arises solely under section

1

two of the mortgage, which specifically includes and incorporates RESPA. *Appellant's Brief* at App. A-1 and A-10; *Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 840-41 (1989) ("Whether a case is one arising under federal law, in the sense of the jurisdictional statute, . . . must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." (citation omitted)).

The cases cited by Appellee analyze federal laws which specifically to not establish federal jurisdiction. In the Mass Transportation Act § 13(c) (49 U.S.C. § 1609) at issue in *Jackson Transit Auth.*, Congress did not create a federal cause of action or establish federal jurisdiction over contracts made between local governments and labor workers. *Jackson Transit Auth.*, 457 U.S. at 27. Similarly, in *Oliver v. Trunkline Gas Co.*, a case involving the Natural Gas Act, the Fifth Circuit Court of Appeals held, "it is well-established that the Natural Gas Act does not create a cause of action that completely preempts state contract actions." 796 F.2d 86, 87 n.1 (5th Cir. 1986). The Court of Appeals also stated,

> It is true, on the other hand, that the well-pleaded complaint rule has given rise to an independent corollary under which a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint. This, however, is simply another way of saying that if a federal cause of action completely preempts a state cause of action, any complaint that comes within the scope of the federal cause of action necessarily arises under federal law.

*Id.* (citations and quotations omitted). Congress, on the other hand, established federal jurisdiction within RESPA's statutory scheme. 12 U.S.C. § 2614; *Calvagno v. Bisbal*, 430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006) (retaining and establishing federal jurisdiction under RESPA); *Williams v. Berkshire Financial Group, Inc.*, 491 F. Supp. 2d 320 (E.D.N.Y. 2007) (accepting federal question jurisdiction pursuant to 12 U.S.C. § 2614 but dismissing the case on other grounds).

Mazaska Complaint Exhibit 3
112

In addition to the Congressional establishment of jurisdiction under RESPA, federal subject matter jurisdiction in this case is reinforced by the facts before this Court. Namely, Appellee admits the funds used to make her loan were federal funds authorized by a federal lending program. *United States v. Am. Horse*, 352 F. Supp. 2d 984, 990 (D.N.D. 2005) (finding this fact in conjunction with the fact that the promissory note at issue in the case was not signed by the Tribe was sufficient to find federal jurisdiction over a leasehold mortgage of Indian trust land). The mortgage at issue here is a leasehold mortgage of Indian trust land subjected to RESPA, which can be "[i]ncluded within [that] category of mortgages . . . executed on Indian trust land, where the loan itself is a product of a federal lending program." *United States v. Hump*, 515 F. Supp. 3d 1015, 1020 (D.S.D. 2021).

Finally, Appellee provides no authority as to how RESPA does not establish subject matter jurisdiction. Rather, she confuses the jurisdictional nature of 12 U.S.C. § 2614 with basic statutory interpretation by arguing RESPA is a non-factor despite the clear language of the leasehold mortgage of Indian trust land incorporating RESPA. The Appellee seems content with broad legal strokes which overlook the nuances of the law. If this were a simple case of arguing Appellant is relying on the interpretation of a federal statute for its defense, *Oliver v. Trunkline Gas Co.* and *Okla. Tax Comm'n v. Graham* might be more persuasive. But the legal reality is that Appellee is master of her complaint and seeks damages which only arise from RESPA. No tribal law or ordinance supersedes RESPA. Therefore, subject matter jurisdiction resides with the federal district court.

II.    The lease between Appellant and the Oglala Sioux Tribe is irrelevant to these issues.

Appellee argues that *Montana v. United States* applies because the Oglala Sioux Tribe has a lease with Appellant. However, the Oglala Sioux Tribe has no direct connection to the

3

Mazaska Complaint Exhibit 3 113

debt owed by Appellee to Mazaska. *United States v. Am. Horse*, 352 F. Supp. 2d 984, 990 (D.N.D. 2005). The transaction does not include tribal law or tribal regulation. There is no consideration of tribal monies, tribal taxes, or tribal policy. Appellee has not shown how Mazaska's lease with the Tribe establishes heretofore non-existent adjudicative authority under *Montana* over Mazaska for the benefit of Appellee.

## CONCLUSION

If damages are ultimately awarded to the Petitioner/Appellee, they will be awarded pursuant to 12 U.S.C. § 2601, *et seq.*, as a result of Appellee's control of the pleadings. The United States Congress established subject matter jurisdiction in the federal courts for claims arising under 12 U.S.C. §§ 2605, 2609, 2610, and 2614, apart from any security instrument or consent to personal jurisdiction. Therefore, based on the foregoing, this Court is requested to reverse the trial court and dismiss this case from tribal court for lack of subject matter jurisdiction.

## REQUEST FOR ORAL ARGUMENT

Mazaska requests the opportunity for oral argument to address the issues raised by this appeal.

Dated this 23rd day of November 2022.

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: _____

Jonathan P. McCoy
*Attorneys for Appellant*
704 St. Joseph Street
P.O. Box 290
Rapid City, SD 57709
(605) 343-2410
jmccoy@costelloporter.com

4

Mazaska Complaint Exhibit 3
114

## CERTIFICATE OF SERVICE

On this the 23rd day of November 2022, the undersigned hereby certifies that he served a copy of the foregoing document upon the person herein next designated, on the date below shown, by placing the same in the service indicated, first class postage prepaid, addressed as follows:

Steven D. Sandven                    [ ]  U.S. Mail
12294 Gold Mountain Loop             [ ]  Certified Mail
Hill City, SD 57745                  [ ]  Facsimile
sdsandven@gmail.com                  [ ]  Federal Express
*Attorney for Petitioner*            [X]  Email

                                **COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

                                By: */s/ Jonathan P. McCoy*
                                      Jonathan P. McCoy
                                      *Attorneys for Appellant*
                                      704 St. Joseph Street
                                      P.O. Box 290
                                      Rapid City, SD 57709
                                      (605) 343-2410
                                      jmccoy@costellporter.com

## CERTIFICATE OF PROOF OF FILING

The undersigned hereby certifies that he served an electronic copy in Word format and an original and one physical copy of the above and foregoing **APPELLANT'S REPLY** on the Clerk of the Supreme Court by depositing the same this date in the United States mail, postage prepaid, at Rapid City, South Dakota, addressed as follows:

                  Clerk of the Supreme Court
                  Oglala Sioux Nation Supreme Court
                  PO Box 127
                  Pine Ridge, SD 57752
                  Email address: *niki@oglala.org*

Dated this 23rd day of November 2022.

                                  **COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

                                By: */s/ Jonathan P. McCoy*
                                        Jonathan P. McCoy

Mazaska Complaint Exhibit 3
115

*Attorneys for Appellant*
704 St. Joseph Street
P.O. Box 290
Rapid City, SD 57709
(605) 343-2410
jmccoy@costellporter.com

Mazaska Complaint Exhibit 3
116

# OGLALA SIOUX TRIBE
## SUPREME COURT

IN THE MATTER OF:                          Case N0.  CIV-2022-0388

**MAZASKA OWECASO OTIPI FINANCIAL, INC.**
 Appellant

V.

**LILLIAN "TONI" MONTILEAUX**
Appellee

---

    Appellant, Mazaska Owecaso Otipi Financial, Inc., filed its appeal of the lower court order on or about August 12, 2022.  The Court hereby orders Appellant to file with the court the entirety of the lower court record and serve the same on opposing counsel, on or before **February 20th 2024** close of business.

**ORDER**

    THIS COURT ORDERS:

    1.  This Order shall become FINAL upon issuance.

**IT IS SO ORDERED.**

Dated this 6th day of February 2024.

_____
Jack Duran, Jr., Chief Justice
Oglala Sioux Tribe Supreme Court

1

RECEIVED

FEB 09 2024

COSTELLO PORTER
LAW FIRM

Mazaska Complaint Exhibit 3
117

CASE NO. CIV-2022-0388                                                    ORDER 02/06/24

## OGLALA SIOUX TRIBE

## SUPREME COURT

IN THE MATTER OF:                              **Case N0.  CIV-2022-0388**

**MAZASKA OWECASO OTIPI FINANCIAL, INC.**          **SCHEDULING ORDER AND REVISED CALL OF THE QUESTIONS ON APPEAL**

Appellant

V.

**LILLIAN "TONI" MONTILEAUX**
Appellee

The Record on Appeal having been filed with the Court, the Court's briefing and oral argument schedule is as follows:

Appellant's Reply Brief            **Due 4/17/2024**

Oral Argument                      **4/22/2024 @ 1:00 pm MT Time**

                                   (12:00 PST, 2:00 pm CST)

Petitioner's question presented is *revised* as follows: (1) Does the Tribal Court have subject matter jurisdiction over Plaintiff's action?  Does the Tribe have both regulatory and adjudicatory jurisdiction over the claims under established tribal or federal law?

## ORDER

THIS COURT ORDERS:

1. This Order shall become FINAL upon issuance.

**IT IS SO ORDERED.**

Attest:

Clerk of Supreme Court
OST Supreme Court

Dated this 26th day of February 2024.

_____
Jack Duran, Jr., Chief Justice
Oglala Sioux Tribe Supreme Court



1

**Mazaska Complaint Exhibit 3
118**

## SUPREME COURT OF OGLALA SIOUX NATION

## OGLALA SIOUX TRIBE

## PINE RIDGE INDIAN RESERVATION

---

| | | |
|---|---|---|
| MAZASCA OWECASO OTIPI FINANCIAL, INC. | ) ) ) | |
| Appellant, | ) ) | Case No. CIV-2022-0388 |
| vs. | ) ) | |
| LILLIAN "TONI" MONTILEAUX, | ) ) | |
| Appellee. | ) | |

---

## UNOPPOSED MOTION FOR LEAVE TO FILE *AMICUS* BRIEF BY OGLALA SIOUX TRIBE

---

COMES NOW the Oglala Sioux Tribe ("Tribe"), pursuant to Rule 29 of the Oglala Sioux Tribe Rules of Appellate Procedure, O.S.T. Ord. No. 17-04, and moves the Court for leave to file an *Amicus* Brief in this matter. In support of this motion, the Tribe states that, on April 17, 2024, the undersigned counsel for the Tribe conferred with counsel for Appellant and counsel for Appellee and they have no opposition to this motion provided Appellant is given a period of 30-45 days to reply to the *Amicus* Brief of the Tribe.

WHEREFORE, the Tribe moves the Court for leave to file its *Amicus* Brief and to allow Appellant a period of 30-45 days to reply to the *Amicus* Brief of the Tribe.

Dated: April 19, 2024

Mazaska Complaint Exhibit 3
119

Dated: April 19, 2024

Respectfully submitted,

STEVEN J. GUNN
1301 Hollins Street
St. Louis, MO 63135
Telephone: (314) 920-9129
Facsimile: (800) 520-8341
Email: sjgunn@wulaw.wustl.edu

*Attorney for Oglala Sioux Tribe*

13

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on April 19, 2024, a true and accurate copy of the foregoing was served on all counsel and parties of record by electronic mail.

_____
STEVEN J. GUNN

# SUPREME COURT OF OGLALA SIOUX NATION

## OGLALA SIOUX TRIBE

### PINE RIDGE INDIAN RESERVATION

---

MAZASCA OWECASO OTIPI      )
FINANCIAL, INC.               )
                               )
       Appellant,           )       Case No. CIV-2022-0388
                               )
       vs.                   )
                               )
LILLIAN "TONI" MONTILEAUX,    )
                               )
       Appellee.            )

---

Appeal from the Oglala Sioux Tribal (Inferior) Court
Oglala Sioux Tribe
Pine Ridge Indian Reservation

---

The Honorable David Dillion, Chief Judge
Oglala Sioux Tribal (Inferior) Court

---

### *AMICUS* BRIEF OF THE OGLALA SIOUX TRIBE

---

Steven J. Gunn
Special Counsel to the Oglala Sioux Tribe
1301 Hollins Street
St. Louis, MO 63135
(314) 920-9129
sjgunn@wulaw.wustl.edu

*Attorney for Oglala Sioux Tribe*

Mazaska Complaint Exhibit 3
122

## TABLE OF CONTENTS

INTEREST OF *AMICUS*.................................................................................................1

STATEMENT OF THE CASE

    A.  Plaintiff/Appellee Montileaux Is a Member of the Tribe Who Resides on the Reservation..................................................................................................2

    B.  Defendant/Appellant Mazaska Is Based on the Pine Ridge Indian Reservation and Enters Consensual Relationships with the Tribe and Its Members........................2

    C.  Ms. Montileaux's Claims Arise Out of a Loan She Made with Mazaska Relating to Her Home on the Reservation ......................................................3

    D.  Ms. Montileaux's Home Is Located on Tribal Trust Land and Individual Indian Allotted Trust Land on the Reservation ...............................................4

    E.  The Mortgage Purports to Convey an Interest in Trust Land on the Reservation ................................................................................................5

    F.  The Mortgage Does Not Appear to Be a Leasehold Mortgage......................................6

    G.  The Tribal Court Rejected Mazaska's Challenges to Its Jurisdiction ...........................7

ARGUMENT

I.  THE TRIBAL COURT HAS JURISDICTION OVER MAZASKA AND ITS ON-RESERVATION CONDUCT IN THIS CASE ...........................................................9

II.  MAZASKA HAS NOT ESTABLISHED THAT MS. MONTILEAUX'S CLAIMS ARISE UNDER THE REAL ESTATE SETTLEMENT PROCEDURES ACT OR ANY OTHER FEDERAL LAW ...........................................................................11

CONCLUSION...........................................................................................................12

Mazaska Complaint Exhibit 3
123

## INTEREST OF *AMICUS*

The Oglala Sioux Tribe ("Tribe") is a federally recognized Indian tribe that reserved its original, inherent right to self-government through the Treaty of 1851, 11 Stat. 749 (Sept. 17, 1851), and the Treaty of 1868, 15 Stat. 635 (Apr. 29, 1868). The Tribe possesses sovereignty over both its members and its territory. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982); *United States v. Mazurie*, 419 U.S. 544, 557 (1975). It has the right to make its own laws and be ruled by them. *Williams v. Lee,* 358 U.S. 217, 220 (1959).

The Tribe organized under Section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 5123, by adopting a federally approved Constitution and By-Laws. Pursuant to Article IV, Section 1(k), of the Tribal Constitution, the Tribe has established a tribal judiciary, consisting of the Oglala Sioux Tribal (Inferior) Court and the Oglala Sioux Tribe Supreme Court. The judicial power of the Tribe is vested in these courts, which provide for the maintenance of law and order and the administration of justice on the Pine Ridge Indian Reservation ("Reservation"). *See* O.S.T. Const., Art. V, § 1.

The adjudicative jurisdiction of the Tribe is essential to tribal self-government since it allows "reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217 (1959).

The Tribe has an interest in preserving and protecting the jurisdiction of its Tribal Courts, including the courts' jurisdiction over civil causes of action involving tribal members, tribal and allotted trust lands, and on-reservation contracts and commercial dealings. The Tribe also has an interest in preserving the jurisdiction of its Tribal Courts over civil causes of action involving nonmembers, including its jurisdiction over nonmembers under the so-called "*Montana* exceptions." In *Montana v. United States*, 450 U.S. 544 (1981), the Supreme Court held that Indian

1

Mazaska Complaint Exhibit 3
124

tribes retain the inherent sovereign power to regulate the conduct of nonmembers who enter consensual relationships with the Tribe or its members or whose conduct threatens or has a direct effect on the political integrity, economic security, or health and welfare of the Tribe. *Id.* at 565-566. In *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), the Court articulated the "unremarkable proposition" that, "where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts." *Id*. at 453 (internal citation and punctuation omitted).

In keeping with these interests, and for the reasons set forth below, the Tribe supports affirmance of the Tribal Court's decision below, which upholds the court's jurisdiction over this action.

## STATEMENT OF THE CASE

This case involves a civil cause of action brought by appellee Lillian "Toni" Montileaux against appellant Mazaska Owecaso Otipi Financial, Inc. ("Mazaska") for alleged breach of contract and alleged breach of the covenant of good faith and fair dealing. The salient facts, and procedural posture, of the case are as follows:

### A. Plaintiff/Appellee Montileaux Is a Member of the Tribe Who Resides on the Reservation.

Ms. Montileaux is an enrolled member of the Oglala Sioux Tribe who resides on trust land on the Pine Ridge Indian Reservation.

### B. Defendant/Appellant Mazaska Is Based on the Pine Ridge Indian Reservation and Enters Consensual Relationships with the Tribe and Its Members.

Mazaska is a non-profit corporation organized and existing under the laws of the State of South Dakota. *See* O.S.T. Appendix 1-8 (Certificate and Articles of Incorporation). It appears that

Mazaska Complaint Exhibit 3 125

some or all of the officers and directors of Mazaska are "members of the Tribe." Tribal Court Order 5 (Aug. 10, 2022).

The principal office of Mazaska is in Pine Ridge, South Dakota, on the Pine Ridge Indian Reservation. O.S.T. Appendix 9-10 (Annual Report). Specifically, Mazaska's office is located on Tract TR 11514, which is Tribal Reserve land held in trust by the United States for the Tribe, and which was set aside by the Tribe for the Mazaska office. *See* O.S.T. Appendix 11-12 (Resolution No. 12-20XB (Mar. 16, 2012)).

Mazaska was formed, among other things, "to provide grants, loans, guarantees, or other arrangements to individuals or organizations working to develop the community" on the Pine Ridge Indian Reservation, to "provide information, technical, assistance, and housing counseling to the residents of the Pine Ridge Reservation, and to "enhance affordable home ownership opportunities among residents of the Pine Ridge Reservation." O.S.T. Appendix 3-4 (Articles of Incorporation).

Mazaska has entered consensual relationships with the Tribe and its members through contracts, commercial dealings, and other arrangements. On information and belief, the transactions at issue in this case are illustrative of the kinds of contracts and commercial dealings Mazaska enters with tribal members. For its part, as noted above, the Tribe set aside tribal trust land for the principal office of Mazaska. *See* O.S.T. Appendix 11-12 (Resolution No. 12-20XB (Mar. 16, 2012)). The Tribe has also pledged financial support for some of the corporate activities of Mazaska. *See*, *e.g.*, O.S.T. Appendix 13-14 (Resolution No. 17-63XB (Jun. 22, 2017)).

### C.  Ms. Montileaux's Claims Arise Out of a Loan She Made with Mazaska Relating to Her Home on the Reservation.

Ms. Montileaux's claims against Mazaska arise out of a promissory note and mortgage she entered with Mazaska in May 2011 in relation to her home on the Reservation. The Complaint

Mazaska Complaint Exhibit 3 126

alleges that Ms. Montileaux and Mazaska entered three promissory notes, each of which was secured by a mortgage. Compl. ¶¶ 9, 14, 17, 18, 21, 22 (Oct. 31, 2021). The first note and mortgage were entered on July 7, 2010. Appellant's Appendix A000037-A000039 (Note), A000026-A000036 (Mortgage). The second note and mortgage were entered on December 1, 2010. *Id*. at A000051-A000054 (Note), A000040-A000050 (Mortgage). The third note ("Third Note") and third mortgage ("Third Mortgage") were entered on May 11, 2011. *Id*. at A000022-A000025 (Note), A000012-A000021 (Mortgage).

Ms. Montileaux alleges that Mazaska "breached its contractual obligations" under the third promissory note and Third Mortgage by:

> failing and refusing to properly account for the escrow funds required by Section 2 of the Third Mortgage, unilaterally extending the maturity date as delineated in the Third Note, and not applying [Ms. Montileaux's] payments in accordance with the Third Mortgage.

Compl. ¶ 53. Ms. Montileaux further alleges that by breaching its contractual obligations, Mazaska breached the covenant of good faith and fair dealing. *Id*. at ¶ 57.

The Third Note provides that it shall be governed by "the laws of the Tribe … and applicable federal law," and "[t]he courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims arising out of this Note." Appellant's Appendix A000024.

### D.  Ms. Montileaux's Home Is Located on Tribal Trust Land and Individual Indian Allotted Trust Land on the Reservation.

Ms. Montileaux reports that her home is located on two separate tracts of trust land on the Reservation: Tract T 1373-N, which is tribal trust land, and Tract 1373-F, which is individual Indian allotted trust land. *See* O.S.T. Appendix 15 (Map).

Mazaska Complaint Exhibit 3 127

The first tract, T 1373-N, is held in trust by the United States for the benefit of the Oglala Sioux Tribe. It contains approximately 5.0 acres. Ms. Montileaux leases 2.5 acres within Tract T 1373-N from the Tribe. *Id*. at 16-19 (Residential Lease). The lease for tract T 1373-N describes the land as SE1/4 SE1/4 NE1/4 NE1/4 of Section 18, Township 39 North, Range 41 West, [Oglala Lakota] County, South Dakota, Sixth Prime Meridian, containing 2.5 acres, more or less. *Id*. at 16. The lease for Tract T 1373-N runs through 2040. *Id*. at 20 (Lease Modification).

The second tract, 1373-F, is allotted land held in trust by the United States for the benefit of two individual Indian owners: Lillian "Toni" Montileaux, who has an undivided 25% interest in the tract, and her mother, Annie Montileaux, who has an undivided 75% interest in the tract. O.S.T. Appendix 21-25 (Title Status Report). Tract 1373-F contains 10.0 acres. *Id*. Ms. Montileaux leases 2.5 acres within Tract 1373-F. *Id*. at 26-33 (Residential Lease of Allotted Land). The lease for Tract 1373-F describes the land as NW1/4 SW1/4 NE1/4 NE1/4 of Section 18, Township 39 North, Range 41 West, [Oglala Lakota] County, South Dakota, Sixth Prime Meridian, containing 2.5 acres, more or less. *Id*. at 26. The lease for Tract 1373-F runs through 2035 and may be extended. *Id*. at 27.

### E.  The Mortgage Purports to Convey an Interest in Trust Land on the Reservation.

The promissory note at issue in this case is purportedly secured by a mortgage related to the Tract 1373-F, which is allotted trust land, and the improvement and fixtures on that land. *See*, *e.g.*, Appellant's Appendix A000022-A000025 (Note), A000012-A000021 (Mortgage).  The mortgage describes the land to which it purportedly attaches as all ten acres of NW1/4 SW1/4 NE1/4 NE1/4 of Section 18, Township 39 North, Range 41 West, [Oglala Lakota] County, South Dakota. Appellant's Appendix A000012. This is the legal description of Tract 1373-F.

The mortgage states that:

Mazaska Complaint Exhibit 3 128

> Borrower [Lillian A. Montileaux] does hereby mortgage, grant and convey to Lender [Mazaska Owecaso Otipi Financial, Inc.], with power of sale, the following described property located in Shannon County, South Dakota, which has the address of: NWI/4SWI/4NEI/4NEI/4,S18-39-41,Shannon County, South Dakota (Property Address) 10 acres … TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.

Appellant's Appendix A000012.

Because the mortgage purports to convey an interest in individual Indian allotted trust land, it must be approved by all "individual Indian owners" of Tract 1373-F and the Secretary of the Interior, pursuant to 25 U.S.C. § 5135(a). It is not known whether those approvals were secured.

The mortgage does not appear to convey an interest in Tract T 1373-N, which is tribal trust land. If it did, it would have to be approved by the Tribe and the United States, pursuant to 25 U.S.C. § 177. Without those approvals, the mortgage would be invalid.

## F.  The Mortgage Does Not Appear to Be a Leasehold Mortgage.

Mazaska describes the Third Mortgage as "a leasehold mortgage," App. Br. 2, but that does not appear to be accurate. The mortgage does not convey an interest in any lease, let alone a lease for Tract 1373-F. Instead, it purports to "mortgage, grant and convey" to Mazaska, "with power of sale," the "property" consisting of all ten acres in Tract 1373-F. Appellant's Appendix A000012. As noted above, a conveyance of this kind is not valid without approval of all individual Indian landowners, including Ms. Montileaux and her mother, and the Secretary of the Interior. 25 U.S.C. § 5135(a).

In other contexts, federal law requires leasehold mortgages related to Indian trust land to contain protections for Indian tribes, tribal members, and their lands. For example, under the Section 184 of the Housing and Community Development Act of 1992, before a security interest in Indian trust or restricted land may be liquidated, the mortgagee must offer "to transfer the

6

account to an eligible tribal member, the tribe, or the Indian housing authority serving the tribe," and even after liquidation, the mortgagee may "not sell, transfer, or otherwise dispose of or alienate the property," except to an eligible tribal member, the tribe, and the Indian housing authority serving the tribe. 12 U.S.C. § 1715z-13a(h)(2). The mortgage in this case contains no such protections for the Tribe, its members, or their lands.

**G.  The Tribal Court Rejected Mazaska's Challenges to Its Jurisdiction.**

Mazaska filed an Answer and Affirmative Defenses in which it asserted various defenses, none of which challenged the personal or subject matter jurisdiction of the Tribal Court. Ans. and Aff. Def. 4 (Jan. 10, 2022).

Thereafter, Mazaska filed a Motion to Dismiss in which it challenged the subject matter jurisdiction of the Tribal Court. Mazaska argued that tribal jurisdiction is not authorized by "the exception in *Montana*." Br. in Support of Mot. to Dismiss 3. Mazaska addressed the second *Montana* exception, but not the first, which authorizes tribal jurisdiction over "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565 (citations omitted). Mazaska's activities fit squarely within the first *Montana* exception, since they arise out of, and have a direct nexus to, the contracts Mazaska made with Ms. Montileaux, a tribal member.

As to the second *Montana* exception, Mazaska argued that "there is no tribal interest involved." Br. in Support of Mot. to Dismiss 6.  Mazaska incorrectly asserted that, "[t]he Oglala Sioux Tribe does not regulate [the] action or conduct of Mazaska by taxation, licensing, or other means." *Id*. This is simply not true. The Tribe licenses and regulates all businesses on the Reservation and has enacted laws specifically regulating the extension of credit on the Reservation.

Mazaska Complaint Exhibit 3
130

*See*, *e.g.*, O.S.T. Appendix 34-60 (Ordinance No. 19-38 (Sept. 4, 2019) (Oglala Sioux Tribe Credit Code)).

The Tribal Court denied Mazaska's motion to dismiss. The court held that Mazaska is a non-Indian "citizen of the State of South Dakota" because it is incorporated under state law. Tribal Court Order 6 (Aug. 10, 2022). The court held that it has jurisdiction over Ms. Montileaux's claims against Mazaska because, among other things, the claims relate to and arise out of consensual relationships Mazaska entered into with Ms. Montileaux, within the meaning of the first *Montana* exception. *Id*. at 9-10. Those consensual relationships include one or more promissory notes in which Mazaska consented to the sole and exclusive jurisdiction of the Tribal Court over all controversies or claims relating to or arising out of the note. *Id*.

Mazaska had also argued that the Tribal Court lacks subject matter jurisdiction because, in its view, Ms. Montileaux's claims arise under the Real Estate Settlement Procedures Act ("RESPA"). According to Mazaska, "[t]he Petitioner's sole claims, stated to be breach of contract, arise specifically from 12 U.S.C. § 2605, which is incorporated into the mortgage document …" Br. in Support of Mot. to Dismiss 7.

The Tribal Court did not address Mazaska's RESPA argument, most likely because the Complaint in this action does not mention RESPA, let alone assert a cause of action under RESPA or seek damages under REPSA. *See*, *e.g.*, 12 U.S.C. § 2605(f) (authorizing actual and statutory damages for certain RESPA violations). The Complaint asserts common law causes of action arising under tribal law.

Mazaska has appealed the denial of its motion to dismiss. On appeal, Mazaska appears to abandon any argument that its lending transactions with Ms. Montileaux do not satisfy the first or second *Montana* exception. In its reply brief, Mazaska addresses its land lease with the Tribe and

8

Mazaska Complaint Exhibit 3
131

states that it is "irrelevant" to the *Montana* analysis, Reply 3, but it does not address its several contracts with Ms. Montileaux and the direct nexus between those contracts and Ms. Montileaux's common law claims against Mazaska.

Mazaska's primary argument on appeal appears to be that the Tribal Court lacks subject matter jurisdiction because, in its view, Ms. Montileaux's claims are not tribal law claims, but instead federal claims arising under RESPA. The Tribe disagrees, and for the reasons set forth herein, urges the Court to affirm the order of the Tribal Court.

## ARGUMENT

I.    **THE TRIBAL COURT HAS JURISDICTION OVER MAZASKA AND ITS ON-RESERVATION CONDUCT IN THIS CASE.**

In *Montana v. United States*, 450 U.S. 544 (1981), the Supreme Court held that Indian tribes retain the inherent sovereign power to regulate, through taxation, licensing, or other means, the conduct of nonmembers (1) who enter consensual relationships with the Tribe or its members, through commercial dealing, contracts, leases, or other arrangements, or (2) whose conduct threatens or has a direct effect on the political integrity, economic security, or health and welfare of the Tribe. *Id.* at 565-566. The Tribe submits that both *Montana* exceptions are met in this case.

With respect to the first *Montana* exception, there is no dispute that Mazaska entered consensual relationships, including one or more promissory notes and mortgages, with Ms. Montileaux, a member of the Tribe. There is also no dispute that Ms. Montileaux's common law claims arise out of and have a direct nexus to her contracts with Mazaska, specifically the Third Note and Third Mortgage.

In its order below, the Tribal Court correctly determined that Ms. Montileaux and Mazaska entered consensual relationship and that Ms. Montileaux's claims have "a sufficient nexus to the

Mazaska Complaint Exhibit 3
132

consensual relationship." Tribal Court Order 10-11 (Aug. 10, 2022). The lower court's order should be affirmed.

With respect to the second *Montana* exception, the Complaint alleges conduct by Mazaska that, if proven, would pose a threat to core tribal interests. Specifically, it is alleged that Mazaska: made a home loan to a tribal member on the Reservation; refuses to account for, or properly apply, payments made by the tribal member on the loan; unilaterally extended the repayment period of the loan; and secured a purported security interest in Indian trust land on the Reservation, which it may seek to foreclose if further loan payments are not made. The loss of on-reservation Indian trust land threatens the economic security, political integrity, and health and welfare of the Tribe.

The Tribe has an extraordinary interest in protecting Indian trust land on the Reservation and in preventing the alienation and loss of that land through foreclosure. The Tribe also has an interest in regulating the extension of credit on the Reservation, including the extension of credit secured by on-reservation Indian trust land. To that end, the Tribe licenses and regulates all businesses on the Reservation, including lenders, and it has enacted laws specifically regulating the extension of credit on the Reservation. *See*, *e.g.*, O.S.T. Ordinance No. 19-38 (Sept. 4, 2019) (Oglala Sioux Tribe Credit Code). If the Tribe's inherent authority were denied in these areas, it would threaten the economic security, political integrity, and health and welfare of the Tribe.

In *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), the Court held that, "where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts." *Id.* at 453 (internal citation and punctuation omitted).

The Tribe has the authority to regulate the activities of nonmembers, like Mazaska, who extend credit to tribal members on the Reservation. It follows that the Tribal Courts have

Mazaska Complaint Exhibit 3
133

jurisdiction to adjudicate disputes arising out of such activities. Indeed, the Tribal Courts play an important role in regulating on-reservation credit transactions involving tribal members by, among other things, enforcing the Tribe's common law of contracts and good faith and fair dealing.

## II.    MAZASKA HAS NOT ESTABLISHED THAT MS. MONTILEAUX'S CLAIMS ARISE UNDER THE REAL ESTATE SETTLEMENT PROCEDURES ACT OR ANY OTHER FEDERAL LAW.

Mazaska's primary challenge to the Tribal Court's jurisdiction is that, in its view, Ms. Montileaux's claims arise under RESPA. However, the Complaint in this action does not mention RESPA, assert a cause of action under RESPA, or seek damages under REPSA. Instead, the Complaint asserts common law causes of action arising under tribal law.

Mazaska correctly notes that plaintiff/appellee Montileaux is the master of her Complaint. Appellant's Br. 3. In her Complaint, Ms. Montileaux is asserting common law claims that arise under tribal law, not federal claims that arise under RESPA or any other federal law.

The reference in the Complaint to Section 2 of the Third Mortgage does not transform Ms. Montileaux's common law claims into RESPA claims. Section 2 provides, in part, that the amount of funds Mazaska may collect and hold in escrow may not exceed the maximum amount a lender for a federally related mortgage loan may require for a borrower's escrow account under RESPA, unless another law that applies to the escrow funds sets a lesser amount. Appellant's Appendix A000013. This is insufficient to transform Ms. Montileaux's breach of contract claim into a RESPA claim.

The cited language in Section 2 appears to be nothing more than a reference to extrinsic standards made by the parties for the purpose of establishing the maximum amount of funds Mazaska may hold in escrow under the Third Mortgage. Simply put, Mazaska agreed to limit the escrow funds to the maximum amount a lender for a federally related mortgage loan could require

Mazaska Complaint Exhibit 3 134

under RESPA or by any other applicable law setting a lesser amount. The parties did not agree that RESPA governs the Third Mortgage.

It is Mazaska's burden to show: that RESPA governs to the Third Mortgage; that Ms. Montileaux's claims *must* arise, if at all, under RESPA; that Ms. Montileaux's claims *cannot* arise under tribal law, including tribal common law; and that RESPA deprives the Tribal Court of jurisdiction over this action. Mazaska has not met that burden. In fact, Mazaska does not appear to address, let alone overcome, Ms. Montileaux's contentions that the Third Mortgage is not a federally related mortgage loan and that Mazaska does not qualify as a lender, creditor, or dealer under RESPA. *See* Appellee's Br. 4.

Ms. Montileaux alleges breaches of substantive requirements specifically set forth in the Third Mortgage, not breaches of standards found in extrinsic laws, like RESPA. For example, the Third Mortgage specifically states, in § 2, that, "Lender shall give to Borrower, without charge, an annual accounting of the [Escrow] Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made." Appellant's Appendix A000013.

This Court should reject Mazaska's attempt to use an isolated reference in the Third Mortgage to extrinsic standards in RESPA or other applicable laws to defeat the clear jurisdiction of the Tribal Court over an on-reservation contract made by Mazaska with a tribal member that touches and concerns on-reservation trust land.

## CONCLUSION

For the reasons set forth herein, the Court should affirm the decision below.

Mazaska Complaint Exhibit 3
135

Dated: April 19, 2024

Respectfully submitted,

STEVEN J. GUNN
1301 Hollins Street
St. Louis, MO 63135
Telephone: (314) 920-9129
Facsimile: (800) 520-8341
Email: sjgunn@wulaw.wustl.edu

*Attorney for Oglala Sioux Tribe*

13

Mazaska Complaint Exhibit 3
136

332 1571

Receipt Number:  *1330461*

File Number  **NS012594**   *N S 0 1 2 5 9 4*

 * C E R T I F I C A T E   O F   I N C O R P O R A T I O N *

**CERTIFICATE_OF_INCORPORATION**

For

**MAZASKA OWECASO OTIPI FINANCIAL, INC.**

Filed at the request of:

**DAVID SNELL**
**MAZASKA OWECASO OTIPI FINANCIAL INC**
**PO BOX 3001**
**PINE RIDGE  SD  57770**

*State of South Dakota*
*Office of the Secretary of State*

Filed in the office of the Secretary of State on: **Monday, June 14, 2004**

Secretary of State

Fee Received:     $25.00

Mazaska Complaint Exhibit 3
137



# State of South Dakota

## OFFICE OF THE SECRETARY OF STATE

# Certificate of Incorporation
# Nonprofit Corporation

### ORGANIZATIONAL ID #: NS012594

**I, Chris Nelson,** Secretary of State of the State of South Dakota, hereby certify that the Articles of Incorporation of **MAZASKA OWECASO OTIPI FINANCIAL, INC.** duly signed and verified, pursuant to the provisions of the South Dakota Corporation Act, have been received in this office and are found to conform to law.

**ACCORDINGLY** and by virtue of the authority vested in me by law, I hereby issued this Certificate of Incorporation and attach hereto a duplicate of the Articles of Incorporation.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and affixed the Great Seal of the State of South Dakota, at Pierre, the Capital, this June 14, 2004.

**Chris Nelson**
**Secretary of State**

Cert of Incorp Non Profit Merge.doc



RECEIVED

JUN 14 '04

S.D. SEC. of STATE

# ARTICLES OF INCORPORATION

## OF

### MAZASKA OWECASO OTIPI FINANCIAL, INC., A Non-Profit Corporation

The undersigned, who are citizens of the United States, acting as incorporators of a nonprofit corporation, hereby adopt the following Articles of Incorporation:

## ARTICLE I

The name of the corporation is Mazaska Owecaso Otipi Financial, Inc

## ARTICLE II

The corporation shall have perpetual existence.

## ARTICLE III

This Corporation is organized and shall be operated exclusively for charitable and educational purposes as contemplated and permitted by Sections 170(c)(2) and 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). All references in these Articles of Incorporation to a particular section of the Code shall include the corresponding provisions of any future federal tax law. Within the framework and limitations of the foregoing, the specific primary purposes of the Corporation include:

1. To act as a Community Development Financial Institution as defined in and regulated by 12 CFR Part 1805

2. To provide grants, loans, guarantees, or other arrangements to individuals or organizations working to develop the community, and to enter into lawful agreements to secure and enforce the performance and payment obligations of such financial assistance.

3. To provide information, technical assistance, and housing counseling to the residents of the Pine Ridge Reservation concerning the methods and resources available for construction of new housing and the rehabilitation of substandard housing. The Corporation is also formed for the educational purposes of instructing the residents of the Pine Ridge Reservation on how to prepare for home ownership, purchase a home, and

1

NSO12594

Mazaska Complaint Exhibit 3 139

maintain and rehabilitate a home, which will improve or develop the capabilities of the community.

4. To enhance affordable home ownership opportunities among residents of the Pine Ridge Reservation.

5. To promote and develop affordable, decent, safe, and sanitary housing for residents of the Pine Ridge Reservation.

6. To improve the community physically, socially, and economically by the coordinated efforts of the citizens of the Oglala Sioux Tribe, the business community, and government representatives, thus promoting the general welfare and combating community deterioration while lessening the burdens of government.

7. To establish linkages and partnerships with public and private financial intermediaries and to provide financial services and assistance, including, but not limited to, home ownership loans, down payment buy-downs, lease-purchase options, revolving loan funds, and loan loss reserve services.

8. To enter into contracts, partnerships, joint ventures, or other arrangements to provide or secure services, funding, or other assistance which serve the purposes of this Corporation.

9. To solicit, hold, use, invest, and dispose of money, personal property, or real property and collect and use proceeds of such money or property, including interest, rent, sale proceeds, and other types of income, for the purposes for which this Corporation is formed.

10. To acquire, hold, use, invest, and dispose of money, personal, and real property, and exercise any lawful right to make use of that property, including, but not limited to, renting, leasing, assigning, exchanging, selling, mortgaging, or otherwise encumbering, improving, converting, or altering such property.

11. To acquire, hold, use, and dispose of through any lawful means or instrument, shares in stock, bonds, notes, debentures, mortgages, and other securities.

12. To incur debt obligations and secure such debt or obligations through any lawful instrument which is reasonable and appropriate to achieve the purposes of the Corporation.

13. To communicate with residents and government regarding capital improvements, needed services, available programs, and resources that currently or potentially impact the Oglala Sioux Tribe.

2

Mazaska Complaint Exhibit 3 140

14. To work in cooperation with other organizations having aims similar to those of Corporation.

15. To do any and all lawful things which a natural person might find necessary and desirable for the general purposes for which the Corporation is organized, as permitted by a nonprofit corporation organized under the laws of the State of South Dakota and exempt from federal income tax under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code.

## ARTICLE IV

The Corporation shall have no members.

## ARTICLE V

A. The affairs of the Corporation will be managed by its Board of Directors. The number, qualifications, terms of office, method of selection or election, powers, authority, and duties of the directors of this Corporation, the time and place of their meetings, and such other provisions with respect to them as are not inconsistent with the express provisions of these Articles of Incorporation shall be as specified in or prescribed pursuant to the Bylaws of the Corporation.

B. Directors shall be elected and/or appointed by the Board of Directors in accordance with the Bylaws of the Corporation.

## ARTICLE VI

A. The Corporation is organized exclusively for charitable and educational purposes within the meaning of Section 501(c)(3) of the Code. Notwithstanding any other provision of these Articles of Incorporation, the Corporation will not carry on any other activities not permitted to be carried on (1) by a corporation exempt from federal income tax under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code, or (2) by a corporation contributions to which are deductible under Section 170(c)(2) of the Code.

B. This Corporation is not organized nor will it be operated for pecuniary profit and no part of this Corporation's net income, earnings, or assets shall, directly or indirectly, ever inure to the benefit of, or be distributed to, any member or person having a personal and private interest in the activities of the Corporation, except that the Corporation may pay reasonable compensation for services rendered to this Corporation in furtherance of its purposes set forth in Article III. The property of the Corporation is irrevocably dedicated to charitable and public purposes. No substantial part of the activities of this Corporation will be conducting

3

Mazaska Complaint Exhibit 3 141

propaganda or attempting to influence legislation, except pursuant to an election under, and as permitted by, Section 501(h) of the Code, nor will this Corporation participate in or intervene in any political campaign on behalf of or in opposition to any candidate for political office.

C. Dissolution:

    1. The Corporation may voluntarily dissolve for any reason at any time, after providing notice to its known creditors and claimants, and posting a notice of intent to dissolve on the Reservation for a period of one month. Upon the expiration of 90 days after the notice was posted, if there are no known creditors or claimants, then the Corporation may dissolve by submitting Articles of Dissolution with the South Dakota Secretary of State.

    2. Upon dissolution of the Corporation, and after the payment of all liabilities and obligations of the Corporation and all costs and expenses incurred by the Corporation in connection with such dissolution, any remaining assets shall be distributed to one or more nonprofit corporations that are organized and operated exclusively for charitable and/or educational purposes and that have established their tax exempt status under Section 501(c)(3) of the Code, or shall be distributed to the Oglala Sioux Tribe for housing and educational purposes, in the manner and in such amounts as may be determined by the Board of Directors. The Board of Directors shall make all reasonable efforts to distribute the Corporation's assets to one or more nonprofit corporations organized or operated exclusively for the purpose of promoting affordable, decent, safe, and sanitary housing for residents of the Pine Ridge Reservation and that have established their tax exempt status under Section 501(c)(3) of the Code. Notwithstanding anything apparently or expressly to the contrary contained in this Article VI, if any assets are then held by the Corporation in trust or upon condition or subject to any executory or special limitation, and if the condition or limitation occurs by reason of the dissolution of the Corporation, such assets shall revert or be returned, transferred, or conveyed in accordance with the terms and provisions of such trust, conditions, or limitation.

**ARTICLE VII**

The initial registered office of the Corporation shall be:

    Old Ambulance Building           PO Box 3001
    Pine Ridge, SD 57770           Pine Ridge, SD 57770

and the name of the registered agent at such address is Melvin Cummings.

4

Mazaska Complaint Exhibit 3 142

## ARTICLE VIII

A. The initial Board of Directors shall be composed of three members

B. The names and addresses of the initial directors, who will serve until the first annual election of directors or until their successors are elected are:

*Elsie Meeks*                    *PO Box 340    Kyle, SD 57752*
*Melvin Cummings*                *P.O. Box 109   Manderson, SD 57776*
*Lyle Meyer*                     *3611 Croftview Ter, Minnetonka, MN 55345*

## ARTICLE IX

A.    The Corporation shall indemnify its directors, officers, employees, and agents, including persons formerly occupying such positions, and the heirs, executors, and administrators of such persons, against all expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by them in connection with any action, suit, or proceeding relating to the Corporation, including an action by or in the right of the Corporation.

B.    No indemnification shall be provided for any person with respect to any matters as to which he or she shall have been adjudged in any proceedings to have acted in bad faith or without a reasonable belief that his or her action was in the best interests of the Corporation. If he or she has not been so adjudged, he or she shall be entitled to indemnification unless the Board of Directors determines that he or she did acted in bad faith or acted without a reasonable belief that his or her action was in the best interests of the Corporation. To the fullest extent permitted by law, and except as otherwise determined by the Board of Directors in a specific instance, expenses incurred by a person seeking indemnification in defending any action, suit or proceeding shall be advanced by the Corporation before final disposition of the proceeding and upon receipt by the Corporation of an undertaking by that person to repay such amount unless it is ultimately determined that the person is entitled to be indemnified by the Corporation for those expenses.

## ARTICLE X

These Articles of Incorporation and the Bylaws of the Corporation may be amended to include any provision permitted by law, or may be restated in their entireties, at the times and in the manner provided in the Bylaws of the Corporation and in accordance with the laws of the State of South Dakota\

5

Mazaska Complaint Exhibit 3 143

**IN WITNESS WHEREOF**, we have hereunto set our hand this 4ᵗʰ day of June, 2004.

INCORPORATORS

State of South Dakota
County of Shannon

On this, the 4ᵗʰ day of June _____, 2004 before me personally appeared Elsie Meeks, Melvin Cummings & Lyle Meyer, know to me or satisfactorily proven to be the persons who are described in, and who executed the within instrument and acknowledge to me that they executed the same.

~~My Commission Expires~~
My Commission Expires
May 24, 2007

Notary Public

Notarial Seal

ROSEMARIE C. DILLINGHAM
NOTARY PUBLIC
State of South Dakota

---

CONSENT OF APPOINTMENT BY THE REGISTERED AGENT

I, Melvin Cummings, hereby give my consent to serve as the registered agent for Mazaska Owecaso Otipi Financial, Inc.

Dated: Jun 4, 2004

(Signature of Registered Agent)

---

6

Mazaska Complaint Exhibit 3
144

 

531948003

# ANNUAL REPORT

### Domestic Nonprofit Corporation
**SDCL 47-24-6, 59-11-24**

Secretary of State
500 E. Capitol Ave
Pierre, SD 57501-5070
(605) 773-4845

**2023**
FILING YEAR

**Please Type or Print Clearly in Ink**
**Please submit one Original**
**Make payable to the SECRETARY OF STATE**

| Filing Fee: $10 |
|---|
| Total Fee: $10 |

1. Business ID and Name:

**NS012594**
BUSINESS ID

**MAZASKA OWECASO OTIPI FINANCIAL, INC.**
BUSINESS NAME

2. The jurisdiction under whose law it is formed   **SOUTH DAKOTA**

3. The address of the principal executive office (business address):

Actual Street Address

**108 OGLALA STREET**
**PINE RIDGE, SD  57770-1996**

Mailing Address

**108 OGLALA STREET**
**PINE RIDGE, SD  57770-1996**

4. The South Dakota Registered Agent's Name:

South Dakota law permits the registered agent to be either (a) a noncommercial registered agent, (b) a commercial registered agent, or (c) an office holder.

(a) The South Dakota Noncommercial Registered Agent's name

Name   **TAWNEY BRUNSCH**

Actual Street Address in this State

**108 OGLALA STREET**
**PINE RIDGE, SD  57770**

Mailing Address in this State

**PO BOX 1996**
**PINE RIDGE, SD  57770**

5. The names and addresses of its principal officers.

| Title | Name | Address |
|---|---|---|
| **Secretary** | Irving  Provost Sr | **PO Box 326, Pine Ridge, SD 57770** |
| **Vice President** | Kadem  Fisher | **617 Tanglewood Lane, Box Elder, SD 57719** |
| **Treasurer** | TAWNEY  BRUNSCH | **PO BOX 522, KYLE, SD, 57752** |
| **President** | TANYA  FIDDLER | **PO BOX 199, Hermosa, SD 57744** |
| | Lisa  Schrader | **PO Box 20 Pine Ridge, SD 57770** |

6. The names and addresses of its directors (governors).

| Name | Address |
|---|---|
| **Kadem  Fisher** | **PO Box 956 Sisseton, SD 57262** |
| **Tanya  Fiddler** | **202 East Nowlin Street, Rapid City SD 57701** |
| **Tawney  Brunsch** | **PO Box 522, Kyle, SD 57752** |
| **Lisa  Schrader** | **PO Box 20 Pine $IDGE 57770** |

Page 1 of 2

Mazaska Complaint Exhibit 3
145



| Irving  Provost Sr | PO Box 326, Pine Ridge, SD, 57770 |
|---|---|

7.  43-2A-1. "Agricultural land" defined.

For purposes of this chapter, the term "agricultural land" means land capable of use in the production of agricultural crops, timber, livestock or livestock products, poultry or poultry products, milk or dairy products, or fruit and other horticultural products but does not include any royalty interest, any oil, gas, or other mineral interest, or any lease, right-of-way, option, or easement relating thereto, or any land zoned by a local governmental unit for a use other than and nonconforming with agricultural use

Does the entity own any Agricultural land? (Required)

    No

If the answer is yes, please answer below

"Foreign Beneficial Owner" Foreign government, a government, or the state-controlled enterprise of a government, other than the United States, its states, or its territories. A natural person who is not a United States Citizen.  An entity registered outside the United States or its territories.

Does the entity have any foreign beneficial owners/interests?

    N/A

8.  Beneficial Owners (optional): A beneficial owner is a person who has or in some manner controls an equity security. Please consult an attorney for legal advice if you have any questions concerning this entry. Any question under this heading is considered a request for legal advice and the secretary of state's office is, by statute, not permitted, to provide legal advice.

No person may execute this report knowing it is false in any material respect.  Any violation may be subject to a civil and/or criminal penalty (SDCL 47-1A-129; 22-39-36).

| 08/02/2023 | *Colleen Steele* |
|---|---|
| Dated | Signature of an Authorized Person |
| | Colleen Steele |
| Email (Optional) | Printed Name |

Mazaska Complaint Exhibit 3
146

B0276-7443  08/02/2023  10:35AM  Rec'd by SD SOS

RESOLUTION NO. <u>12-20XB</u>

RESOLUTION OF THE EXECUTIVE COMMITTEE
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

RESOLUTION OF THE EXECUTIVE COMMITTEE OF THE OGLALA SIOUX TRIBE
APPROVING AND SETTING ASIDE THE SITE FOR THE MAZASKA OWECASO OTIPI
FINANCIAL INC. OFFICE.

WHEREAS, the Oglala Sioux Tribe organized in accordance with
Section 16 of the Indian Reorganization Act of 1934 on December 14,
1935 by adopting a federally approved Constitution and By-laws, and
the Tribal Council is the governing body of the Tribe, and

WHEREAS, the Tribal Constitution authorizes the Tribal Council,
in Article IV, Section 1(f) to manage all economic affairs and
enterprises of the Oglala Sioux Tribe, and Section 1(w) to protect
and promote the health and general welfare of the Tribe and its
members, and

WHEREAS, Article XIII, Section 6, of the Tribal Constitution
authorizes the Executive Committee to act on behalf of the Tribal
Council of the Oglala Sioux Tribe on routine matters when the Tribal
Council is not in session, and

WHEREAS, the Oglala Sioux Tribe has established a partnership
with Mazaska Owecaso Otipi Financial Inc., a non-profit corporation,
and

WHEREAS, Mazaska Owecaso Otipi Financial Inc. is a mortgage
lending agency and provides such services on the Pine Ridge Indian
Reservation, and

WHEREAS, the Oglala Sioux Tribe Land Office has identified the
following land as suitable to be set aside for the site of the
Mazaska Owecaso Otipi Financial Inc office:

TR 11514, Block 44, Lot 19, Section 12, Township 35,
Range 45, a total of 4,452.33 square feet

, and

WHEREAS, the Mazaska Owecaso Otipi Financial Inc. requests the
bond requirement be waived in lieu of a lease amount of $100.00, per
year, for a term of 25 years, and

WHEREAS, on the 30th day of January, 2012, the Land and Natural
Resource Committee of the Oglala Sioux Tribe met and voted to
forward the issue of setting aside a site for the Mazaska Owecaso
Otipi Financial Inc. office to the Executive Committee, and

Mazaska Complaint Exhibit 3
147

RESOLUTION NO. 12-20XB
Page Two

WHEREAS, the Executive Committee has considered the matter and determined that it is in the best interest of the Tribe and its members to set aside the following site for the Mazaska Owecaso Otipi Financial Inc. office:

TR 11514, Block 44, Lot 19, Section 12, Township 35, Range 45, a total of 4,452.33 square feet,

, now

THEREFORE BE IT RESOLVED, that the Executive Committee of the Oglala Sioux Tribe hereby approves and sets aside the following site for the Mazaska Owecaso Otipi Financial Inc. office:

TR 11514, Block 44, Lot 19, Section 12, Township 35, Range 45, a total of 4,452.33 square feet; and

BE IF FURTHER RESOLVED, that the site is to be leased for a period of up to 25 years and will revert back to the Tribe if it is no longer used as an office for Mazaska Owecaso Otipi Financial Inc.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, as undersigned Secretary of the Executive Committee of the Oglala Sioux Tribe, hereby certify that this Resolution was adopted by the vote of: 4 For; 0 Against; 0 Abstain, and 0 Not Voting during a SPECIAL SESSION held on the 16TH day of MARCH, 2012.

RHONDA TWO EAGLE
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:

THOMAS POOR BEAR
Vice-President
Oglala Sioux Tribe

RECEIVED
MAR 2 1 2012

Mazaska Complaint Exhibit 3
148

RESOLUTION NO. <u>17-63XB</u>

RESOLUTION OF THE EXECUTIVE COMMITTEE
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

RESOLUTION OF THE EXECUTIVE COMMITTEE OF THE OGLALA SIOUX TRIBE AUTHORING, APPROVING AND DIRECTING THE MAZASKA OWECASO OTIPI FINANCIAL, INC. PROPOSAL FOR FUNDING TO THE OGLALA SIOUX TRIBE FOR SUPPORT FOR NON-FEDERAL CASH MATCH NECESSARY FOR THE ADMINISTRATION FOR NATIVE AMERICANS SOCIAL ECONOMIC DEVELOPMENT PROGRAM (ANA SED) 2017 APPLICATION TO FUND THE "HOME MAINTENANCE CURRICULUM AND EDUCATION PROJECT", WHICH HAS A CLOSING DATE OF JUNE 22, 2017.

WHEREAS, the Oglala Sioux Tribe adopted its Constitution and By-Laws by referendum vote on December 14, 1935, in accordance with Section 16 of the Indian Reorganization Act of 1934 (25 U.S.C. § 5123), and under Article III of the Constitution, the Oglala Sioux Tribal Council is the governing body of the Oglala Sioux Tribe, and

WHEREAS, Article XIII Section 6 of the Oglala Sioux Tribe's Constitution authorizes the Executive Committee to act on behalf of the Tribal Council when the Tribal Council is not in session and shall be in charge of all routine matters that arise during such recess and other matters as may be delegated to it by the Tribal Council, and

WHEREAS, Mazaska Owecaso Otipi Financial, Inc. (hereinafter referred to as "the Corporation") is a non-profit mortgage lending corporation organized under the laws of the State of South, and

WHEREAS, the Corporation is sub mitting a proposal for funding to the Oglala Sioux Tribe to support a non-federal cash match for the Administration for Native Americans Social Economic Development Program (ANA SEDS) 2017 application to fund the "Home Maintenance Curriculum and Education Project", and

WHEREAS, On July 19, 2017 the Oglala Sioux Tribe (hereinafter "OST") Finance Committee met and after discussion recommended that the Executive Committee assist in the Corporation to submit a proposal to the Oglala Sioux Tribe for a total of one hundred thousand dollars ($100,000) with 3 payments consisting of thirty-three thousand, three hundred thirty-three dollars, thirty four cents ($33,333.34) for Year 1, and thirty-three thousand, three hundred thirty-three dollars, thirty-three cents ($33,333.33) for Year 2 (2018) and thirty-three thousand, three hundred thirty-three dollars, thirty-three cents ($33,333.33) for Year 3 (2019), and

Mazaska Complaint Exhibit 3
149

RESOLUTION NO. <u>16-63XB</u>
Page Two


WHEREAS, the OST Finance Committee met in Special Session on June 19, 201 and by affirmative motion resolved to recommends that the OST Executive Committee authorize Mazaska to submit a proposal to Oglala Sioux Tribe for a total of $1,000,000 in non-federal matching with three (3) payments as described below.  The Corporation Director shall negotiate and execute all documents related to the Oglala Sioux Tribe non-federal cash match contribution; now

THEREFORE BE IT RESOLVED, that the Executive Committee of the Oglala Sioux Tribe does hereby agree to support the Corporation after it receives the proposal required above, written to the OST for a total of one hundred thousand dollars ($100,000) with 3 payments consisting of thirty-three thousand, three hundred thirty-three dollars, thirty four cents ($33,333.34) for Year 1, and thirty-three thousand, three hundred thirty-three dollars, thirty-three cents ($33,333.33) for Year 2 (2018) and thirty-three thousand, three hundred thirty-three dollars, thirty-three cents ($33,333.33) for Year 3 (2019).

C-E-R-T-I-F-I-C-A-T-I-O-N

I, as undersigned Secretary of the Executive Committee of the Oglala

Sioux Tribe, hereby certify that this Resolution was adopted by the

vote of: <u>3</u> For; <u>0</u> Against; <u>0</u> Abstain, and <u>0</u> Not Voting during a

<u>REGULAR SESSION</u> held on the <u>22ND</u> day of <u>JUNE</u>, 2017.

DONNA M. SALOMON
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:

TROY S. WESTON
President
Oglala Sioux Tribe



JUN 28 2017

Mazaska Complaint Exhibit 3
150



Mazaska Complaint Exhibit 3
151

HOMESITE LEASE.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

RESIDENTIAL LEASE

Recorded at the
U.S. Department of the Interior
Bureau of Indian Affairs
Land Titles and Records Office
Document Number: 2T1373N520
Date: 2016 DEC 05 10:37 AM
LTRO: Great Plains

Allotment Number:   T 1373-N

Lease Number:   2T1373N520

Contract Number:   C250365

NTRACT, made and entered into this 2nd day of May, 2015 AD, by and between Oglala
or", and Toni Montileaux of PO Box 7020, Pine Ridge, SD 57770, hereinafter called
accordance with the provisions of existing law and the regulations (25 CFR 162).
e are made a part of hereof.

at for and in consideration of the rents, convents, and agreements hereinafter provided
ts and lease unto the premises described as follows, to with:

er Southeast Quarter Northeast Quarter Northeast Quarter of Section 18,
th, Range 41 West.

ocated within the State of South Dakota, 6th PM, County of Shannon:

res more or less, for a term of 5 years, beginning on the First day of May, 2015 and
2020, to be used only for the following purposes: Homesite

| Tribe | Due date | Amount |
|---|---|---|
| ENCY-BIA | 05/01/2015 | $25.00 |
| | 05/01/2016 | $25.00 |
| | 05/01/2017 | $25.00 |
| 50947-4888 | 05/01/2018 | $25.00 |
| www.pay.gov | 05/01/2019 | $25.00 |

ion Home sites attached is part of this contract. Any improvements listed on this
property of the Lessee. The Lessee may remove listed improvements within 120 days
of this lease: Trailer and basement

t of the death of any of the Lessors receiving "DIRECT PAYMENTS", under terms of
ments due and outstanding will be paid to the official of the Bureau of Indian Affairs,
n over the leased premises, only while the leased premises are in trust or restricted

leased premises are in trust or restricted status, the Secretary may in his discretion, and
Lessee, suspend the direct payment provisions of this lease in which event the rental
: Bureau of Indian Affairs having jurisdiction over the leased premises.

⊓ ORIGINAL

Mazaska Complaint Exhibit 33
151

OST APPENDIX

- 2 -

MAY 26 2015

**OST LAND OFFICE**

the following provisions:

" as used herein means the Secretary of rized representative.

NTS Unless otherwise Provided
nd aid that any buildings or other
on the said land by the lessee become
e superannuation or expiration of this

CONDUCT. -- The lessee agrees that
use to be used any part of said
ful conduct or purpose.

ND ASSIGNMENTS. --
ed herein, a sublease, assignments or
may be made only with the approval
written consent of all parties to this
ty or sureties.

It is understood and agreed between
any installment of rentals is not paid
fter becoming due, Interest will be
erage prime rate in effect on the last
three percent (3%). Interest assessed
n will become due and will run until

MENT OR SUPERVISION BY
Nothing contained in this lease shall
nt a termination of Federal trust
ect to the land by the issuance of a fee
ng the term of the lease; however, such
ve to abrogate the lease. The owners
s and his surety or sureties shall be
of any such changes in the status of

USTMENT. -- The rental provision in
ted for a term of more than five years
rimarily on percentages of income

produced by the land shall be subject to review and adjustment
by the Secretary at not less than five-year-intervals in
accordance with the regulations in 25 CFR 162. Such Review
shall give consideration to the economic Conditions at the
time, exclusive of improvement or Development required by
this contract or the contribution value of such improvements.

8. INTEREST OF MEMBER OF CONGRESS. -- No
member of, or Delegate to, Congress or Resident
Commissioner shall be admitted to any share or part Of this
contract or to any benefit that may arise herefrom , but this
provision shall not be construed to extend to this contract if
made with a corporation or Company for its general benefit.

9. VIOLATIONS OF LEASE. -- It is understood And
agreed that violations of this lease shall be acted upon in
accordance with the regulations in 25 CFR 162.

10. ASSENT NOT WAIVER OF FUTURE BRANCH
OF COVENANTS. -- No assent, express or implied to any
breach of any of the lessee's covenants, shall be deemed to be
a waiver of any succeeding breach of any covenants.

11. UPON WHOM BINDING. -- It is understood and
agreed that the covenants and agreements herein before
mentioned shall extend to and be binding upon the heirs,
assigns, successors, executors, and administrators of the parties
of this lease. While the leased premises are in trust or
restricted status, all of the lessee's obligations of its sureties,
are to the United States as well as to the owner of the land.

12. APPROVAL. -- It is further understood and agreed
between the parties hereto that this lease shall be valid and
binding only after approval by the Secretary.

13. ADDITIONS. -- Prior to execution of this lease,
provision(s), number(s) _____ has (have) been
added hereto any reference is (are) made a part hereof.

EOF, the parties hereto have hereunto set their hand on this 26th Day of May , 20 15.

_____ _____
JM Michael                 (Lessee)-Toni Montileaux

_____   6/2/15
R Reilly Officer              Date

SUPERINTENDENT/PINE RIDGE AGENCY: Pursuant to
and authority delegated to the Assistant Secretary Indian Affairs
by 209 DM 8, 230 DM 1, to the Great Plains Regional Director
by 3 IAM 4 (Release No. 00-03) and to the Superintendents by
3 IAM 4 (Release No. 0502)
Great Plains Regional Addendum 3 IAM 4 (Release No. 0502)

Withdrawn

R APPROVAL:

_____ 5/26/15
Trib Land Office          Date

A SIUX TRIBE
tion By-Laws of
proved December

_____ 8-9-15
Date

APPROVAL DATE: _____6/12/15_____

☐ ORIGINAL

Mazaska Complaint Exhibit 3
153

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs

## OF CONSERVATION FOR HOME AND/OR BUSINESS LEASES

es carry out the Plan of Conservation for a Home site/Short Term Business
ed below for Allotment No. **T 1373-N** Lease No. **2T1373N520**, for the period
rough **April 30, 2020**. It is further understood and agreed that this Plan of
to be attached and made a part of the lease contract.

to be clear of litter at all times, including junk cars. Failure to comply will
essment of penalty of $1.50 per calendar day per junk car(s).

tes outside of the town areas only: The above described land is to be fenced
1) year from the date that the improvements have been put upon the lease area
re to be maintained for the term of the lease (when applicable for businesses).
tendent will be the sole judge as to the adequacy of fence maintenance and
assessed for non-compliance. Penalty will be assessed at $20.00 per acre per
n-compliance to construct and maintain fences.

ning at any time unless a valid permit is obtained from the Pine Ridge Fire
Failure to comply with this will result in an administrative penalty of $100.00
any criminal or civil actions.

l homes (trailer houses, houses)/business are to be placed upon the premises.
mply with this will constitute penalty of $1.00 per calendar day for each
building(s).

are to be installed for access to home site, if the home site location requires
ion.

are be kept on this Business/Residential leased land.

are be raised for commercial purposes on acreage leased for residential
on-compliance will constitute penalty to be assessed at $50.00 per calendar day,
it.

e provisions of these conditions shall constitute grounds for cancellation of
ddition to any other penalties preceded in these conditions, or provided by law.
a provision(s) of these conditions, where no penalty is otherwise provided,
sed $10.00 per calendar day for each day of non-compliance.

tinue use of a Residential lease within one (1) year of issuance of the lease
te grounds for cancellation of the lease unless determined otherwise by the
nt and/or OST Land Committee via the OST Land Office.

Mazaska Compliant Exhibit 3
154

ORIGINAL

mmence use of a commercial lease within six (6) months of issuance of the lease
te grounds for cancellation of the lease. Commercial leases shall be issued after
of Plan of the use of the proposed lease, including commencement of
ad other details to show the intended use of the site. Commercial leases within
es of the Pine Ridge Town will be subject to RESOLUTION NO. 94-162.

STRUENDIX

es will be allowed on a Residential lease.

Leases: If there is no documentation to justify the long term lease within a year
val of this lease then this lease shall revert back to a five year lease.

**ANY PERSONS AUTHORIZED TO USE INDIAN LAND UNDER
APPROVED LEASES, PERMITS, EASEMENTS, OR OTHER
WITH THE OGLALA SIOUX TRIBE, MAY BECOME SUBJECT TO
SDICTION FOR PURPOSES RELATING TO THAT CONTRACT.**

en determined to be in the best interest of the landowner.

_____
Lessee – Toni Montileaux

_____
Date

_____
Witness

_____
Date

ORIGINAL

**Mazaska Complaint Exhibit 3**
**155**

Allotment No.: _____

Lease No.: 2T1373N520

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Pine Ridge Agency

RECEIVED

MAY 26

OST LAND OFFICE

MODIFICATION

by and between the Oglala Sioux Tribe, Lessor, and Toni Montileaux,
No. 2T1373N520 covering Southeast Quarter Southeast Quarter Northeast
st Quarter, Section 18, Township 39 North, Range 41 West be MODIFIED:

nancing. This lease shall be extended to a full twenty-five year term. The new
e April 30, 2040

cres more or less. All other terms and stipulations remain the same.

_____    _____
e – Toni Montileaux                Witness

_____    5/20/2015
Date                               Date

_____    _____
t – OST Land Office                President – Oglala Sioux Tribe (Lessor)

_____    _____
Date                               Date

or Approval:    _____    6/2/15
                Agency Realty Officer              Date

_____
Superintendent

IFICATION is hereby approved and declared to be made in accordance with
lations prescribed by the Secretary of the Interior thereunder, and now in force.

gated by the Assistant Secretary – Indian Affairs by 209 DM 8,
ans Regional Director by 3 IAM 4 (Release No. 00-O), and to
ne Ridge Regional Addendum 3 IAM 4 (Release No. 0502)

_____
Date                               6/2/15
                                   Date

OST APPENDIX

Mazaska Complaint Exhibit 3
156

ORIGINAL

# United States Department of the Interior
## Bureau of Indian Affairs
### Title Status Report

Report Certification Time and Date: 06/10/2022 10:27:47 AM

Requestor: HRENVILL Date/Time: 06/10/2022 10:28:04

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|-----------|----------------|--------------|------|--------|--------|-----------|
| 344 | PINE RIDGE | 1373 -F | ABERDEEN, SD | GREAT PLAINS REGIONAL OFFICE | PINE RIDGE AGENCY | Both |

Original Allottee:

See Appendix A for Land Legal Descriptions

**Title Status**

Tract 344 1373 -F is held by the United States of America in trust for the land owner(s) with trust interests and/or by the land owner(s) with restricted interests and/or fee simple interests, as listed in Appendix "B" attached to and incorporated in this Title Status Report.

The title to Tract 344 1373 -F is current, complete, correct, and without defect. Ownership is in unity and interests are owned in the following title status: trust.

The tract ownership is encumbered by the title documents which have been approved by a properly delegated Federal official and are required to be recorded by law, regulation, or Bureau policy as listed on Appendix "C" attached to and incorporated in this Title Status Report.

See Appendix D for all other documents that are required to be recorded by law, regulation or Bureau policy.

No Tract Notes or Coded Remarks for this tract.

This report does not cover encroachments nor any other rights that might be disclosed by a physical inspection of the premises, nor questions of location or boundary that an accurate survey may disclose. This Report also does not cover encumbrances, including but not limited to irrigation charges, unpaid claims, not filed or recorded in this Land Titles and Records Office. This report does not state the current ownership of the interests owned in fee simple but states the ownership at the time the interest ceased to be held in trust or restricted ownership status.

This Title Status Report is a true and correct report of the status of title to the real estate described herein according to the official land records recorded and maintained in this office.

_Mariosa Richardson_

LTRO Manager

Mazaska Complaint Exhibit 3 157

**Appendix "A"**

| Land Area | Land Area Name | Tract Number | LTRO<br>ABERDEEN, SD | Region<br>GREAT PLAINS<br>REGIONAL OFFICE | Agency<br>PINE RIDGE<br>AGENCY | Resources |
|---|---|---|---|---|---|---|
| 344 | PINE RIDGE | 1373 -F | | | | Both |

**Land Legal Descriptions**

| Section | Township | Range | State | County | Meridian | Legal Description | Acres |
|---|---|---|---|---|---|---|---|
| 18 | 039.00N | 041.00W | SOUTH DAKOTA | OGLALA LAKOTA | Sixth<br>Principal | N SW NE NE | 5.000 |
| | | | | | | N SE NE NE | 5.000 |

TOTAL TRACT ACRES:    10.000

Mazaska Complaint Exhibit 3
158

**Appendix "B"**

| Land Area 344 | Land Area Name PINE RIDGE | Tract Number 1373-F | LTRO ABERDEEN, SD | Region GREAT PLAINS REGIONAL OFFICE | Agency PINE RIDGE AGENCY | Resources Both |

Effective Ownership as of 06/21/2010

| ---- OWNER ---- | | | | ---- DOCUMENT ---- | | NAME IN WHICH | | FRACTION | TRACT AGGREGATE SHARE | | AGGREGATE |
| Tribe | Indian / NonIndian | Title | Interest* | Class | Type | SURNAME/FIRST NAME | AS ACQUIRED | | CONVERTED TO LCD | DECIMAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OGLALA SIOUX (PINE RIDGE) - S | Indian | Trust | All | Deed-TS | ACT 1934 | MONTILEAUX ANNIE L H | 3 | 4 | 3 4 | 4 .7500000000 | |
| OGLALA SIOUX (PINE RIDGE) - S | Indian | Trust | All | Deed-TS | ACT 1934 | MONTILEAUX LILLIAN ANTOINETTE | 1 | 4 | 1 4 | 4 .2500000000 | |

| | | |
|---|---|---|
| IN TRUST: | 4 4 | 1.0000000000 |
| IN FEE: | 0 4 | .0000000000 |
| TOTAL: | 4 4 | 1.0000000000 |

*"All" means the equitable beneficial interest and the legal title interest merged together.

Page 3 of 5

Mazaska Complaint Exhibit 3 159

**Appendix "C"**

| Land Area | Land Area Name | Tract Number | Region | Agency | Resources |
|---|---|---|---|---|---|
| 344 | PINE RIDGE | 1373 -F | LTRO ABERDEEN, SD | GREAT PLAINS REGIONAL OFFICE | PINE RIDGE AGENCY | Both |

Ownership of Tract 344 1373 -F is encumbered by the following:

NO REALTY DOCUMENTS FOUND

| Type of Encumbrance | Encumbrance Holder | Expiration | Document Description and Explanation |
|---|---|---|---|
| ASSIGNMENT | FMHA | | 40913-- ASSIGNMENT OF INCOME |

Page 4 of 5

Mazaska Complaint Exhibit 3 160

**Appendix "D"**

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|---|---|---|---|---|---|---|
| 344 | PINE RIDGE | 1373 -F | ABERDEEN, SD | GREAT PLAINS REGIONAL OFFICE | PINE RIDGE AGENCY | Both |

| Contract Type/Contractor Name | Contract | Contractor ID | Begin Date | Expiration Date | Acres | Recorded Date | Recorded Image# |
|---|---|---|---|---|---|---|---|
| RESIDENTIAL | 21373F1034 | 344C2503B0 | 01/01/2010 | 12/31/2034 | 2.500 | 07/21/2010 | |
| TONI MONTILEAUX | | | | | | | |

No Encumbrances to list for Appendix D

Page 5 of 5

Mazaska Complaint Exhibit 3 161

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

Fees: $ 10.00

Allotment Number: OS 1373-F

Lease Number: 21373F1034

Contract Number: C250380

## RESIDENTIAL LEASE OF ALLOTTED LAND
## (BIA/USDA)

THIS lease is made and entered into by and between Heirs of Tract 1373-F hereinafter designated as either owner of land or "Lessor", and Lillian Antoinette (Toni) Montileaux of PO Box 7020, Pine Ridge, SD 57770 member(s) of the Oglala Sioux Tribe and residing upon the Pine Ridge Indian Reservation, hereinafter designated as "Lessee".

WITNESSETH

1. SECRETARIAL APPROVAL: DEFINITIONS. As used in this Lease, the term "Secretary" means the Secretary of the Interior or his or her duly authorized representative. This Lease is subject to the approval of the Secretary pursuant to the Act of August 9, 1955, 60 Stat. 539, as amended, 25 U.S.C. § 415, as implemented by Title 25, Code of Federal Regulations, Part 162. This Lease is for use in connection with the issuance by the United States Department of Agriculture ("USDA"), acting through *the* Rural Housing Service ("RHS"), of a direct or guaranteed loan pursuant to section 602 of the Housing Act of 1949 as amended, 42 U.S.C. § 1472, secured by a Mortgage on the leasehold interest in and to the property described in this Lease, including improvements now existing thereon or which may be construed thereon. When used in this Lease, the "lender" is any guaranteed lender that RHS has approved or RHS itself if a direct USDA loan is involved. The term "lender" also includes any of the lender's successors or assigns of the lender's right, title to, or interest in, the Mortgage and any subsequent noteholder secured by the Mortgage. The assignment of the Mortgage or any interest therein does not require the consent of the above mentioned Tribe, hereinafter designated as ("Tribe").

2. PREMISES. Lessor hereby Leases to the Lessee all that tract or parcel of land situated on the Pine Ridge Indian Reservation, County of Shannon, State of South Dakota, 6th PM, and described as follows (the Leased Premises):

Northwest Quarter Southwest Quarter Northeast Quarter Northeast Quarter of Section 18, Township 39 North, Range 41 West.

(NW¼SW¼NE¼NE¼, S18-39-41)

Tract Number 1373-F, containing 2.5 acres more or less.

3. USE OF PREMISES. The purpose of this Lease is to enable the Lessee to construct, improve, and maintain a dwelling and related structures on the Leased Premises, and otherwise to use said premises as a principle residence. The Lessee agrees not to use any part of the Leased Premises for any unlawful conduct or purposes and will comply with all applicable Laws.

MAZASKA 000195

Mazaska Complaint Exhibit 3
162

Lease No. 21373F1034 – Lillian Antoinette (Toni) Montileaux

4.  TERM. Lessee shall have and hold the Leased Premises for a term of twenty-five (25) years beginning on the effective date of this Lease. This lease is subject to an option to renew for one additional term of 25 years. This Lease may not be terminated by either or both parties during its term if, and as long as, the Lease and/or any improvements on the Leased Premises, or any interest therein, is mortgaged or otherwise pledged as security for any loan in accordance with the provisions hereof, unless consent in writing to such termination is given by the lender. In the event the loan is guaranteed by RHS, a written consent of RHS is also required. This Lease shall not be subject to any forfeiture or reversion and shall not be otherwise terminable, if such event would adversely affect any interest in the Leased Premises, including improvements thereon, acquired in accordance with the provisions hereof by the holder of any mortgage or other lien, or of any purchaser at a foreclosure sale under such mortgage (or lien) or under any conveyance given *in* lieu of foreclosure, or of any holder subsequent to such purchase. In the event RHS acquires a mortgage on the interest created by this Lease, including improvements thereon, by assignment from a lender, the Lessor shall not terminate the Lease without the written consent of RHS, as long as the mortgage is in force.

5.  RENT. The consideration for this Lease is (1): the promise hereby given by Lessee to pay the Lessor rent at the rate of $ 0 per acre, (2) the extinguishment, hereby agreed to by Lessee, of any and all use rights heretofore held by Lessee in the Leased Premises, so that Lessee shall here hereafter hold rights only by virtue of this Lease, and (3) other good and valuable considerations, the receipt of which is hereby acknowledged by Lessor. Rental payments should be made directly to Pine Ridge Agency, PO Box 91066, Prescott, AZ 86304-9116. Lessee will be notified if rent submittal addresses changes Rent may be subject to adjustment pursuant to 25 CFR 162.

6.  IMPROVEMENTS. All buildings or other improvements now existing or hereafter constructed on the Leased Premises shall be the leasehold property of the Lessee during the term of this Lease, including any extension or renewal thereof. During the term of this Lease, Lessee shall obtain any necessary governmental permits, approvals or authorization required for the construction and use of all improvements he or she (they) places or cause(s) to be placed on the Leased Premises, and shall comply with all laws applicable to the construction and use of improvements.

7.  USE RIGHT. Upon expiration of this Lease, or upon its termination in accordance with the terms thereof, unless such termination is due to default upon the part of the Lessee, Lessee or any successors in interest shall be entitled to use rights in the lease Premises if qualified under the laws of the Tribe. If not so eligible, Lessee, his or her (their) sublessee and any successors in interest shall, upon demand, surrender to Lessor upon expiration or other termination of this Lease complete and peaceable possession of the Leased Premises and all improvements thereon which have not been relocated as permitted under Paragraph 23 of this Lease, which shall be the property of the Tribe.

8.  FEDERAL SUPERVISION. Nothing contained in this Lease shall operate to delay or prevent a termination of Federal responsibilities with respect to the Leased Premises by the issuance of a fee patent, the lifting of restrictions on alienation, or otherwise during the term of the Lease; such termination, however, shall not serve to abrogate the Lease. The owners of the land, the Lessee and his or her (their) sureties, and lender shall be notified of any changes in the status of the land. In the event the loan is guaranteed by RHS, notice shall be given to RHS.

Page 2 of 7

MAZASKA 000196

Mazaska Complaint Exhibit 3 163

Lease No. 21373F1034 – Lillian Antoinette (Toni) Montileaux

No member of Congress or any delegate thereto or *any* Resident Commissioner shall be admitted to any share or part of this Lease or to any benefit that may arise herefrom.

9.  QUITE ENJOYMENT.  Lessor agrees to defend the title to the Lease Premises and also agrees that Lessee and any successors in interest shall peaceably and quietly hold, enjoy and occupy the Leased Premises for the duration of this Lease without any hindrance, interruption, ejection or molestation by Lessor or by any other persons whomsoever, except if the requirements of any part of this Lease are not kept by the Lessee.  Notwithstanding the foregoing, Lessee and his or her (their) assigns is (are) subject to all the laws of the Tribe to the same extent as any other Tribal member or resident.

10.  ASSIGNMENT AND SUBLEASE.  Except as otherwise provided herein, Lessee shall not assign or sublet this Lease without the prior written consent of the Lessor and sureties (as found in 25 CFR 162), and approval of the Secretary of the Interior.  If this Lease and/or any improvements on the Leased Premises are mortgaged or pledged as security for a loan, Lessee shall not assign or sublet this Lease without the written approval of the lender.  In the event the loan is guaranteed by RHS, written approval of RHS is also required.  Lessee may assign the Lease and deliver on possession of the Lease Premises, including any improvements thereon, to the lender or RHS, if Lessee defaults in any mortgage or other loan agreement for which the leasehold interest described in this Lease is pledged as security, and, in such event, the lender or RHS may transfer this Lease or possession of the Leased Premises to successor Lessee; provided, that the successor Lessee accepts and agrees in writing to be bound by all the terms and conditions of the Lease. In the event it becomes necessary for lender or RHS to take possession of the Lease Premises in order to protect its interests under the mortgage covering the leasehold, the lender and RHS shall not incur any liability to the Lessor under the terms of this Lease. Nothing in this Lease shall prevent the Lessee, with the approval of the Secretary of the Interior, from executing and recording the mortgage, declaration of trust, and/or other security instrument as may be necessary to obtain financing for the purchase of a dwelling, refinancing of an existing mortgage, construction and/or improvement of a dwelling and related structures, or shall prevent the lender or RHS from foreclosing or instituting other appropriate proceedings under law in the event of default of any mortgage or other loan agreement by the Lessee or its assigns.  Except in cases involving loans for home construction or home improvements by a bank, recognized lending institution, or a lending agency of the United States Government, where no such consent or approval of Lessor shall be required, Lessee may not execute a mortgage, declaration of trust or other security instrument pledging Lessee's interest in this Lease or any improvements on the Leased Premises without the prior written consent of Lessor and the approval of the Secretary.

In the event RHS is the lender or acquires acquires the mortgage secured by this Lease, and subsequently acquires said Lease by foreclosure, or by the assignment of said Lease by Lessee, his or her (their) Lessees or assigns (for which the approval of the Tribe is not required), then:

  1)  RHS will notify the above-mentioned Tribe of the availability of the Leased Premises for sale, the selling price of the Leased Premises and the other terms of the sale.
  2)  The Lease may only be assigned to another tribal member or tribal entity, except that RHS may lease the Leased Premises to a non-member under the

Page 3 of 7

MAZASKA 000197

Mazaska Complaint Exhibit 3 164

Lease No. 21373F1034 – Lillian Antoinette (Toni) Montileaux

conditions specified herein.   Any such sublease or assignment shall be executed consistent with the applicable law.

3) If a purchaser is found, the Lease will be transferred by RHS to the purchaser, with the prior written consent of the Tribe.

4) If a purchaser cannot be found, RHS shall be entitled to sublease the Leased Premises and improvements without the prior written approval of the Tribe. Such sublease shall be to a member of the Tribe, unless a tribal member Lessee cannot be found, in which case RHS may be sub-Lease to any individual.  The term of the initial sublease period and any succeeding period shall not exceed one year each.  Any purchase of the Lease shall be subject to any sublease by RHS pursuant to this subsection.

5) No mortgagee (except RHS as mortgagee or assignee or a mortgagee) may obtain title to the interest created by this Lease without the prior written consent of the Tribe.

In the event that the lender is the entity responsible for acquiring the Lease and the leasehold estate by foreclosure, the lender shall have the rights of RHS who had insured or guaranteed the foreclosed mortgage under subparagraphs (1) through (5) above.

11. OPTION.  Subsequent to Lessee's breach of any covenant or agreement under a mortgage or other security instrument for which the leasehold is pledged as security , and upon the expiration of any applicable cure period, the Lessor shall have an option to acquire the Lessee's Leasehold interest, subject to all valid liens and encumbrances, upon either payment in full of all sums secured by the mortgage or assumption of the loan as evidenced by the note and mortgage and execution of an assumption agreement acceptable in all respects to the Lender.  In the event the loan is guaranteed by RHS, written approval of RHS is also required.   Said option may be exercised at any time within (30) days after receiving notice in writing from the lender of the Lessee's default, which notice shall be given to the Lessor before the lender invokes any other remedies provided under the mortgage or by law, and shall be exercised by notice in writing from the Lessor to the Lessee and lender; provided, however, that the Lessee shall have (15) days from the date of the letter notice to cure said default.  The estate acquired by the Lessor through the exercise of such option shall not merge with any other estate or title held by the Lessor as long as the leasehold interest is mortgaged or otherwise pledged as security for any loan, and the leasehold interest shall remain subject to any valid and subsisting mortgage or other security instrument.  Notwithstanding the Lessor's option to acquire the Lessee's interest in the Leased Premises, such option shall be subject to any right the Lessee may have under the mortgage or by law to reinstatement after the acceleration of the loan, and the right to bring appropriate court action to assert the non-existence of a default or any other defense to acceleration and sale or foreclosure.

12.  RESERVATIONS.  Lessee shall use the premises exclusively for residential purposes, except as otherwise agreed to by the parties.  Any rights not expressly provided are reserved by the Lessor.

Page 4 of 7

MAZASKA 000198

Lease No. 21373F1034 – Lillian Antoinette (Toni) Montileaux

Minerals: The Lessor reserves all rights, as owned by the Lessor, to all mineral rights, including but not limited to oil, gas, or hydrocarbon substances. The Lessor shall not exercise surface entry in connection with reserved mineral rights without prior consent of the Lessee and sureties (as found in 25 CFR 162).

Timber: The Lessor reserves all rights, as owned by the Lessor to timber and forest products on the premises.

Water: The Lessor reserves all rights, as owned by the Lessor, to water on the premises, except that which is needed for residential purposes.

13. EFFECTIVE DATE. This Lease and all its terms and provisions shall be binding upon the successors, and assigns of the Lessee and any successor in interest to the Lessor, and shall take effect on the 1st day of January, 2010.

14. OBLIGATION TO THE UNITED STATES. It is understood and agreed that while the Leased Premises are in trust or restricted status, all of the Lessee's obligations under this Lease, and the obligation of his, hers (theirs) sureties, are to be United States as well as to the owner of the land.

15. ASSENT NOT WAIVER OF FUTURE BREACH OF COVENANTS. No assent, express or implied, to any breach of any of the Lessee's covenants, shall be deemed to be a waiver of any succeeding breach of any covenants.

16. VIOLATIONS OF LEASE. It is understood and agreed that violations of this Lease shall be acted upon in accordance with the regulations in 25 CFR Part 162.

17. CARE OF PREMISES. It is understood and agreed that the Lessee is to keep the premises covered by this lease in good repair. Lessee shall not commit or permit to be committed any waste whatever on said premises and shall not remove or tear down any building or other improvements thereto, but shall keep the same in good repair. Lessee shall not destroy or permit to be destroyed any trees, except with the consent of the Lessor and the approval of the Secretary, and shall not permit the premises to become unsightly. The Lessee will be held financially responsible for all unrepaired damages to buildings, fences, improvements or appearance, except for the usual wear and decay.

18. FORCE MAJEURE. Whenever under this instrument a time is stated within which or by which original construction, repairs or re-construction of said improvements shall be completed, and if during such period any cause reasonably beyond the Lessee's power to control occurs, the period of delay so caused shall be added to the period allowed herein for the completion of such work.

19. INSPECTION OF PREMISES. The Secretary, lender, applicable Federal Agency, and the Lessor and their authorized representative shall have the rights, at any reasonable times during the term of this Lease, and with reasonable notice, to enter upon the leased premises, or any part thereof, to inspect the same and all buildings and other improvements erected and placed thereon.

Page 5 of 7

MAZASKA 000199

Lease No. 21373F1034 – Lillian Antoinette (Toni) Montileaux

20.  INDEMNIFICATION.  Neither the Lessor nor the United States, nor their officers, agents, and employees shall be liable for any loss, damage, or injury of any kind whatsoever to the person or property of the Lessee or sublessee or any other person whomsoever, caused by any use of the leased premises, or by any defect in any structure erected thereon, or arising from any accident, fire, or other casualty on said premises or from any other cause whatsoever; and Lessee, as material part of the consideration for this lease, hereby waives on Lessee's behalf all claims against Lessor and/or the United States and agrees to hold Lessor and/or the United States free and harmless from liability for all claims for any loss damage, or injury arising from the use for the premises by Lessee, together with all costs and expenses in connection therewith.

21.  UTILITIES.  Neither the Lessor nor the United States shall have any obligation to provide utilities as of the commencement of this Lease.  In the event that the Lessee requires utilities, the installation and maintenance thereof shall be the Lessee's sole obligation, provided that such installation shall be subject to the written consent of the Lessor, which the Lessor will not unreasonably withhold.  The Lessee shall pay, as they become due, all bills for electricity and other utilities that are furnished to the lease premises.

22.  LATE PAYMENT INTEREST.  It is understood and agreed between the parties hereto that, if any installment of rental is not paid within 30 days after becoming due, interest will be assessed at the existing prime rate, plus three (3) percent, times the amount owed for the period during which payments are delinquent.  Interest will become due and payable from the date such rental becomes due and will run until said rental is paid.  The interest rate formula is Interest = (Prime rate + 3%) times (x) amount due.  Special fees may be assessed on delinquent rental payments.

23.  RIGHT OF REMOVAL.  Upon termination of the lease, the Lessee of a one-unit single family dwelling shall be entitled, within 120 days, to remove the dwelling and related structures from the lease premises and relocated such improvements to an alternative site, not located on the leased premises.  Any Lessee who exercises such a right shall be required to pay all costs related to the relocation of the dwelling unit.  Lessee shall leave the land in good order and condition.  All other improvements shall become the property of the Lessor at the expiration of this Lease.  The Lessee will have 120 days to remove any excepted improvements deemed to be the property of the Lessee.

24.  INSURANCE.  The Lessee agrees, so long as this lease is in effect, to keep buildings and improvements on the lease premises insured against loss or damage by fire with extended coverage endorsements in an amount equal to the full insurable value of the buildings and improvements insured.  During such time that a mortgage is in effect against this Leasehold interest, said insurance policy is to be made jointly payable to the Lessee and the lender, and premium payments provided for per specific requirements of the lender.

25.  ADDITIONAL STIPULATIONS.  Prior to the execution of this lease, provision(s) number(s) one (1) through (8) of the PLAN OF CONSERVATION FOR HOMESITE/BUSINESS has (have) been added hereto and by reference is (are) made a part hereof.

Page 6 of 7

MAZASKA 000200

Mazaska Complaint Exhibit 3 167

Lease No. 21373F1034 – Lillian Antoinette (Toni) Montileaux

IN WITNESS WHEREOF, the parties hereto have hereunto set their hand on this _____ Day of _____ 20____.

_____        _____
            (Witness)                              (Lessee) – Lillian Antoinette (Toni) Montileaux

RECOMMENDED FOR APPROVAL:

_____        6-30-10
            Realty Officer                            Date

_____        6-30-10
SUPERINTENDENT-PINE RIDGE AGENCY:  Pursuant to            Date
and authority delegated to the Assistant Secretary Indian Affairs
by 209 DM 8, 230 DMI 1, to the Great Plains Regional Director
by 3 IAM 4 (Release No. 00-03) and to the Superintendents by
Great Plains Regional Addendum 3 IAM 4 (Release No. 0502)

Page 7 of 7

MAZASKA 000201

Mazaska Complaint Exhibit 3 168

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs

**PLAN OF CONSERVATION FOR HOME/BUSINESS**

The Lessee agrees to carry out the Plan of Conservation for a Home site/Short Term Business Lease as stipulated below for Allotment No. **OS 1373-F** Lease No. **21373F1034**, for the period **January 1, 2010** through **December 31, 2034**. It is further understood and agreed that this Plan of Conservation is to be attached and made apart of this lease contract.

1.  Premises are to be clear of litter at all times, including junk cars. Failure to comply will constitute assessment of penalty of $1.50 per day per junk car(s).

2.  For home sites outside of the town areas only: The above described land is to be fenced within one (1) year from date of approval of the lease and fences to be maintained for the term of the lease (when applicable for businesses). The Superintendent will be the sole judge as to the adequacy of fence maintenance and penalty to be assessed for non-compliance. Penalty will be assessed at $20.00 per acre per month on non-compliance to construct and maintain fences.

3.  No open burning at any time unless a valid permit is obtained from the Pine Ridge Fire Department. Failure to comply with this will result in an administrative penalty of $100.00 in addition to any criminal or civil actions.

4.  No additional homes (trailer houses, houses)/business are to be placed upon the premises. Failure to comply with this will constitute penalty of $1.00 per day for each unauthorized building(s).

5.  Cattle guards are to be installed for access to home site: If the home site location requires each installation.

6.  No animals are to be raised for commercial purposes on acreage leased for residential purposes. Non-compliance will constitute penalty to be assessed at $50.00 per day, per animal unit.

7.  Violation of any provisions of these conditions shall constitute grounds for cancellation of the lease in addition to any other penalties preceded in these conditions, or provided by law. Violations of any provision(s) of these conditions, where no penalty is otherwise provided, shall be assessed $10.00 per day for each day of non-compliance.

8.  Failure to commence use of a commercial lease within six (6) months of issuance of the lease shall constitute grounds for cancellation of the lease. Commercial leases shall be issued after submission of a Plan of the use of the proposed lease, including commencement of operations and other details to show the intended use of the site. Commercial leases within the boundaries of the Pine Ridge Town will be subject to RESOLUTION NO. 94-162.

9.  No burial sites will be allowed on this Residential lease.

**NOTICE TO ANY PERSONS AUTHORIZED TO USE INDIAN LAND UNDER FEDERALLY APPROVED LEASES, PERMITS, EASEMENTS, OR OTHER DOCUMENTS WITH THE OGLALA SIOUX TRIBE, MAY BECOME SUBJECT TO TRIBAL JURISDICTION FOR PURPOSES RELATING TO THAT CONTRACT.**

_____        _____
Witness                                  Lessee – Lillian Antoinette (Toni) Montileaux

                                         6-30-P

_____        _____
Date                                     Date

MAZASKA 000202

ORDINANCE NO. <u>19-38</u>

ORDINANCE OF THE OGLALA SIOUX TRIBAL COUNCIL
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

ORDINANCE OF THE OGLALA SIOUX TRIBAL COUNCIL OF THE OGLALA SIOUX TRIBE
ADOPTING THE OGLALA SIOUX TRIBAL CREDIT CODE.

WHEREAS the Oglala Sioux Tribe adopted its Constitution and
By-Laws by referendum vote on December 14, 1935 in accordance with
Section 16 of the Indian Reorganization Act of 1934 (25 U.S.C. § 5123)
and under Article III of the Constitution the Oglala Sioux Tribal
Council is the governing body of the Oglala Sioux Tribe, and

WHEREAS, pursuant to the Constitution and By-laws of the Oglala
Sioux Tribe. the Oglala Sioux Tribal Council exercises legislative
powers to enact and promulgate resolutions and ordinances, and

WHEREAS, Article IV, Section 1(f) of the Constitution of the
Oglala Sioux Tribe authorizes the Oglala Sioux Tribal Council to
manage all economic affairs and enterprises of the Oglala Sioux Tribe,
and Article IV, Section 1 (w) authorizes the Oglala Sioux Tribal
Council to adopt laws protecting and promoting the health and general
welfare of the Oglala Sioux Tribe and its membership, and

WHEREAS, the Oglala Sioux Tribe adopted its Constitution and
By-Laws by referendum vote on December 14, 1935, in accordance with
Section 16 of the Indian Reorganization Act of 1934 (25 U.S.C. §
5123), and under Article III of the Constitution, the Oglala Sioux
Tribal Council is the governing body of the Oglala Sioux Tribe, and

WHEREAS, under Article IV, Sections 1(f), 1(k), 1(m), and 1(w),
of the Tribal Constitution, the Tribal Council has the authority to
manage the economic affairs of the Tribe, protect and preserve the
property of the Tribe, adopt laws governing the conduct of persons on
the Pine Ridge Indian Reservation, and adopt laws protecting and
promoting the health and general welfare of the Tribe and its members,
and

WHEREAS, Article IV, Section 1(f) of the Constitution of the
Oglala Sioux Tribe authorizes the Oglala Sioux Tribal Council to
manage all economic affairs and enterprises of the Oglala Sioux Tribe,
and Article IV, Section 1(w) authorizes the Oglala Sioux Tribal
Council to adopt laws protecting and promoting the health and general
welfare of the Oglala Sioux Tribe and its membership, and

WHEREAS, Article IV, Section 1(t) of the Constitution gives the
Tribal Council the power to delegate its enumerated powers to
subordinate boards or officers, reserving the right to review their
actions taken by virtue of such delegated power, and

Mazaska Complaint Exhibit 3
170

ORDINANCE NO. <u>19-38</u>
Page Two


        WHEREAS, the Economic and Business Development Committee is a Standing Committee of the Oglala Sioux Tribal Council, and has been delegated the power to oversee matters relating to economic and business development opportunities on behalf of the Oglala Sioux Tribal Council, and

        WHEREAS, economic development is a central mission of the Tribe in order to provide funding for governmental services to Tribal Members. Unfortunately like most tribal governments, Tribe lacks access to familiar governmental revenue streams such as property income and sales tax, and

        WHEREAS, the rural and highly isolated nature of the Pine Ridge Indian Reservation as well as the lack of access to large population-bases requires a renewed focus on internet-based industries for external income e-commerce, and

        WHEREAS, in addition to internet-based industries such as tourism and arts & crafts, financial services have become a significant and reliable dozens industry for rural tribal economies, and

        WHEREAS, through e-commerce, the Tribe can attract customers from throughout the United States, and bring those nation-wide dollars from other locations back to the Pine Ridge Indian Reservation, and

        WHEREAS, the Economic and Business Development Committee has identified the online consumer lending industry as a potential industry for the Tribe to enter, and

        WHEREAS, when done correctly, with respect for the borrower, tribal online consumer lending provides an important and much needed service to millions of Americans in need, and

        WHEREAS, as a nation who has struggled with poverty, we know the importance small dollar loans play in an emergency and the difficulty in accessing capital from traditional banks and lenders, and as such Tribal nations and tribal people are uniquely qualified to provide good customer service and access to credit in the small-dollar industry, and

        WHEREAS, the Tribe believes it can provide safe, reliable and customer-protective credit products, and

        WHEREAS, the Tribe's intent is to be cautious and conservative in establishing their businesses, requiring close management, and mandating robust consumer-protective practices through our codes and oversight, and

Mazaska Complaint Exhibit 3
171

ORDINANCE NO. <u>19-38</u>
Page Three

WHEREAS, there is no federal interest rate cap or federal small-dollar lending laws which Congress has directly made applicable to tribes, and therefore tribal law will govern small-dollar lending emanating from the Pine Ridge Indian Reservation, and

WHEREAS, nonetheless the Tribe will ensure that all online small-dollar lending activities follow the spirit of federal regulations as the Tribe provides sufficient control and protection for both lenders and borrowers through its own sovereign governmental regulation and oversight, and

WHEREAS, the Tribe recognizes that several states and federal agencies have an interest in this industry, however, the Tribe is a sovereign government and will serve as its own regulator for all lenders operating from its sovereign lands, and

WHEREAS, the Tribe has determined that it is in the best interest of the economic development of the Oglala Sioux Tribe to expand into the financial services industry as an essential governmental revenue-creating function, and

WHEREAS, in recognition of the above on March 26, 2019, the Oglala Sioux Tribal Council passed Resolution No. <u>19-66</u>, directing and authorizing the Economic and Business Development Committee to review current ordinances and draft as needed any proposed revisions or new ordinances as may be necessary for online small-dollar lending, including a Financial Services Code, and to bring back any proposed revision or draft to the Tribal Council for approval, and

WHEREAS, for years the Tribe has been very creative in terms of revenue generation. This creativity includes developing entrepreneurial businesses and engaging in e-commerce. The Tribe has had to be creative because the Tribe has little, if any, natural resources to develop, and no reliable tax base, and to fund services to citizens, the Tribe must engage in enterprise, as some states have done with the establishment of state lotteries and the like. The Tribe continually seeks to develop jobs for Tribal Members and to create and foster economic development opportunities to improve the quality of life for the Tribe, including services the Tribe provides to Tribal Members, and

WHEREAS, "Tribe-building" is a key goal of the Tribe Council. The Tribe is working to develop and foster an economic environment in and around its lands in South Dakota that will be attractive to Tribal Members, provide desperately needed jobs, and support basic necessities such as food, diapers, and heating costs for Tribe Members and also allow for development and improvement of Tribe assets such as softball fields, a recreational center, and after-school programs, and

Mazaska Complaint Exhibit 3
172

ORDINANCE NO. <u>19-38</u>
Page Four


WHEREAS, e-commerce, such as online consumer lending businesses, represents a new ray of economic hope for the Tribe and its members. The Tribe seeks to develop online lending as an important revenue source to fund Tribe government and to capitalize basic infrastructure and public works, and

WHEREAS, the Tribe presently enjoys the experience of numerous employees and consultants with significant experience in the online consumer lending industry who can support the Tribe's new lending enterprises and ensure their success, and

WHEREAS, from the financial struggles and experiences of Tribe Members, the Tribe is acutely aware that lack of access to credit and onerous loan terms are significant concerns for borrowers. The Tribe believes it can provide safe, reliable and borrower-protective credit products that fill urgent and pressing credit needs for Americans, and

WHEREAS, the Tribe believes that its businesses need to work for everyone including consumer and commercial borrowers. The Tribe's intent is to be cautious and conservative in establishing the businesses requiring their close management and auditing 5 and mandating robust consumer-protective practices, and

WHEREAS, in 2000 Congress also presented definite and unambiguous support, for the unencumbered development of tribal economies. In the Native American Business Development Act Congress made specific findings regarding tribal economic development and the role of the federal government and federal agencies in that Tribe-building pursuit. Specifically, the Act found that:

- consistent with the principles of inherent tribal sovereignty and the special relationship between Indian tribes and the United States, Indian tribes retain the right to enter into contracts and agreements to trade freely, and seek enforcement of treaty and trade rights;

- the United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes;

- the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands;

Mazaska Complaint Exhibit 3 173

ORDINANCE NO. <u>19-38</u>
Page Five

- despite the availability of abundant natural resources on Indian lands and a rich cultural legacy that accords great value to self- determination, self-reliance, and independence, Native Americans suffer higher rates of unemployment, poverty, poor health, substandard housing t and associated social ills than those of any other group in the United States;

- the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to-

    o encourage investment from outside sources that do not originate with the tribes; and

    o facilitates economic ventures with outside entities that are not tribal entities;

- the economic success and material well-being of Native American communities depends on the combined efforts of the Federal Government, tribal governments, the private sector, and individuals;

- the lack of employment and entrepreneurial opportunities in communities has resulted in a multigenerational dependence on Federal assistance that is-

    o insufficient to address the magnitude of needs and

    o unreliable in availability and

- the twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available to address the challenges faced by those groups-

    o the resources of the private market

    o adequate capital and

    o technical expertise.

25 USC § 4301(0.), and

Mazaska Complaint Exhibit 3
174

ORDINANCE NO. 19-38
Page Six

WHEREAS, with a clear Congressional intent to encourage exactly this sort of economic development, the Tribal Council of the Oglala Sioux Tribe believes it is in the Tribe's best interests to establish operate and regulate online lending enterprises. Accordingly, the Tribal Council desires to adopts this Tribal Credit Code, and

WHEREAS, the Tribal Council has determined that it is in the best interest of the economic development of the Tribe to expand its offerings in the financial services industry, as an essential governmental revenue-creating function, and the Tribe desires to continue "Tribe-building" and has determined that expanding its offerings in the financial services industry will assist in the creation of job and ancillary economic opportunities and the funding and maintenance of important infrastructure that will aid those Tribe-building efforts, and the Tribe would like to ensure that all Tribe activities, including lending activities, follow the spirit of federal regulations and provide sufficient control and protection for both lenders and borrowers; now

THEREFORE BE IT ORDAINED, that the Tribal Council of the Oglala Sioux Tribe hereby enacts the following Oglala Sioux Tribal Credit Code (the "Code"), as attached hereto, and

BE IT FURTHER ORDAINED, that this Ordinance shall become effective immediately, and shall supersede, repeal, and replace all prior, inconsistent laws of the Oglala Sioux Tribe.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, as the undersigned Secretary of the Oglala Sioux Tribal Council, of the Oglala Sioux Tribe hereby certify that this Resolution was adopted by a vote of: 11 For; 2 Against; 0 Abstain; and 2 Not Voting; during a REGULAR SESSION held on the 4TH day of SEPTEMBER, 2019.

JENNIFER SPOTTED BEAR
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:

JULIAN R. BEAR RUNNER
President
Oglala Sioux Tribe

OST APPENDIX    39    Mazaska Complaint Exhibit 3 175

## OGLALA SIOUX TRIBAL CREDIT CODE

### ARTICLE 1
### SHORT TITLE, FINDINGS, AND PURPOSE

1.1     Title.  This law shall be referred to as the Oglala Sioux Tribal Credit Code.

1.2     Scope. This Code applies to all Financial Services made or offered from the Pine Ridge Indian Reservation and are otherwise subject to the Tribe jurisdiction.

  1.2.1     However, this Code shall not apply to any Tribal credit program operated by the Tribe that is exclusively available to Tribal members and/or Tribal employees (or employees of Tribally Charted entities) by virtue of their status as a Tribal member and/or Tribal employee (or employees of Tribally Chartered entities).

1.3     Applicability. Because any violation of this Code or any regulation adopted thereunder will demonstrably and seriously impact the public health, safety, welfare, political integrity and economic security of the Tribe, this Code, and any regulations adopted thereunder, apply to all Persons participating in Financial Services transacted under the Tribe's auspices or otherwise subject to Tribe jurisdiction and all Financial Services transacted within the Tribe's jurisdiction.

1

REFERENCE: Ordinance No. 19-38              APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3
176

## ARTICLE 2
## DEFINITIONS

2.1    <u>Definitions</u>. For purposes of this Code, the following words and phrases have the following meanings:

2.1.1    "Borrower's Agreement" means any contract or document memorializing an extension of credit, whether Commercial or Consumer.

2.1.2    "Code" means this Tribal Credit Code, as it may be amended from time to time.

2.1.3    "Commissions" mean both the Regulatory Commission and the Licensing Commission, which provide regulatory oversight, licensing, and compliance as defined herein.

2.1.4    "Commissioner" means any member of either Commission.

2.1.5    "Commercial Financial Services" means any extension of credit for purposes that are primarily business, commercial, investment, or any solicitation therefore, made under the auspices of the Tribe or subject to Tribe jurisdiction. It includes any extension of credit to an organization regardless of purpose or that an individual guarantees the extension of credit or provides security therefor, including, without limitation, any extension of credit to a corporation, partnership, or limited liability company.

2.1.6    "Commercial Financial Services License" means a Person or entity that is licensed by the Licensing Commission to provide Commercial Financial Services.

2.1.7    "Tribe" means the Oglala Sioux Tribe.

2.1.8    "Tribe Council" means the governing body of the Tribe as defined by Tribal law.

2.1.9    "Tribe Enterprise" means any business entity, operation or enterprise wholly-owned and controlled by the Tribe.

2.1.10    "Consumer" means a natural person who obtains an extension of credit primarily for personal, family or household purposes.

2.1.11    "Consumer Financial Services" means any extension of credit to an individual for purposes that are primarily personal, family or household, or any solicitation therefor, made under the auspices of the Tribe or subject to Tribe jurisdiction. Consumer Financial Services does not include any extension of credit to an organization, including but not limited to a corporation, partnership, or limited liability company.

2.1.12    "Consumer Financial Services Licensee" means a Person or entity that is licensed by the Licensing Commission to provide Consumer Financial Services.

2.1.13    "Employer License," means a Person or entity licensed by the Licensing Commission to employ individuals engaged in Consumer Financial Services who meet Licensing Commission standards. Each Employer License shall certify the number of Employees employed by Licensee.

2.1.14    "Financial Services" means any extension of credit, or any solicitation therefore, made under the auspices of the Tribe or subject to Tribe jurisdiction.

2.1.15    "License" means any license issued pursuant to this Code with respect to Financial Services conducted by the Tribe on the Pine Ridge Reservation or otherwise subject to Tribe jurisdiction. It includes a Consumer Financial Services License, Commercial Financial Services License, Vendor License, or Employer License, issued by

2

the Licensing Commission. A License is a revocable privilege.

2.1.16 "Licensee" or "Financial Services Licensee" means any holder of a License.

2.1.17 "Licensing Commission" means the three-member Commission created to oversee and grant Licenses pursuant to this Tribal Credit Code.

2.1.18 "Person" means any individual, tribe (whether or not federally recognized), any governmental entity of a tribe, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity or group.

2.1.19 "Regulatory Commission" means the Oglala Sioux Regulatory authority that, pursuant to this Tribal Credit Code, is authorized to oversee and enforce the non-licensing regulatory functions of this Tribal Credit Code.

2.1.20 "Tribe" or "Tribal" means the Oglala Sioux Tribe or pertaining to the Oglala Sioux Tribe, a federally-recognized sovereign American Indian tribe.

2.1.21 "Tribal Law" means all laws of the Oglala Sioux Tribe including, but not limited to, its Constitution, laws, Tribal Council Resolutions, and this Code.

2.1.22 "Vendor Licensee" means a Person or entity that is licensed by the Licensing Commission to provide services or funding to aid in the providing of financial services by a Financial Services Licensee.

22   Interpretive Provisions. For purposes of this Code, unless the context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Code as a whole and not to any particular provision of this Agreement; (b) references to any Article or Section are references to Articles and Sections in or to this Agreement and references to any paragraph, subsection, clause or other subdivision within any Section or definition refer to such paragraph, subsection, clause or other subdivision of such Section or definition; (e) the term "including" and all variations thereof means "including without limitation"; (f) except as otherwise expressly provided herein, references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (g) references to any Person include that Person's successors and assigns; and (h) headings are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof.

3

REFERENCE: Ordinance No. 19-38          APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 178

## ARTICLE 3
## TRIBE FINANCIAL SERVICES REGULATORY COMMISSIONS

3.1     Establishment and Purpose. The Tribe will create two Commissions jointly responsible for oversight and enforcement of this Tribal Credit Code: a three-member Licensing Commission shall be responsible for all Licensing under this Code and a Regulatory Commission shall be responsible for implementing and enforcing all non-licensing portions of this Code.

3.2     Duties and Powers of Commissions. The Tribe hereby grants to the Commissions the authority and responsibility to discharge the duties imposed by this Code including:

3.2.1     Publishing and enforcing regulations and rules furthering the purpose and provisions of this Code provided that such regulations shall take effect only upon approval of the Tribe Council.

3.2.2     Employing advisors as the Commissions may deem necessary for the Commissions to implement the authority granted in and meet the requirement of this Code. Advisors may include, but are not limited to, lawyers, accountants, managers, compliance consultants, security personnel, inspectors, law enforcement specialists, financial services professionals and such other persons.

3.2.3     Reviewing and approving or disapproving any applications for a License, including conducting or arranging for background investigations of all Applicants.

3.2.4     Examining or inspecting or causing to be examined or inspected each Licensee annually and more frequently if the Commissions consider it necessary.

3.2.5     Establishing a Regulatory Commission to receive and record consumer complaints regarding any Licensee or Person subject to this Code and to generally monitor risks to consumers in the offering or provision of consumer financial products or services.

3.2.5.1 The Regulatory Commission will act as a neutral party in facilitating communication between the consumer and the Consumer Financial Licensees in an attempt to resolve complaints.

3.2.5.2 The Regulatory Commission will establish a Consumer Hotline to provide consumers with a reporting system/option to submit concerns and complaints against Oglala Sioux Consumer Financial Licensees regarding to perceived unethical practices, violations of federal and tribal laws. The Regulatory Commission has an obligation to ensure the consumers are supported and heard when they raise concerns or complaints in good faith.

3.2.6     Making or causing to be made reasonable investigations of any Licensee or Person as it deems necessary to ensure compliance with this Code or any order of the Commission, to determine whether any Licensee or Person has engaged, is engaging or is about to engage in any act, practice or transaction that constitutes an unfair, deceptive or abusive act or practice or violation of this Code or any order of the Commissions.

3.2.7     Initiating enforcement actions under this Code and related regulations, as further described in Article 9, as well as the sole authority to coordinate enforcement actions with other governmental agencies and departments.

4

REFERENCE: Ordinance No. 19-38                         APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 179

3.2.8    Adopting a schedule of fees to be charged for the processing, issuance and renewal of Licenses, including fees or charges associated with conducting background checks; for reasonable examinations of Licensees; and for services rendered relating to transcripts and the furnishing or certifying of copies of proceedings, files and records and to impose the forgoing fees as applicable.

3.2.9    Collecting fees and penalties in connection with this Code.

3.2.10    Establishing procedures designed to permit detection of any irregularities, fraud and the like and to allow for the redress of customer complaints against a Licensee.

3.2.11    Examining under oath, either orally or in writing, in hearings or otherwise, any Licensee or Person, or agent, officer or employee of any Financial Services Licensee, or any other witness with respect to any matters related to this Code and to compel by subpoena the attendance of witnesses and the production of any books, records and papers with respect thereto. Upon refusal to appear or produce, the Commissions may apply to a court of competent jurisdiction to compel appearance or production.

3.2.12    Holding public hearings, issuing notice of hearings, issuing subpoenas requiring the attendance of witnesses and the production of evidence, administering oaths and taking such testimony as the Commissions deem necessary.

3.2.13    Disciplining any Licensee or Person engaging or participating in Financial Services in violation of this Code by ordering immediate compliance, issuing fines and sanctions, and suspending or revoking any License pursuant to the hearings and due process required by this Code.

3.2.14    Settling, subject to any approval of the Tribe Council, any dispute to which the Commissions are a party relating to the Commissions' authorized activities.

3.2.15    Coordinating and monitoring fair lending efforts with sister sovereigns, including other U.S. states, territories, and with the U.S. Federal Government and Foreign Governments.

3.2.16    Protecting any information provided to the Commissions by a Person or Licensee as proprietary and/ or confidential.

3.2.17    Exercising all incidental powers necessary to carry out the purposes of this Code.

3.3    Commissioners. [RESERVED]

3.4    Reporting.

3.4.1    Annual Report. No less than thirty (30) days after to the end of each fiscal year, the Licensing Commission shall deliver a report to the Tribe Council containing an annual operating budget and summary of all Commission activities during such prior year.

3.4.2    Annual Reports. On at least an annual basis, the Licensing Commission shall file a report with the Tribe Council summarizing reports received from each Licensee pursuant to this code and make such comments as it deems necessary to keep the Tribe Council fully informed as to the status of the Licensing Commission's activities.

3.4.3    Reporting by Regulatory Commission. Regulatory Commission shall review compliance audit reports and any other compliance documents and shall prepare any necessary reports. Regulatory Commission shall meet at least quarterly and document their meeting with minutes.

5

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 180

**ARTICLE 4**
**LICENSING**

4.1    License Required. Any Person seeking to engage in Commercial or Consumer Financial Services subject to this Code or, when applicable, to provide services to a Licensee or be employed by a Licensee, shall apply for and receive all required licenses prior to engaging in consumer financial services or providing services to a Financial Services Licensee.

4.1.1    Every Vendor that provides or receives, or is likely to provide or receive at least One Hundred Thousand ($100,000) Dollars in any twelve (12) month period from a Financial Services Licensee in exchange for services or aid in providing financial services subject to this Code is required to have a current and valid Vendor License as issued by the Licensing Commission.

4.1.2    Every Person extending financing, directly or indirectly, to any Financial Services Licensee is required to have a current and valid Vendor License issued by the Licensing Commission.

4.1.3    A Person who engages in financial services without charging or collecting interest or other consideration for a transaction or charges or collects nominal or incidental consideration is not required to obtain a License to engage in Financial Services but is required to otherwise comply with the provisions of this Code.

4.2    A License is a revocable privilege to do business within the jurisdiction of the Tribe.

4.3    Applications. Any applicant applying for a License hereunder shall complete and submit an application promulgated by the Licensing Commission and pay any associated fees as determined by the Licensing Commission. At a minimum, each application shall contain:

4.3.1    The applicant's full legal name, and any other names by which the applicant is or has been known (including trade names and nicknames).

4.3.2    The ownership, directors (if any) and senior management of the applicant.

4.3.3    The name and address of the registered agent who will accept service from the Commissions on behalf of the applicant if a License is issued.

4.3.4    Completion of any necessary supporting documents required by the Licensing Commission.

4.3.5    The application fee if any.

4.4    Review and issuance of License. The Licensing Commission shall reasonably promptly review each application for a License. The Licensing Commission may issue a License if it believes such issuance is in the best interests of the Tribe. Licensure is a privilege, not a right, and the decision to issue any license rests in the sole discretion of the Commission

4.5    Restrictions on licensure. The Licensing Commission may issue Licenses that authorize a Licensee to provide all types of Financial Services under this Code or a limited-purpose License that only authorizes certain types of Financial Services. A license, for example, may indicate it is for Commercial Financial Services, Consumer Financial Services, or all Financial Services. Each License shall bear on its face the name of the Licensee, the issuance date, the license

6

number and license scope.

    4.6    <u>Records</u>. The Licensing Commission shall maintain, on a confidential basis, all applicants' files, including all applications and all information submitted therewith, for no less than three (3) years from date that such an applicant ceased to hold a License, or if such applicant never held a License, from the date that such applicant was denied a License. The Licensing Commission shall, upon written request, provide the Regulatory Commission with copies of all Records.

    4.7    <u>License Denial, Suspension or Revocation of License</u>.

        4.7.1    <u>Denial; Temporary Suspension or Revocation</u>. The Licensing Commission shall not unreasonably withhold issuance or renewal of a License. The Licensing Commission shall deny a License or suspend or revoke a License if the Licensing Commission finds that an applicant or Licensee:

| | |
|---|---|
| (i) | Made or offered Financial Services not authorized by this Code; |
| (ii) | Has a senior officer that includes a Person or Persons not possessing honesty, truthfulness or good character; |
| (iii) | Made a material misstatement or omission on the application or on any document filed with the Licensing Commission; |
| (iv) | Withheld or provided incomplete or insufficient pertinent information; |
| (v) | Failed to pay any application fee (including for any renewal); |
| (vi) | Violated or aided, abetted or conspired with another Licensee or Person, or knowingly or knowingly caused any Licensee or Person to or otherwise participated in a violation of this Code or the rules and regulations of the Licensing Commission, the Regulatory Commission, or applicable federal law; |
| (vii) | Is insolvent; |
| (viii) | Employs a Person that has been convicted or has entered a plea of no contest in any jurisdiction of any felony or any other crime involving breach of trust or dishonesty; |
| (ix) | Has a financial judgment ordered against the applicant or Licensee in a civil action based on fraud, deceit or misrepresentation; |
| (x) | Employs any Person in a Financial Services business whom the Licensee knew or should have known was convicted of fraud, theft or embezzlement; |
| (xi) | Refuses to comply with any lawful order, inquiry or directive of the Commission or the Tribal Council; |
| (xii) | Attempts to bribe or offer anything of value to any Person, member of the Tribal Council or Commissioner in an attempt to avoid or circumvent Tribal law; |
| (xiii) | Poses a threat to the public interest or the effective regulation of Financial Services; |
| (xiv) | Creates or enhances the danger of unsuitable, unfair or illegal practices and methods and activities in the conduct of Financial Services; or |
| (xv) | Was a former Licensee pursuant to this Code whose License was suspended |

7

REFERENCE: Ordinance No. <u>19-38</u>          APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 182

or revoked and not subsequently reinstated.

4.7.2    Procedure for Suspension or Revocation.

(i)    Upon reasonable basis for belief that a violation of the Code has occurred, the Licensing Commission, the Regulatory Commission or their designee may either undertake an investigation of the Licensee or serve upon such Licensee an order to show cause why the Licensee's License should not be suspended or revoked, or why the Licensee should not be enjoined from conducting Financial Services under this Code.

(ii)    Such notice shall state the reason for the suspension and/or order, and the time and place for the hearing before the Commission.

(iii)    Licensee shall have an opportunity to present testimony and cross-examine opposing witnesses, and to present any other evidence as to why a suspension, revocation order or injunction should not be issued.

(iv)    The hearing shall be governed in all respects in accordance with Tribal law and the Commissions regulations. Any suspension or revocation decision of the Commissions after hearing may be appealed in accordance herewith.

4.8    Period of License. Each license may be issued for a period not to exceed two (2) years from the date of issuance.

4.9    Renewal of License. The Licensing Commission may deny renewal of a License or suspend or revoke a license if the Licensing Commission or the Regulatory Commission find the existence of any circumstance listed in section 4.6.1 above, or that any other fact or condition exists that, if it had existed at the time of the original application for the License, would have warranted the Commission to refuse to issue the License.

4.10    Transferability of Licenses. Licenses issued by the Licensing Commission hereunder shall not be transferable and may only be utilized by the Person in whose name it was issued. Any change in the ultimate ownership or management control of any Licensee shall be deemed a transfer for purposes of this subsection, and shall not be permitted without the prior written consent of the Licensing Commission.

4.11    Voluntary Surrender of License. Any Licensee registered pursuant to this Code may voluntarily surrender its License at any time by giving written notice of the surrender to the Commissions.

8

Mazaska Complaint Exhibit 3 183

## ARTICLE 5
## REQUIREMENTS OF LICENSEES

5.1    Legal Compliance by Consumer Financial Services Licensees. The Tribe requires Consumer Financial Services Licensees to comply at all times with the provisions of this Code, rules and regulations promulgated pursuant to this Code, all other applicable Tribal, and principles of federal law and regulations as applicable. In particular, the Tribe requires Consumer Financial Services Licensees to comply with the spirit of the following federal laws, regardless whether they apply to Tribal-related lending: Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5491-5493; Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and related regulations at 12 C.F.R. Part 1026; Consumer Leasing Act, 15 U.S.C. §§ 1667 *et seq.*, and related regulations at 12 C.F.R. Part 1013; Fair Credit Billing Act, 15 U.S.C. § 1666a; Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and related regulations at 12 C.F.R. Part 1002; Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*, and related regulations at 12 C.F.R. Part 1005; Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* and related regulations at 12 C.F.R. Part 1022; privacy provisions of Title V of the Gramm- Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*, and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314; Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and related regulations at 16 C.F.R. Part 901; Military Protection Act, 10 U.S.C § 987, and related regulations of the Department of Defense at 32 C.F.R. part 232; and Service members' Civil Relief Act, 50 U.S.C. App. §§ 501-596, together with any similar or future acts and regulations promulgated thereunder.

5.2    Consumer Lending Best Practices. The Tribe requires Consumer Financial Services Licensees to attempt to comply with industry best practices that may be established from time to time by the Native American Financial Services Association, Online Lenders Association or other recognized industry groups unless a determination is made that such practices conflict with policies and procedures of the Tribe.

5.3    Legal Compliance by Commercial Financial Services Providers. The Tribe requires Commercial Financial Services Licensees to comply at all times with the provisions of this Code, rules and regulations promulgated pursuant to this Code, all other applicable Tribal, and federal law and regulations as applicable. This includes the federal laws specified in Section 5.1 as applicable. Commercial Financial Services Licensees must also have a Compliance Management System in place.

5.4    The Tribe will maintain a compliance management system that ensures that their Consumer Financial Licensees are following all Federal and Tribal laws and regulations as described below.

(a)    Have comprehensive, written policies and procedures designed to ensure that the Tribe and their Licensees do not violate any Applicable Laws.

(b)    have effective Customer complaint monitoring processes, including the maintenance of adequate records of all written, oral, or electronic complaints or inquiries, formal or informal

9

REFERENCE: Ordinance No. 19-38                APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 184

(c)    have well-documented compliance monitoring that is designed to detect and correct compliance weaknesses that would impact Customers and the Tribe

(d)    effective training programs that include regulator, specific, comprehensive training in consumer protection laws commensurate with individual job functions and duties for appropriate employees, including all employees having responsibilities that relate to consumer protection laws and senior management.

(e)    Requirement of at least annual compliance audits to be performed by vendors selected by Oglala Sioux Tribe

5.5    <u>Prohibited Acts by Licensees</u>. A Licensee shall not:

5.5.1    Engage in any Financial Services other than those allowed under this Code or as permitted by its License.

5.5.2    Threaten to use or use any criminal process to collect on any amounts outstanding.

5.5.3    Use any device or agreement which would have the effect of charging or collecting more fees, charges or interest than allowed by this Code.

5.5.4    Use or cause to be published or disseminated any advertisement that contains false, misleading or deceptive statements or representations.

5.5.5    Engage in unfair, deceptive, fraudulent or abusive practices.

5.5.6    Tie or otherwise condition the providing of Financial Services to the sale of any good or service by the Licensee.

5.5.7    Fail to maintain a system of minimum internal controls systems regulation as may be promulgated by the Commissions.

5.6    <u>Books, Accounts and Records, Examinations, Costs</u>.

5.6.1    A Licensee shall maintain at each location at which it conducts business all books, accounts and records that the Commissions reasonably require. Each Licensee shall:

(i)    Ensure that the books, accounts and records are sufficiently detailed to comply with the Code and all applicable Tribal and federal laws; and

(ii)    Maintain the books, accounts and records separately from any other business in which the Licensee is engaged and shall retain the books, accounts and records for at least three (3) years.

5.6.2    Either Commission may examine or cause to be examined each Licensee annually. In conducting such examination, a Commission or its agent may examine the books, accounts and records to determine if the Licensee has complied with this Code and any implementing regulations adopted pursuant to this Code. The Licensee shall pay the reasonable cost of the examination as may be required by the investigating Commission in accordance with its regulations.

5.7    <u>Annual Reports</u>. Every Licensee shall file a confidential report with the Licensing

10

REFERENCE: Ordinance No. <u>19-38</u>             APPROVED BY OSTC: September 4, 2019

Commission at least annually. Each report shall contain information sufficient for the Commission to determine compliance with this Code including, at a minimum, the following: (1) the name, address and telephone number of the Licensee; (2) the names, addresses and titles of all of senior management of the Licensee; (3) a sworn statement that the Licensee, to the best of its knowledge, has complied and will continue to comply with all Tribal and federal laws applicable to Financial Services; and (4) the name and address of the registered agent who will accept service of process from the Licensing Commission on behalf of the Licensee. Such Annual Reports, upon request, shall be provided to the Regulatory Commission.

5.8    Monthly Reports. Licensees deemed by the Licensing Commission to conduct substantial Financial Services shall also be required to file confidential monthly reports with the Licensing Commission sufficient for the Licensing Commission to determine Compliance with this Code. Such Monthly Reports summarizing Licensee's key financial indicators, staffing, consumer complaints, notices, compliance monitoring, training, and any audit results shall, upon request, be provided to the Regulatory Commission.

5.9    Financial Reporting requirements. On an annual basis, each Licensee shall provide, on a confidential basis, to the Licensing Commission annually a true and correct copy of their annual financial statements. If the Licensee's financials are audited or reviewed, such Licensee shall provide such audited financial or reviewed (as applicable) statements to the Licensing Commission and such reports shall be provided, upon request, to the Regulatory Commission.

5.10    Public Notice. Each Financial Services Licensee shall have a copy of this Code and any implementing regulations readily available for inspection by any Person at each location where it maintains a presence if required by Regulatory Commission.

11

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 186

## ARTICLE 6
## AUTHORIZED FINANCIAL SERVICES TRANSACTIONS

6.1    General Authority. Subject to this Code, a Licensee may engage in the business of providing Financial Services as provided in this Code, as may be limited by such Licensee's Licensee.

6.2    Financial Services. Any Licensee may, subject to any limitations as set forth in such Licensee's License or as otherwise imposed by, offer Financial Services and, in connection therewith, may charge and collect the interest and other charges permitted by this subchapter. Financial Services may be offered online, in retail locations or anywhere Tribe desires.

6.3    Collateral. A License may take as collateral any personal property such as automobiles, jewelry, etc. A Licensee may not take real property, i.e real estate as collateral. With respect to any collateral that is tangible personal property, a Licensee must provide a customer at least ten (10) days to reinstate the obligation by bringing it current before disposing of the collateral. The taking of an authorization for an automatic clearing house debit shall not be deemed a security interest.

6.4    Forms of credit. Extensions of credit may be open-end credit or closed- end credit. The fact that an open-end extension of credit has a maturity date does not preclude it from being open-end credit.

6.5    Payment terms. A Licensee may make extensions of credit that are payable in one or more installments. Payments may be weekly, bi-weekly, bi-monthly, monthly, or other periodic basis, as the agreement governing such extension of credit provides. Extensions of credit with a principal amount over $2,000 must be payable in at least three (3) installments.

6.6    Location. Loans are specifically prohibited to any individuals on the Pine Ridge Reservation or in the state of South Dakota.

6.7    Loan Type. Two-week payday loans are prohibited and all loans must be amortized.

6.8    Minimum Requirements. All Borrowers must be employed or have sufficient proof of recurring income and must have a bank account or prepaid card.

6.9    Interest. A Licensee may charge and collect interest in respect of any Loan at such daily, weekly, monthly, annual or other periodic percentage rate or rates as the agreement governing such extension of credit provides. For purposes hereof, a year may but need not be a calendar year and may be such period of from 360 to 366 days, including or disregarding leap year. Interest may be calculated on a daily earnings method or scheduled due date method. In the event of prepayment in full with respect to the scheduled due date method, unearned interest shall be subject to refund using a daily factor from the date of the last scheduled payment to the date of prepayment in full.

6.10    Variable rates. If the agreement governing any extension of credit so provides, the

12

periodic percentage rate or rates of interest charged and collected may vary in accordance with a schedule or formula. Such periodic percentage rate or rates may vary from time to time as the rate determined in accordance with such schedule or formula varies and such periodic percentage rate or rates, as so varied, may be made applicable to all or any part of outstanding unpaid amounts of such extension of credit on and after the effective date of such variation.

6.11    Additional charges. In addition to or in lieu of interest at a periodic percentage rate or rates permitted hereunder, the Licensee may charge and collect, in respect of any extension of credit, any of the following fees and charges as the agreement governing such extension of credit provides:

6.11.1    A late or delinquency charge upon any outstanding unpaid payment or portions thereof under the agreement which are in default; provided, however, that no more than one (1) such delinquency charge may be imposed in respect of any single payment or portion thereof regardless of the period during which it remains in default. Nothing contained in this subdivision shall limit, restrict or otherwise affect the right of a Licensee to change the periodic percentage rate or rates of interest applicable to the agreement upon the occurrence of a delinquency or default or other failure of the customer to perform in accordance with the terms of the agreement.

6.11.2    On return of a payment device to a holder of a Financial Services obligation following dishonor of the payment device, the holder, the holder's assignee, agent, or representative, or any other person retained by the holder to seek collection of the face value of the dishonored payment device, may charge the drawer or endorser a reasonable dishonored item fee of not more than fifty dollars ($50). For purposes of this section, "payment device" means any check, debit card, paper or electronic payment, or other payment device used as a medium for payment, including ACH.

6.11.3    Such other charges as are set forth in the agreement governing such extension of credit including, but not limited to, costs, fees, services, points, premiums and all other reasonable expenses which may be incurred by such applicant in connection with such extension of credit.

6.11.4    No Licensee shall demand, collect or receive from any applicant for Financial Services, directly or indirectly, any other charges, or any greater amounts for any authorized charges than those permitted by this Article.

6.12    Deferred installments. A Licensee may at any time or from time to time permit installment payments of an extension of credit and, in connection with such deferral, charge and collect deferral charges.

6.13    Refinancing.

6.13.1    Customer may, with the consent of the Licensee, refinance the entire outstanding and unpaid amount of the extension of credit, and the Licensee may charge and collect a refinancing charge in connection with any such refinancing.

6.13.2    For the purposes of this section, the entire outstanding and unpaid amount of any extension of credit shall be deemed to be the total of the unpaid principal balance and the accrued but unpaid interest and other charges and fees on the date of any such

13

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 188

refinancing.

6.14    Right of Rescission. No Consumer Financial Services Licensee shall make an extension of credit to a consumer unless such extension of credit is subject to a minimum one-business day right of rescission on the part of the consumer. The Consumer Financial Services Licensee may require that the consumer first return the loan proceeds in order to rescind.

6.15    Complaint procedure. The contract between a Consumer Financial Services Licensee and a consumer must include a notice providing contact information for the Regulatory Commission via the Tribal hotline for filing a complaint.

6.16    Threats of Criminal Prosecution. No Consumer Financial Services Licensee shall pursue or threaten to pursue criminal action against a consumer in connection with the nonpayment of any amount due, including the unpaid return of any check or automated clearing house transaction.

6.17    Certain requirements for short-term consumer extensions of credit.

6.17.1    The requirements in this Section 6.14 apply to a consumer extension of credit that is payable in less than 180 days.

6.17.2    The Consumer Financial Services Licensee shall conspicuously disclose in the application substantially the following:

(i)     This extension of credit is designed as a short-term cash flow solution and not designed as a solution for longer term financial problems;

(ii)    Additional fees and interest may accrue if such extension of credit is refinanced; and

(iii)   Credit counseling services are available to customers who are experiencing financial problems.

6.17.3    The Consumer Financial Services Licensee must post on any website a prominent statement that reads substantially as follows: "This loan is not intended to meet long-term financial needs."

6.17.4    The Consumer Financial Services Licensee shall obtain some form of documentation or reference whether electronic or actual documents showing that the principal amount of the extension of credit does not exceed an unreasonable amount of the consumer's gross monthly income or other verifiable source of income or such specific percentage(s) as may be determined by regulation adopted by the Regulatory Commission or the Licensing Commission from time to time. The Licensing Commission and the Regulatory Commission shall jointly oversee any Licensee's methodology to determine a borrower's demonstrated capacity to repay any loan and to oversee other consumer-protective measures.

6.18    No oral agreements. A customer transaction may provide that it represents the entire

14

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 189

agreement of the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. Such provisions are enforceable and disallow evidence of oral agreements.

6.19    Electronic commerce. And electronic signature or assent that is authenticated shall constitute a signature or assent in writing for all purposes.

6.20    Notice of Sovereign Immunity. The customer must be provided a notice in a form approved by the Regulatory Commission regarding preservation of tribal sovereign immunity and exclusive jurisdiction and a customer's limited and exclusive rights to submit complaints to arbitration before a national arbitration organization.

6.21    Enforcement of Licensee's rights and remedies. In any proceeding in which a Licensee is a party in interest with respect to any transactions with a customer, the Licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written transaction documents and the payment and business records maintained by the Licensee in the ordinary course of business. Except for payment, any claims or defenses whatsoever asserted by or on behalf of a customer shall be subject to the exclusive jurisdiction of the national arbitration organizations identified in the consumer's contract.

15

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3
190

## ARTICLE 7
## RESOLVING BORROWER DISPUTES

7.1     Tribe Dispute Resolution Procedure Is Arbitration. The Tribe desires to provide a neutral and accessible forum for the expedient resolution of any consumer disputes and hereby authorizes any wholly-owned Tribe enterprise entering into consumer credit contracts to provide a limited waiver of its sovereign immunity from suit and service of process, which shall apply to any Borrower's Agreement made by a Licensee under this Code.

7.2     Traditional Litigation Not Available. Because of the nature of the Financial Services industry, and the fact that most consumers anticipated to be served by Tribe Enterprises will receive small-denominational short-term loans, traditional litigation would be cost-prohibitive for borrowers and likewise inefficient and impractical to address any Tribe sovereignty issues that might be implicated in any dispute.

7.3     Steps in Tribe Dispute Resolution Protocol. Any consumer's first recourse under this Code shall be to the customer service representatives for any Tribe Enterprise. If the Tribe Enterprise's customer services staff is unable to satisfy a borrower's concerns, a borrower's second recourse shall be to submit his or her concerns in writing to the Regulatory Commission, which shall evaluate the borrower's complaint in accord with the dispute resolution regulations then in effect, as may be established from time to time by the Regulatory Commission. If the borrower remains dissatisfied following his or her exhaustion of remedies made available under the Regulatory Commission's dispute resolution regulations, the borrower may, as a final method of recourse, submit his or her complaint in writing a national arbitration organization of the borrower's choosing.

7.4     Disclosure to Borrowers. The Tribe's and any Tribe Enterprise's sovereign immunity, and preservation thereof, and the availability of arbitration shall be disclosed in writing in any Borrower's Agreement.

16

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

## ARTICLE 8
## ENFORCEMENT

8.1    Jurisdiction. Except as provided otherwise in this Code, the Regulatory Commission and the Licensing Commission shall jointly have jurisdiction over all violations of this Code.

8.2    Civil Violations. Any Financial Services Licensee who violates or fails to comply with any provision of this Code or who fails or neglects to comply with any final order of the Commissions may be charged with a violation and given due process. If the Licensee or Person is found to have committed a violation, such Licensee may be required to pay a civil fine to the Commissions not to exceed Five Thousand Dollars ($5,000) for each violation. Each day during which any such violation or failure to comply continues may be treated as a separate violation of this Code, but not to exceed $100,000. A violation or series of violations related to the same act or omission may be treated as one violation. A Licensee found responsible for a material violation pursuant to this Code may also be subject to revocation of its License. An officer or agent of a Licensee who knowingly or recklessly participates in a material violation of this Code is subject to a civil penalty imposed by the Commissions.

8.3    Notice and Opportunity to Cure; Due Process; Notice; Hearings; Examiner. The Regulatory Commission shall provide notice and a reasonable opportunity of at least sixty (60) days to cure before it initiates any action to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder absent exigent circumstances or other good cause. If the matter(s) is not satisfactorily cured within that period, the Regulatory Commission shall provide notice and the opportunity for a hearing comporting with notions of due process if it is to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder.

8.4    No Hearing, Voluntary Resolution. Whenever it shall appear to the satisfaction of the Regulatory Commission that all of the interested parties involved in any dispute or concern have agreed concerning the matter at hand, the Regulatory Commission may dismiss or approve resolution of the issue, as appropriate, without a hearing.

8.5    Notice of Hearing. The Regulatory Commission shall, within ten (10) days after learning of the event giving rise to the concern, provide a written notice setting forth, with specificity, the issues to be resolved and the date and time at which a hearing shall be conducted. Such Hearing Notice shall be provided to the Licensing Commission.

8.6    Hearing. Except as determined by the Regulatory Commission, the hearing shall be scheduled to take place no less than ten (10) and no more than thirty (30) business days after the notice of hearing is delivered. At the hearing, the affected parties shall be provided the opportunity to present oral or written testimony to all people interested therein as determined by the Regulatory Commission. The Licensing Commission may, at its own discretion, attend.

8.7    Examiner. The Regulatory Commissioners shall act as examiner for the purpose of holding any hearing, or the Regulatory Commissioners may appoint an examiner qualified in the

17

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 192

law or possessing knowledge or expertise in the subject matter of the hearing for the purpose of conducting any hearing. Any such appointment shall constitute a delegation to such examiner of the powers of the Commission under this Code with respect to any such hearing.

     8.8    <u>Decision</u>. The Regulatory Commission shall issue a written decision to all affected parties within thirty (30) days after the hearing. Such decision shall be provided to the Licensing Commission and shall require written approval of the majority of the Licensing Commission before any change in Licensing is enforced.

     8.9    <u>Appeals</u>. Affected parties may appeal a Regulatory Commission determination by filing a written appeal to the Tribal Council within twenty (20) days of receiving the Regulatory Commission's final written decision. The Tribal Council shall place the matter on the agenda of its next regularly scheduled meeting. Any decision of the Tribal Council on appeal shall be final and not subject to further appeal.

     8.10    <u>Purpose of civil penalties</u>. The civil fines imposed under this Code are intended to be remedial and not punitive and are designed to compensate the Tribe for the damage done to the peace, security, economy and general welfare of the Tribe, and to compensate the Tribe for costs incurred by the Tribe in enforcing this Code. Any civil fines collected by the Regulatory Commission shall be paid to the Tribe.

     8.11    <u>Seizure and forfeiture of property</u>. Property utilized in violation of this Code shall be subject to seizure and forfeiture by order of the Commissions pursuant to such implementing regulations as the Commissions shall promulgate.

     8.12    <u>Cumulative fines</u>. All civil fines accruing under this Code shall be cumulative and a suit for the recovery of one fine shall not bar or affect the recovery of any other fine, or judgment, penalty, forfeiture or damages nor bar the power of a court of competent jurisdiction to enter an order of contempt, nor bar any criminal prosecution against any officer, director, agent or employee of any Licensee, or any other Person.

18

REFERENCE: Ordinance No. <u>19-38</u>           APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 193

**ARTICLE 9**
**USE OF PROCEEDS**

9.1    Application of Proceeds. The gross proceeds collected by the Tribe from all licensing of Financial Services hereunder and from fines imposed as a result of violations of this Code, shall be applied as follows: (a) first, for the payment of all necessary personnel, administrative costs and legal fees incurred in the enforcement of this Code; and (b) second, the remainder shall be turned over to the general fund of the Tribe and expended by the Tribe Council for governmental services and programs on the Tribe in accordance with the requirements of the Oglala Sioux Tribe's Constitution.

19

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3
194

**ARTICLE 10**
**MISCELLANEOUS PROVISIONS**

10.1     Severability and Savings Clause. If any provision or application of this Code is determined by judicial review to be invalid, such provision shall be deemed ineffective and void, but shall not render ineffectual the remaining portions of this Code, which shall remain in full force and effect.

10.2     Effective Date. This Code shall be effective as of the date adopted by Tribal Council Ordinance.

10.3     Repeal of Prior Codes. Any and all prior resolutions, laws, regulations, acts or Codes pertaining to the subject matter set forth in this Code are hereby rescinded and repealed in their entirety.

20

REFERENCE: Ordinance No. 19-38                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 195

## ARTICLE 11
## <u>SOVEREIGN IMMUNITY</u>

Nothing contained in this Code nor any action of the Commissions are intended to nor does it in any way limit, alter, restrict, or waive the Tribe's or the Commissions' sovereign immunity from suit, action or service of process. Further, in their roles within the Commissions, each Commissioner and Commission employee shall possess sovereign immunity from suit, action and service of process. The Tribe Council shall indemnify each Commissioner against any and all losses, damages, judgments, interest, settlements, fines, court costs and other reasonable costs and expenses of legal proceedings including attorneys' fees and any other liabilities incurred by, imposed upon or suffered by such individual in connection with or resulting from any claim, action, suit or proceeding, actual or threatened, arising out of or in connection with the performance of such Commissioner's duties under this Code. The immunity and indemnification provided by the Tribe pursuant to this Article to Commissioners or Commission employees and agents shall not cover any acts or omissions which involve willful or wanton conduct, breach of good faith, intentional misconduct, or any transaction from which such individual derives an improper personal benefit.

21

REFERENCE: Ordinance No. <u>19-38</u>                    APPROVED BY OSTC: September 4, 2019

Mazaska Complaint Exhibit 3 196

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on April 19, 2024, a true and accurate copy of the foregoing was served on all counsel and parties of record by electronic mail.

_____

STEVEN J. GUNN

Mazaska Complaint Exhibit 3
197

## OGLALA SIOUX TRIBE
## SUPREME COURT

IN THE MATTER OF:                                    Case NO. CIV-2022-0388

**MAZASKA OWECASO OTIPI FINANCIAL, INC.**

Appellant                                    **REVISED SCHEDULING ORDER**

v.

**LILLIAN "TONI" MONTILEAUX**

Appellee

The Record on Appeal having been filed with the Court, the Court's briefing and oral argument schedule is as follows:

Appellant's Reply Brief to the Tribal Amicus Brief              Due 5/3/2024

Oral Argument                                    5/10/2024 @ 1:00 pm MT Time
                                          (12:00 pm PST, 2:00 pm CST, 3 pm EST)

**ORDER**

THIS COURT ORDERS:

  1. This Order shall become FINAL upon issuance.

**IT IS SO ORDERED.**

Dated this 19th day of April 2024.

Job Serebrov, Associate Justice
Oglala Sioux Tribe Supreme Court

Attest:

Clerk of Supreme Court
OSN Supreme Court

Mazaska Complaint Exhibit 3
198

SUPREME COURT OF THE OGLALA SIOUX NATION

OGLALA SIOUX TRIBE

PINE RIDGE INDIAN RESERVATION

---

LILLIAN "TONI" MONTILEAUX,

                Petitioner/Appellee

v.

MAZASKA OWECASO OTIPI FINANCIAL, INC.,

          Respondent/Appellant

                    CIV. APP. NO. CIV-2022-0388

        **APPELLANT'S RESPONSE TO *AMICUS*
BRIEF OF THE OGLALA SIOUX TRIBE**

---

APPEAL FROM THE OGLALA SIOUX TRIBAL COURT
OGLALA SIOUX TRIBE
PINE RIDGE INDIAN RESERVATION

---

THE HONORABLE DAVE DILLON
Chief Judge OST Tribal Court

---

Steven D. Sandven
12294 Gold Mountain Loop
Hill City, SD 57745
sdsandven@gmail.com
**Counsel for Appellee**

Jonathan P. McCoy
Costello, Porter, Hill, Heisterkamp,
      Bushnell & Carpenter, LLP
PO Box 290
Rapid City, SD 57709
605.343.2410
**Counsel for Appellant**

---

NOTICE OF APPEAL FILED SEPTEMBER 12, 2022

---

**Mazaska Complaint Exhibit 3
199**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Argument in Response to *Amicus* ....................................................................... 1

   Introduction ..................................................................................................... 1

   "The [federal] district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331................... 3

Conclusion ............................................................................................................. 5

Certificate of Service............................................................................................. 6

Certificate of Proof of Filing................................................................................ 7

i

Mazaska Complaint Exhibit 3
200

## TABLE OF AUTHORITIES

PAGE

**UNITED STATES SUPREME COURT**

*Am. Well Works Co. v. Layne & Bowler Co.,*
241 U.S. 257 (1916)....................................................................2

*Gully v. First Nat'l Bank in Meridian,*
299 U.S. 109, 112 (1936)...........................................................4

*Montana v. United States,*
450 U.S. 544 (1981)..............................................................1, 4, 5

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,*
471 U.S. 845 (1985)....................................................................2

*Strate v. A-1 Contr's,*
520 U.S. 438 (1997)....................................................................1

**FEDERAL CASES: CIRCUIT COURTS OF APPEALS AND DISTRICT COURTS**

*Gardner v. First Am. Title Ins. Co.,*
294 F.3d 991, 994 (8th Cir. 2002)...........................................1-2

*Binder v. Weststar Mortg., Inc.,*
No. 14-7073, 2016 U.S. Dist. LEXIS 90620 (E.D. Pa. July 13, 2016)..........3

*Montesanti v. Nationstar Mortg. LLC,*
Civil Action No. 3:22-CV-0688-X,
2023 U.S. Dist. LEXIS 94327 (N.D. Tex. May 31, 2023).....................3

**STATUTES AND REGULATIONS:**

12 U.S.C. § 2601 *et seq.*..........................................................1, 3
28 U.S.C. § 1331........................................................................3, 5
12 C.F.R. § 1024.2(d)...................................................................2
12 C.F.R. § 1024.17(f)(2)(i)..........................................................3
12 C.F.R. § 1024.36(d).................................................................3

Mazaska Complaint Exhibit 3
201

## ARGUMENT IN RESPONSE TO *AMICUS*

**Introduction**

The Oglala Sioux Tribe's (hereinafter, "Tribe") last hour filing purports the Tribe exercises some form of regulation over Mazaska triggering a presumption that civil jurisdiction lies with the Tribal Court. *Strate v. A-1 Contr's*, 520 U.S. 438 (1997) (interpreting the second prong of the test identified in *Montana v. United States, infra*.). However, this was not argued to the trial court. More egregiously, the Tribe overlooks that its freshly asserted regulatory authority derives from a 2019 ordinance passed eight years after the transaction in this case and asks this Court to do the same. It tries to focus the Court's eyes on *Strate's* interpretation of the *Montana* test rather than the interpretation of the facts of this case as applied to the *Montana* test.

In its, perhaps overly simplistic, view of Petitioner's position, the Tribe under values the structure of the Complaint. Paragraph 53 identifies what Petitioner believes is the breach:

> 53.    The Respondent has breached its contractual obligations by failing and refusing to properly account for the escrow funds as required by Section 2 of the Third Mortgage, unilaterally extending the maturity date as delineated in the Third Note, and not applying Petitioner's payments in accordance with the Third Mortgage.

Section 2 is one of the "Uniform Covenants" (Appellant's Appx, 12-13) and incorporates the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, specifically 12 U.S.C. § 2609. However imprecisely and unartfully worded, Petitioner's complaint has alleged Mazaska violated RESPA in connection with a federally related mortgage loan. *Gardner v. First Am. Title Ins. Co.*, 294 F.3d 991, 994 (8th Cir. 2002) ("Though the standing component of jurisdiction is not satisfied merely by

1

citing the federal statute defendant has allegedly violated, [standing and jurisdiction are] satisfied if the complaint says enough about jurisdiction to create some reasonable likelihood that the court is not about to hear a case that it is not supposed to have the power to hear [internal quotes and citations omitted]. Read together and construed in favor of plaintiffs, paragraphs 80 and 82 [in the complaint] alleged, however imprecisely, that defendants violated RESPA in connection with plaintiffs' federally related mortgage loans.").

It is well settled that a "statutory grant of jurisdiction will support claims founded upon . . . statutory origin." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985). "A suit arises under the law that creates the cause of action." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916).

The promissory note and mortgage, originating in 2010-2011 are not subject to tribal regulation. Both parties have approached the transaction from the position of borrower (Montileaux) and lender/servicer (Mazaska). 12 C.F.R § 1024.2.[1] The Tribe has not relied on any Oglala Sioux Tribal Code or Ordinance regulating mortgages or financial transactions of the sort made between Mazaska and Montileaux. There are none. Rather, it reaches to an unknown and unpublished 2019 ordinance,[2] which has not been adopted by

---

[1] As applied to Mazaska, 12 C.F.R. § 1024.2 defines a federally related mortgage loan as:
    (1) Any loan (other than temporary financing, such as a construction loan):
        (i) That is secured by a first or subordinate lien on residential real property, including a refinancing of any secured loan on residential real property, upon which there is either:
            (A) Located or, following settlement, will be constructed using proceeds of the loan, a structure or structures designed principally for occupancy of from one to four families (including individual units of condominiums and cooperatives and including any related interests, such as a share in the cooperative or right to occupancy of the unit); . . .and
        (ii) For which one of the following paragraphs applies. The loan:
            . . .
            (B) Is made in whole or in part, or is insured, guaranteed, supplemented, or assisted in any way:
                . . .; or
            (2) Under or in connection with . . . a housing or related program administered by any other officer or agency of the Federal Government[.]

[2] If the 2019 ordinance is valid, it is not clear what relevance it has to the 2010-2011 financial instruments, o why the Tribe, in reliance on this ordinance, now suggests the mortgages are invalid despite no such argument to the trial court and without any right of redemption of its own.

2

the Secretary of the Department of the Interior, to suggest regulation of Mazaska.

No different than the Plaintiff in *Montesanti v. Nationstar Mortg. LLC*, Civil Action No. 3:22-CV-0688-X, 2023 U.S. Dist. LEXIS 94327 (N.D. Tex. May 31, 2023), Petitioner here alleges failure to provide escrow statements and failing to apply escrow payments. These claims arise because of RESPA. 12 U.S.C. § 2609; 12 C.F.R. §§ 1024.36(d) and 1024.17(f)(2)(i); *accord*, *Nationstar Mortgage*, 2023 U.S. Dist. LEXIS 94327 at *3 (holding that there is no private right of action under 12 C.F.R. § 1024.17); *Binder v. Weststar Mortg., Inc.*, No. 14-7073, 2016 U.S. Dist. LEXIS 90620, at *32-34 (E.D. Pa. July 13, 2016).[3]

**"The [federal] district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.**

The security instrument provided that "Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless *another law* that applies to the Funds sets a lesser amount." *Appellant's Appx.*, at 13 [emphasis added]. RESPA, not "another law," applies to this case. There is no comparable Oglala Sioux Tribe code, ordinance or statute equivalent to the

---

[3] The court in *Weststar Mortg.* stated,

> [Plaintiff] acknowledges that there is no private right of action under the statute for mishandling of the escrow amounts or increasing the escrow amounts and agrees that the Court should grant the defendants' motion as to these components of the RESPA claims. Section 2609 of RESPA governs escrow fee collection. "The majority of Circuit Courts of Appeal have determined that a private right of action does not exist for violations of section 2609." *McAndrew v. Deutsche Bank Nat. Trust Co.*, 977 F. Supp. 2d 440, 446 (M.D. Pa. 2013) (citing decisions from the Fifth, Seventh and Eleventh Circuit Courts of Appeals, holding that no private right of action exists under section 2609 of RESPA.); *Allison v. Liberty Sav.*, 695 F.2d 1086, 1087 (7th Cir. 1982) ("[W]e hold that there is no private right of action under § 10 of RESPA.").

Mazaska Complaint Exhibit 3 204

federal statute. Petitioner's claim for damages will be supported or defeated based on the construction of RESPA, a federal statute. *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112 (1936).

Congress has not granted jurisdiction to Indian tribes in RESPA. A tribe can exercise sovereign rights to the extent the United States Congress permits. *Montana v. United States*, 450 U.S. 544 (1981). "Exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations *is inconsistent with the dependent status of tribes* and so cannot survive without express congressional delegation." *Id.* at 564 (emphasis added). However, two exceptions apply:

1. "A tribe may regulate, through taxation, licensing, or other means, *the activities* of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* (internal citations omitted) (emphasis added); and

2. "A tribe may also *retain* inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 566.

As to the first exception, there is no evidence the Tribe regulates financial lending transactions. Neither is Mazaska taxed by the Tribe. The Tribe has not demonstrated it issued any license to Mazaska. The Tribe has not established financial regulation over Mazaska. Instead, it has merely demonstrated it leases land to Mazaska without showing why that lease is relevant to jurisdiction over a financial lending transaction with a third party.

Under the second *Montana* exception, adjudicatory authority only arises from regulatory authority. As such, the Tribe is obligated to assert a position that its 2019 ordinance regulates a 2011 financial transaction. It goes further, denying RESPA divests it

4

of jurisdiction to adjudicate legal claims which arise under and because of RESPA. However, its brief is silent in authority identifying where Congress granted it jurisdiction under RESPA to even permit a *Montana* analysis. Indeed, federal jurisdiction lies under 28 U.S.C. § 1331.

## <u>CONCLUSION</u>

Petitioner's complaint directly alleges a violation of 12 U.S.C. §§ 1605 and 2609 as the essential element of her cause of action. RESPA, unlike other federal laws, does not provide exceptions to federal jurisdiction. The Tribe has not demonstrated it has been vested with regulatory authority over federal mortgage loans by the Department of the Treasury, the Federal Deposit Insurance Corporation (FDIC), or the National Credit Union Administration (NCUA). There is also no evidence that any act of Congress has permitted the Tribe to step in the shoes of the Consumer Financial Protection Board (CFPB).

Therefore, the complaint, and Petitioner's position, find their place squarely within 12 U.S.C. §§ 2605 and 2609, which, through 12 U.S.C. § 2614 establish federal question jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction is not overcome by any analysis under *Montana v. United States.*

WHEREFORE Mazaska prays this Court reverse the trial court and dismiss this case from tribal court for lack of subject matter jurisdiction.

Dated this 3rd day of May 2024.

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By:_____

Jonathan P. McCoy
*Attorneys for Respondent*

5

704 St. Joseph Street
P.O. Box 290
Rapid City, SD 57709
(605) 343-2410
jmccoy@costelloporter.com

## CERTIFICATE OF SERVICE

On this the 3rd day of May 2024, the undersigned hereby certifies that he served a copy of the foregoing document upon the person herein next designated, on the date below shown, by placing the same in the service indicated, first class postage prepaid, addressed as follows:

Steven D. Sandven            [  ]    U.S. Mail
12294 Gold Mountain Loop     [  ]    Hand Delivery
Hill City, SD 57745          [  ]    Facsimile
sdsandven@gmail.com          [  ]    Federal Express
*Attorney for Petitioner*    [X]    Email

Steven J. Gunn               [  ]    U.S. Mail
Special Counsel to the Oglala Sioux    [  ]    Hand Delivery
    Tribe                  [  ]    Facsimile
1301 Hollins Street          [  ]    Federal Express
St. Louis, MOS 63135         [X]    Email
(314) 920-9129
sjgunn@wulaw.wustl.edu

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: */s/ Jonathan P. McCoy*
    Jonathan P. McCoy
    *Attorneys for Respondent*
    704 St. Joseph Street
    P.O. Box 290
    Rapid City, SD 57709
    (605) 343-2410
    jmccoy@costellporter.com

Mazaska Complaint Exhibit 3
207

## CERTIFICATE OF PROOF OF FILING

The undersigned hereby certifies that he served an electronic copy in Word format and an original and one physical copy of the above and foregoing **APPELLANT'S RESPONSE TO *AMICUS* BRIEF OF THE OGLALA SIOUX TRIBE** on the Clerk of the Supreme Court by depositing the same this date in the United States mail, postage prepaid, at Rapid City, South Dakota, addressed as follows:

> Clerk of the Supreme Court
> Oglala Sioux Nation Supreme Court
> PO Box 127
> Pine Ridge, SD 57752
> Email address: *niki@oglala.org*

Dated this 3rd day of May 2024.

> **COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**
>
> By: */s/ Jonathan P. McCoy*
> Jonathan P. McCoy
> *Attorneys for Appellant*
> 704 St. Joseph Street
> P.O. Box 290
> Rapid City, SD 57709
> (605) 343-2410
> jmccoy@costellporter.com

Mazaska Complaint Exhibit 3 208

## OGLALA SIOUX TRIBE
## SUPREME COURT

IN THE MATTER OF:                                    Case NO. CIV-2022-0388

**MAZASKA OWECASO OTIPI FINANCIAL, NIC.**

Appellant                                    REVISED SCHEDULING ORDER

v.

**LILLIAN "TONI" MONTILEAUX**

Appellee

The Record on Appeal having been filed with the Court, the Court's oral argument schedule is revised as follows:

Oral Argument            5-14-2024 @ 1:00 pm MT (12:00 Noon PST, 2:00 pm CST, 3:00 EST)

**ORDER**

THIS COURT ORDERS:

1. This Order shall become FINAL upon issuance.

Dated this 6th day of May 2024

_____
Job Serebrov, Associate Justice
Oglala Sioux Tribal Supreme Court

Attest:

_____
**Clerk of Supreme Court**
**OSN** Supreme Court

# SUPREME COURT OF OGLALA SIOUX NATION

## OGLALA SIOUX TRIBE

### PINE RIDGE INDIAN RESERVATION

| | | |
|---|---|---|
| MAZASCA OWECASO OTIPI FINANCIAL, INC. | ) ) ) | |
| Appellant, | ) ) | Case No. CIV-2022-0388 |
| vs. | ) ) | |
| LILLIAN "TONI" MONTILEAUX, | ) ) | |
| Appellee. | ) | |

## MOTION FOR LEAVE TO FILE SUPPLEMENTAL POST-ARGUMENT *AMICUS* BRIEF BY OGLALA SIOUX TRIBE

COMES NOW the Oglala Sioux Tribe ("Tribe"), pursuant to Rule 29 of the Oglala Sioux Tribe Rules of Appellate Procedure, O.S.T. Ord. No. 17-04, and moves the Court for leave to file a supplemental post-oral-argument *Amicus* Brief to address the jurisdiction question raised at oral argument by the Court. In support of this motion, the Tribe respectfully submits that its brief will likely aid the Court in its consideration of the case and the Tribe further states that the press of other matters prevented the Tribe from filing any sooner.

WHEREFORE, the Tribe moves the Court for leave to file its *Amicus* Brief.

Dated: May 29, 2024

1

Dated: May 29, 2024

Respectfully submitted,

_____

STEVEN J. GUNN
1301 Hollins Street
St. Louis, MO 63135
Telephone: (314) 920-9129
Facsimile: (800) 520-8341
Email: sjgunn@wulaw.wustl.edu

Mikolaj Cieslewicz
Abbey Fitzsimmons
Thomas Khristenko
Law Student Interns
American Indian Law Summer Program
Washington University in St. Louis School of Law

Mazaska Complaint Exhibit 3
211

## SUPREME COURT OF OGLALA SIOUX NATION

## OGLALA SIOUX TRIBE

## PINE RIDGE INDIAN RESERVATION

---

MAZASCA OWECASO OTIPI     )
FINANCIAL, INC.     )
     )
    Appellant,     )     Case No. CIV-2022-0388
     )
    vs.     )
     )
LILLIAN "TONI" MONTILEAUX,     )
     )
    Appellee.     )

---

Appeal from the Oglala Sioux Tribal (Inferior) Court
Oglala Sioux Tribe
Pine Ridge Indian Reservation

---

The Honorable David Dillion, Chief Judge
Oglala Sioux Tribal (Inferior) Court

---

### POST-ARGUMENT SUPPLEMENTAL *AMICUS* BRIEF OF THE OGLALA SIOUX TRIBE

---

Steven J. Gunn
Special Counsel to the Oglala Sioux Tribe
1301 Hollins Street
St. Louis, MO 63135
(314) 920-9129
sjgunn@wulaw.wustl.edu

Mikolaj Cieslewicz
Abbey Fitzsimmons
Thomas Khristenko
Law Student Interns
American Indian Law Summer Program
Washington University in St. Louis School of Law

Mazaska Complaint Exhibit 3
212

## INTRODUCTION

This post-argument supplemental *amicus* brief addresses the following question:

Whether the Real Estate Settlement Procedures Act (RESPA) precludes the Oglala Sioux Tribal Courts from exercising jurisdiction over this suit, given that Appellee Montileaux seeks relief under Tribal contract law and not RESPA, nothing in RESPA's text or legislative history suggests Congress intended for RESPA to apply to Tribal member loans originated in Indian country, and RESPA does not pre-empt Appellee's Tribal law breach of contract claim.

## ARGUMENT

**THE REAL ESTATE SETTLEMENT PROCEDURES ACT DOES NOT APPLY TO TRIBAL MEMBER LOANS ORIGINATED IN INDIAN COUNTRY OR PRE-EMPT MS. MONTILEAUX'S TRIBAL COMMON LAW BREACH OF CONTRACT CLAIM.**

Appellant Mazaska contends that the Tribal Court does not have jurisdiction over this case because her claims must arise, if at all, under the RESPA and, according to Mazaska, the RESPA claims must be brought in federal court.

Mazaska's claims fail for several reasons. First, Ms. Montileaux's complaint seeks relief for breach of contract under Tribal common law, not a violation of any federal, state, or Tribal statute. Second, nothing in RESPA's text or legislative history suggests that Congress intended the law to apply to Tribal member loans originated in Indian country. Third, even if RESPA did apply to such loans, it would only pre-empts local law where it conflicts with RESPA itself, and only to the extent of the conflict. 12 U.S.C. § 2616. Finally, nothing in RESPA bars this court from exercising jurisdiction over Appellee's breach of contract claim.

A plaintiff has the right to seek the relief he or she chooses, even if multiple forms of relief are available. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The Supreme Court has stated that even when there is relief available from both federal and state laws, the well pleaded complaint rule embodies the policies "that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court." *Id*. In *Caterpillar*, the plaintiffs brought breach of contract claims.

1

Mazaska Complaint Exhibit 3
213

*Id*. at 399. The fact that the plaintiffs also could have asserted claims under the Labor Management Relations Act did not preclude them suing exclusively under state contract law.  *See id*.

This is true in the RESPA context as well: if a plaintiff seeks relief under local law and not RESPA, there is no federal question and removal to federal court is not permitted. *See Brewer v. Compass Bank*, No. 4:14-CV-705-ALM-CAN, 2015 WL 7752130, at *3 (E.D. Tex. Nov. 6, 2015) (court agrees with Plaintiff that RESPA was merely "tangentially mentioned" in her pleading and "[a]t no point did [Plaintiff] cite violations of RESPA as an independent cause of action, nor did she pray for any relief based on RESPA," therefore allowing the suit to remain in state court); *See also Am. Home Shield of Texas v. Texas*, No. CIV.A. H-10-0808, 2010 WL 1903594, at *6 (S.D. Tex. May 10, 2010) (plaintiffs were seeking relief under state law, not RESPA, and the fact that the alleged activity could violate RESPA as well as state law did not establish federal question jurisdiction).

Those cases match closely with the case at hand. Appellee sought relief for breach of contract, which is within the Tribal Court's jurisdiction. The dispute is whether Mazaska violated the terms of the contract by misapplying escrow funds and not providing a proper accounting of the funds. The duties imposed on Mazaska are set forth in the contract itself, not in RESPA. The fact that the contract refers to RESPA to define the maximum amount Mazaska may hold in escrow does not transform Ms. Montileaux's claims into RESPA claims or strip the Tribal Court of jurisdiction. The Tribal Court does not need to apply or  interpret RESPA. It simply has to decide whether Mazaska breached the contract, and the Court has jurisdiction to resolve contract disputes under the Tribal common law.

In *Caterpillar*, the Supreme Court did discuss an exception to the well pleaded complaint rule: "There does exist, however, an independent corollary to the well-pleaded complaint rule known as the complete pre-emption doctrine. *Caterpillar Inc*, 482 U.S. at 393 (internal quotations omitted). On occasion, the Court has concluded that the pre-emptive force of a statute is so "extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id*.  That is not the case here, since local law is only preempted by RESPA when the two are in direct conflict.

Mazaska Complaint Exhibit 3
214

The "complete pre-emption" doctrine also known as "field preemption" does not apply to practices covered by RESPA, as stated thorough an official interpretation by the Consumer Financial Protection Bureau, "State laws that are inconsistent with the requirements of RESPA or Regulation X may be preempted by RESPA or Regulation X. State laws that give greater protection to consumers are not inconsistent with and are not preempted by RESPA or Regulation X. In addition, nothing in RESPA or Regulation X should be construed to preempt the entire field of regulation of the practices covered by RESPA or Regulation X, including the regulations in Subpart C with respect to mortgage servicers or mortgage servicing." Consumer Financial Protection Bureau, § 1024.5 Coverage of RESPA, https://www.consumerfinance.gov/rules-policy/regulations/1024/5/.

Congressional intent behind RESPA was not to preempt the field, but to give consumers additional protections against abusive real estate practices. Tribal laws on breach of contract claims are consistent with RESPA. In *Washington Mutual Bank v. Superior Court*, 89 Cal. Rptr. 2d 560, 567 (Cal. Ct. App. 1999), the court rejected a claim that RESPA preempted state common law and statutory claims. The court upheld a consumer's right to sue under state common law or statute for wrongs that may also violate RESPA. *Id.* The court found that private state causes of action are not inconsistent with the federal disclosure requirements, but were complementary to the federal requirements and in fact promoted full compliance with the disclosure law enacted by Congress. *Id.* Additionally, the court stated "no state law shall be determined to be inconsistent if it provides greater protection to the consumer." *Id.* "Indeed, courts are reluctant to find that state provisions are inconsistent with federal law unless the state law directly conflicts with the federal law, undermines the federal law, or makes it impossible to comply with both federal and state law." *Id.*

In this case, Tribal law that provides a private right of action for breach of contract is not inconsistent with RESPA; in fact, it complements RESPA to offer additional private action as a form of protection for consumers. Importantly, The court in *Washington Mutual Bank* brings attention to the "strong presumption against preemption" quoting the United States Supreme Court in *Medtronic, Inc. v. Lohr*, ". . . because the States are independent sovereigns in our federal system, we have long presumed that Congress

Mazaska Complaint Exhibit 3 215

does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc.* v. *Lohr* 518 U.S. 470 at 485. The same principles that show that RESPA does not pre-empt state law, also hold true for Tribal laws that do not conflict with RESPA's provisions. Furthermore, Tribal courts, as sovereign courts, require specific congressional authority to be pre-empted by federal statutes.

There is no clear statement in RESPA itself or its statutory history that RESPA applies to Tribal member loans originated in Indian country. RESPA is a federal statute of general applicability. The Supreme Court and circuit courts have repeatedly held that statutes of general applicability that interfere with Tribal self governance do not apply to Indian tribes or Indian country absent clear and plain congressional intent. In *Dobbs v. Anthem Blue Cross & Blue Shield*, the court stated that, "respect for Indian sovereignty means that federal regulatory schemes do not apply to Tribal governments exercising their sovereign authority absent express congressional authorization." *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275 at 1283 (2010). In *Scalia v. Red Lake Nation Fisheries*, the court stated: "For a statute of general applicability to apply to Indian self-government, this court looks for either an "explicit statement of Congress" or "evidence of congressional intent to abrogate . . . in the legislative history of a statute."" *Scalia v. Red Lake Nation Fisheries, Inc.*, 982 F.3d 533, 535 (8th Cir. 2020) quoting *United States v. Dion,* 476 U.S. 734, 739-40. In *Red Lake Nation*, the court narrowed the so-called the "*Tuscarosa* rule" that "general acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary." *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 120 (1960). The *Red Lake Nation* court held that the "general rule in *Tuscarora*, however, does not apply when the interest sought to be affected is a specific right reserved to the Indians." *Red Lake Nation Fisheries, Inc.*, 982 F.3d at 535 quoting *EEOC v. Fond du Lac Heavy Equip. & Constr. Co.,* 986 F.2d 246, 248 (8th Cir. 1993).

Many of those rights reserved to the Indians are found in the treaties between tribes and the Federal Government. The treaty at issue in this case, the Fort Laramie Treaty of 1868,15 Stat. 635 (Apr. 29, 1868), was discussed in *Ex Parte Crow Dog*, 109 U.S. 556 (1883), and the court emphasized that a purpose of the treaty was to secure the Tribe an orderly government, and that "it was no part of the design to treat the individuals as separately responsible and amenable, in all their personal and domestic relations with each

4

Mazaska Complaint Exhibit 3 216

other, to the general laws of the United States, outside of those which were enacted expressly with reference to them as members of an Indian tribe." *Id.* at 570. The Court stressed the importance of Tribal sovereignty, stating "The pledge to secure to these people, with whom the United States was contracting as a distinct political body, an orderly government….was the very purpose of all these arrangements to introduce and naturalize among them was the highest and best of all -- that of self-government, the regulation by themselves of their own domestic affairs, the maintenance of order and peace among their own members by the administration of their own laws and customs." *Ex Parte Crow Dog,* 109 U.S. at 568.

In *Williams v. Lee*, the court found that the enforcement of on-reservation contracts under Tribal law and in Tribal court is essential to Tribal self-governance. *Williams v. Lee,* 358 U.S. 217, 223 (1959) (where a collection action was brought against Tribal members by a non-Tribal member who operated a general goods store on reservation land). The Court in that case was concerned about infringing on Tribal sovereignty because Indians have the inherent "the right… to make their own laws and be ruled by them." *Id.* Therefore, the Court held that "there can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the Tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." *Id.*

The lack of any explicit authorization within RESPA or within its legislative history to preempt Tribal law shows that Tribal courts, as sovereign courts, have authority to hear this breach of contract claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the Tribal Court's jurisdiction over this action and permit Appellee's claims to be heard and decided under Tribal law.

Mazaska Complaint Exhibit 3 217

Dated: May 29, 2024

Respectfully submitted,

_____

STEVEN J. GUNN
1301 Hollins Street
St. Louis, MO 63135
Telephone: (314) 920-9129
Facsimile: (800) 520-8341
Email: sjgunn@wulaw.wustl.edu

Mikolaj Cieslewicz
Abbey Fitzsimmons
Thomas Khristenko
Law Student Interns
American Indian Law Summer Program
Washington University In St. Louis School of Law

6

Mazaska Complaint Exhibit 3
218

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on May 29, 2024, a true and accurate copy of the foregoing

was served on all counsel and parties of record by electronic mail.

_____
STEVEN J. GUNN

7

Mazaska Complaint Exhibit 3
219

SUPREME COURT OF THE OGLALA SIOUX NATION

OGLALA SIOUX TRIBE

PINE RIDGE INDIAN RESERVATION

---

LILLIAN "TONI" MONTILEAUX,

                Petitioner/Appellee

v.

MAZASKA OWECASO OTIPI FINANCIAL, INC.,

               Respondent/Appellant

CIV. APP. NO. CIV-2022-0388

**APPELLANT'S OBJECTION TO MOTION FOR LEAVE TO FILE SUPPLEMENTAL POST-ARGUMENT *AMICUS* BRIEF BY OGLALA SIOUX TRIBE**

---

APPEAL FROM THE OGLALA SIOUX TRIBAL COURT
OGLALA SIOUX TRIBE
PINE RIDGE INDIAN RESERVATION

---

THE HONORABLE DAVE DILLON
Chief Judge OST Tribal Court

---

Steven D. Sandven
12294 Gold Mountain Loop
Hill City, SD 57745
sdsandven@gmail.com
**Counsel for Appellee**

Jonathan P. McCoy
Costello, Porter, Hill, Heisterkamp,
    Bushnell & Carpenter, LLP
PO Box 290
Rapid City, SD 57709
605.343.2410
**Counsel for Appellant**

---

NOTICE OF APPEAL FILED SEPTEMBER 12, 2022

Mazaska Complaint Exhibit 3
220

**OBJECTION**

Appellant, Mazaska, objects to any supplemental filing by the Oglala Sioux Tribe. The oral argument for this matter was heard on May 14, 2024. Following argument of counsel, the Court requested post-argument briefings, due on or before May 21, 2024. The briefing was to be simultaneous, without opportunity to respond. Mazaska objected on the record and in its post-argument brief to any supplemental amicus. Only Mazaska filed and served any post-argument briefing within the ordered timeframe.

Mazaska timely filed its post-argument brief on May 21, 2024. Now, the Oglala Sioux Tribe, which was present at the oral argument and addressed by the Court, seeks leave to file an *untimely* brief over Mazaska's objections, which now include the Tribe's untimeliness in addition to the fact the Tribe is not a party to the action and was not heard at oral argument.

WHEREFORE Mazaska prays this Court for its order denying the Oglala Sioux Tribe's motion for leave to file a supplemental *amicus* brief and denying any contemporaneously filed submissions as part of the record.

Dated this 29th day of May 2024.

> **COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**
>
> By: _/s/ Jonathan P. McCoy_
> Jonathan P. McCoy
> *Attorneys for Respondent*
> 704 St. Joseph Street
> P.O. Box 290
> Rapid City, SD 57709
> (605) 343-2410
> jmccoy@costelloporter.com

Mazaska Complaint Exhibit 3
221

## CERTIFICATE OF SERVICE

On this the 29th day of May 2024, the undersigned hereby certifies that he served a copy of the foregoing document upon the person herein next designated, on the date below shown, by placing the same in the service indicated, first class postage prepaid, addressed as follows:

| | | |
|---|---|---|
| Steven D. Sandven | [ ] | U.S. Mail |
| 12294 Gold Mountain Loop | [ ] | Hand Delivery |
| Hill City, SD 57745 | [ ] | Facsimile |
| sdsandven@gmail.com | [ ] | Federal Express |
| *Attorney for Petitioner* | [X] | Email |

| | | |
|---|---|---|
| Steven J. Gunn | [ ] | U.S. Mail |
| Special Counsel to the Oglala Sioux | [ ] | Hand Delivery |
|    Tribe | [ ] | Facsimile |
| 1301 Hollins Street | [ ] | Federal Express |
| St. Louis, MOS 63135 | [X] | Email |
| (314) 920-9129 | | |
| sjgunn@wulaw.wustl.edu | | |
| sjgunn37@gmail.com | | |

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: */s/ Jonathan P. McCoy*
   Jonathan P. McCoy
   *Attorneys for Respondent*
   704 St. Joseph Street
   P.O. Box 290
   Rapid City, SD 57709
   (605) 343-2410
   jmccoy@costellporter.com

## CERTIFICATE OF PROOF OF FILING

The undersigned hereby certifies that he served an electronic copy in Word format and an original and one physical copy of the above and foregoing **APPELLANT'S OBJECTION TO MOTION FOR LEAVE TO FILE SUPPLEMENTAL POST-ARGUMENT *AMICUS* BRIEF BY OGLALA SIOUX TRIBE** on the Clerk of the Supreme Court by depositing the same this date in the United States mail, postage prepaid, at Rapid City, South Dakota, addressed as follows:

Clerk of the Supreme Court

Mazaska Complaint Exhibit 3 222

Oglala Sioux Nation Supreme Court
PO Box 127
Pine Ridge, SD 57752
Email address: *niki@oglala.org*

Dated this 29th day of May 2024.

**COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

By: */s/ Jonathan P. McCoy*
Jonathan P. McCoy
*Attorneys for Appellant*
704 St. Joseph Street
P.O. Box 290
Rapid City, SD 57709
(605) 343-2410
jmccoy@costellporter.com

3

## SUPREME COURT OF OGLALA SIOUX NATION

## OGLALA SIOUX TRIBE

## PINE RIDGE INDIAN RESERVATION

| | | |
|---|---|---|
| MAZASCA OWECASO OTIPI FINANCIAL, INC. | ) ) ) | |
| Appellant, | ) ) | Case No. CIV-2022-0388 |
| vs. | ) ) | |
| LILLIAN "TONI" MONTILEAUX, | ) ) | |
| Appellee. | ) | |

## OGLALA SIOUX TRIBE RESPONSE TO MAZASKA'S OBJECTION

COMES NOW the Oglala Sioux Tribe ("Tribe"), pursuant to Rule 29 of the Oglala Sioux Tribe Rules of Appellate Procedure, O.S.T. Ord. No. 17-04, and for its response to Mazaska's objection to the Tribe's Motion to Leave, states as follows:

1.    Mazaska filed a post-argument brief on May 21, 2024.

2.    The Tribe filed a post-argument *amicus* brief on May 29, 2024.

3.    Mazaska objects to the Tribe's brief, in part, on the grounds that the Tribe is not a party to the appeal and did not participate in oral argument. However, Rule 29 of the Oglala Sioux Tribe Rules of Appellate Procedure permits the Tribe to file an *amicus* brief without the consent of the parties or leave of court.

4.    Mazaska also objects to the timeliness of the Tribe's brief. However, Mazaska does not articulate any actual harm or prejudice caused by the timing of the Tribe's submission.

5.    The Tribe noted in its motion for leave that the press of other matters prevented the

1

Mazaska Complaint Exhibit 3 224

Tribe from filing its brief any sooner.

6.     The timing of the Tribe's filing will cause little, if any, delay in the disposition of this appeal and will result in no actual harm or prejudice to Mazaska.

7.     Permitting the Tribe to file its brief on May 29, 2024, would not be arbitrary, unreasonable, or unduly prejudicial to Mazaska.

WHEREFORE, the Tribe moves the Court to overrule the objection.

Dated: May 30, 2024

Respectfully submitted,

_____
STEVEN J. GUNN
1301 Hollins Street
St. Louis, MO 63135
Telephone: (314) 920-9129
Facsimile: (800) 520-8341
Email: sjgunn@wulaw.wustl.edu

Mikolaj Cieslewicz
Abbey Fitzsimmons
Thomas Khristenko
Law Student Interns
American Indian Law Summer Program
Washington University in St. Louis School of Law

2

Mazaska Complaint Exhibit 3
225

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on May 30, 2024, a true and accurate copy of the foregoing was served on all counsel and parties of record by electronic mail.

_____
STEVEN J. GUNN

3

Mazaska Complaint Exhibit 3
226

CASE NO. CIV-2022-0388                                          ORDER 05/30/24

## OGLALA SIOUX TRIBE

## SUPREME COURT

IN THE MATTER OF:                                    Case No.  CIV-2022-0388

**MAZASKA OWECASO OTIPI FINANCIAL, INC.**            **DECISION ON APPEAL**
 Appellant

V.

**LILLIAN "TONI" MONTILEAUX**
 Appellee

---

Before the court is the appeal of *Mazaska Owecaso Otipi Financial, Inc. Mazaska* is a South Dakota formed corporation conducting business within the interior boundaries of the Oglala Sioux's South Dakota reservation at Pine Ridge. "*Mazaska*" is operated by tribal members and provides loans for improvements to tribal land. *Mazaska's* Articles of Organization at Article III state that it is "acting as a CDFI, to provide loans, grants to individuals or organizations working to develop the community, to provide information, technical assistance and housing counseling   to the residents of the Pine Ridge concerning the methods and resources available for the construction of new housing…." (emphasis in the original). *Mazaska's* most recent corporate filing (2024) lists both its corporate offices an agent for service as being located at the same address in Pine Ridge, South Dakota. *Mazaska* challenges the tribal court's assertion of subject matter and personal jurisdiction. The Supreme Court, after reviewing the record on appeal and performing additional research, denies the appeal and upholds the lower court's decision for the following reasons set forth below. The Court also remands this case back to the lower court for additional review and findings consistent with this Order.

### *Statement of Facts and Procedure*

This matter is a breach of contract and good faith and fair dealing action involving a series of mortgages executed between *Lillian Montileaux* ("Petitioner *Montileaux*"), as the mortgagee, and *Mazaska Owecaso Otipi Financial, Inc.* ("Respondent *Mazaska*"), as the mortgagor. The mortgages permitted Petitioner *Montileaux* to receive certain cash advances from Respondent *Mazaska*. As collateral for the loans, Respondent received a security interest in leasehold property Petitioner *Montileaux* holds within the exterior bounds of Pine Ridge Indian Reservation ("Pine Ridge Reservation") in Oglala Lakota County, South Dakota.[1] The majority of the allegations concern alleged financial irregularities with Petitioner *Montileaux's* account and *Mazaska's* accounting practices. Interestingly, subsequent to *Mazaska* being served with *Montileaux's* complaint it filed an answer as opposed to immediately challenging jurisdiction. *Mazaska* thereafter requested a scheduling order be issued and

---

[1] Although the leases themselves are not before the court, the court questions their legitimacy when considering the leases attempt to encumber trust land.

1

Mazaska Complaint Exhibit 3
227

CASE NO. CIV-2022-0388                                    ORDER 05/30/24

then filed a motion to dismiss. The lower court found that it had jurisdiction over *Mazaska* pursuant to: (1) Montana's *consensual relations* test, (2) because it assented to the Tribe's jurisdiction in its written contracts with *Montileaux* and (3) because it acted as if it consented to jurisdiction by answering the complaint and requesting a scheduling order. In finding subject matter jurisdiction, the court appears, although absent precision, to have found both "regulatory" and "adjudicatory" authority over *Mazaska*.


## A. Court Jurisdiction and Standard of Review

Pursuant to established United States Supreme Court precedent, a non-tribal party must initially challenge the assertion of tribal court jurisdiction before the tribal forum, prior to seeking judicial review by the federal court. *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9 (1987) (federal question jurisdiction); *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985) (diversity jurisdiction). As such, the Oglala Supreme Court has jurisdiction over this matter initially for purposes of determining the court's own jurisdiction. The standard of review for an appeal of subject matter jurisdiction under a 12 (b)(1) motion *is de novo*.


## B. Analysis - Subject Matter Jurisdiction

"To exercise its inherent civil authority over a defendant, a tribal court must have both subject matter jurisdiction—consisting of regulatory and adjudicative jurisdiction—and personal jurisdiction." *Water Wheel*, 642 F.3d at 809. "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers." *United States v. Wheeler*, 435 U.S. 313, 323 (1978). "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Id.* In *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, the Court recognized that "[t]he tribes also retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America." 471 U.S. 845, 851 (1985) (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 55–56 (1978)). The Court went on to say that under 28 U.S.C. § 1331, a federal court may determine "whether a tribal court has exceeded the lawful limits of its jurisdiction." *Id.* at 853. Thus, the outer boundaries of tribal court jurisdiction are a matter of federal common law.

The Supreme Court has long recognized that as part of their residual sovereignty, tribes retain the inherent power to exclude nonmembers from tribal lands. *See Water Wheel*, 642 F.3d at 808; *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on [tribal land] is [] well established."). "From a tribe's inherent sovereign powers flow lesser powers, including the power to regulate [nonmembers] on tribal land." *Water Wheel*, 642 F.3d at 808–09 (citing *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993)). The Court has made clear, however, "that once tribal land is converted into fee simple [land], the tribe loses plenary jurisdiction over it . . . . As a general rule, then 'the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land.'" *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 328–29 (2008) (quoting *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 430 (1989) (plurality opinion)). In *Montana v. United States*, the Court recognized two exceptions to this general rule. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565.

Second, a tribe may exercise civil authority over the conduct of nonmembers on fee lands within its reservation when "that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or

Mazaska Complaint Exhibit 3
228

CASE NO. CIV-2022-0388                                                    ORDER 05/30/24

welfare of the tribe." *Id.* at 566. "Since deciding *Montana*, the Supreme Court has applied those exceptions almost exclusively to questions of jurisdiction arising on [non-tribal] land." *Water Wheel*, 642 F.3d at 809. The exception is *Nevada v. Hicks*, 533 U.S. 353 (2001). *Water Wheel*, 642 F.3d at 809. In *Hicks*, the Court addressed a tribal court's jurisdiction over claims against state officers arising from the execution of a search warrant on tribal land for alleged violations of state poaching laws—specifically, the killing of bighorn sheep off the reservation. 533 U.S. at 356–57. Both the state court and then the tribal court issued search warrants. *Id.* at 356. The Court stated that although ownership status of the land "may sometimes be a dispositive factor" in determining a tribe's authority to regulate nonmember activity on tribal land, the tribe's power to exclude nonmembers from tribal land was "not alone enough to support" the tribe's regulatory jurisdiction over the state officers' activities when the state had a competing interest in executing a warrant for an off-reservation crime. *Id.* at 360. The Court applied *Montana* and concluded that "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations" while "[t]he State's interest in execution of process is considerable." *Id.* at 364.

Although some jurisdictions have interpreted *Hicks* as eliminating the right-to-exclude framework as an independent source of regulatory power over nonmember conduct on tribal land, we have declined to do so. In *Water Wheel*, we observed that *Hicks* "expressly limited its holding to 'the question of tribal-court jurisdiction over state officers enforcing state law.'" *Water Wheel*, 642 F.3d at 813 (quoting *Hicks*, 533 U.S. at 358 n.2). Indeed, the *Hicks* Court specifically "le[ft] open the question of tribal-court jurisdiction over nonmember defendants in general." *Hicks*, 533 U.S. at 358 n.2. In *Water Wheel*, we held that a "tribe's status as landowner is enough to support regulatory jurisdiction" except "when the specific concerns at issue [in *Hicks*] exist." 642 F.3d at 813. "Doing otherwise would impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government." *Id.* at 813.

In *Hicks*, the defendants were state officers enforcing a state-court-issued search warrant, so there was a significant state interest at stake. By contrast, the present case involves a private, consensual business relationship between Appellant Grocery Store and the Tribe, for which the Tribe's members utilize for food, goods and services. There are no significant competing state interests, as in *Hicks*. Accordingly, *federal* precedent compels the conclusion that the Tribe possesses regulatory jurisdiction over Plaintiff/Respondent's claims against Appellant, *Mazaska, Inc.* Since *Hicks*'s limited holding, the Court in *Plains Commerce Bank* held that a tribal court did not have jurisdiction to adjudicate a discrimination claim concerning a non-Indian defendant's sale of fee land. *Plains Commerce Bank*, 554 U.S. at 323, 340–41. The land in question was sold as part of the 1908 Allotment Act and was owned by a non-Indian party for at least 50 years. *Id.* at 331, 341. The Court found that the discrimination law that the plaintiffs were attempting to enforce operated as a restraint on alienation and had the effect of regulating the substantive terms on which the non-Indian bank was able to offer its fee land for sale. *Id.* at 331. The Court stated that while "*Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests," that case "does not permit Indian tribes to regulate the sale of non-Indian fee land," as neither of the *Montana* exceptions applies. *Id.* at 332. By contrast, in the present case the nonmember defendant *allegedly located on fee lands, entered into a consensual relationship* with a tribal member for purposes of selling goods and services to its members that improve the tribe's trust and allotment lands. Plaintiff is a member of the Oglala Sioux Tribe.

### *The Montana v. U.S. Analysis*

i.    **First *Montana* Exception**

*Montana*'s consensual relationship exception recognizes that tribes have jurisdiction to regulate consensual relations "through taxation, licensing, or other means." 450 U.S. at 565. Courts have recognized that tort law, under which the Tribe's claims against Defendant arose, constitutes a form of regulation. *See Attorney's Process*, 609 F.3d at 938 (stating that if a tribe retains the power under *Montana* to regulate nonmember conduct, it does not make any difference

3

Mazaska Complaint Exhibit 3
229

CASE NO. CIV-2022-0388                                              ORDER 05/30/24

whether it does so through precisely tailored regulations or through civil claims). However, *Montana*'s consensual relationship exception requires that "the regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001). "A nonmember's consensual relationship in one area thus does not trigger tribal civil authority in another." *Id.*

### Appellant's Arguments

Appellant argues that the Court lacks jurisdiction because Plaintiff is making a claim pursuant to the Real Estate Settlement Procedures Act ("RESPA"). Appellant argues that the RESPA is the only means of relief for Plaintiff and absent RESPA, which it argues *supersedes* tribal jurisdiction, Plaintiff has no claim. In sum, under Defendants theory all Indians who engage with CDFI's on a reservation, related to Indian lands, must seek recourse in the federal court under RESPA - this is not the law. In making this argument, Appellant does not cite to a single case involving an Indian, Indian lands and the RESPA to support its argument. Rather, *Mazaska* merely analogizes to other federal laws that have found federal jurisdiction. *Mazaska's* argument can be summed up as follows:(1) Montana's first prong, *consensual* relations, is inapplicable because, although there exists a nexus to reservation lands, specifically, Oglala tribal lands, a tribal member plaintiff, an on-reservation non-member business location and an on-reservation agent for service of process, that civil liability is outside the scope of contemplated adjudication under *Montana* and federal jurisprudence. In arriving at its theory Appellant ignores RESPA includes language indicating that RESPA claims may be adjudicated in state law forums, which in this case the Tribe's forum would be akin to a "state" forum for RESPA purposes.[2] The Court finds Appellant's argument unpersuasive, bordering on the ridiculous, under the facts and established law.

### Montana's First Prong - Consensual Relations

Examining the facts of this case, we conclude that the Tribe has regulatory authority over Appellant's conduct, for purposes of tribal court adjudicating civil conduct, in this case under *Montana*'s consensual relationship exception. The conduct that the Tribe seeks to regulate through civil law arises directly out of the consensual business relationship between a tribal member and Appellant. Moreover, given the circumstances, Appellant should have reasonably anticipated that its conduct might "trigger" tribal authority. *WaterWheel*, 642 F.3d at 818 (quoting *Plains Commerce Bank*, 554 U.S. at 338). Appellant is a business that appears to have purposely located in an area to serve the Oglala Sioux community, its Articles of Incorporation state that the non-profit sole purpose was to provide financial assistance and counseling to tribal members related to improvements to tribal lands, specifically home building and refurbishing. This is not a situation as held in *Atkinson Trading* where the Tribe desires to assert regulatory authority over non-member hotel patrons, on fee land within a reservation. The land at issue here is tribal lands, specifically housing for tribal members. Appellant's patrons are by and large almost exclusively Oglala Sioux tribal members. Appellant cannot evade *Montana's* first prong by narrowly construing the business relationship by saying a tribal member can only sue under RESPA.[3]

### Mazaska's Contractual Consent to Tribal Court Jurisdiction

*Mazaska* contractually consented to tribal jurisdiction; it executed three (3) promissory notes that contain language explicitly subjecting it to tribal court jurisdiction. These notes -executed on July 7, 2010, December 1, 2010, and May 11, 2011, respectively-explicitly provide that **"[t]he courts of the Tribe shall have sole and exclusive jurisdiction with respect to all controversies or claims *related to or arising out of* this Note."** (emphasis in the original). Similarly, the mortgage agreements, also dated July 7, 2010, December 1, 2010, and May 11, 201, explicitly reference each promissory note and state, **"This Security Instrument shall be governed by federal law,**

---

[2] Appellant admitted at oral argument that there is no legislative history indicating that RESPA would be applicable to Indian lands.
[3] Appellant's argument ignores the fact that the notes signed by Montileaux expressly state that Mazaska submits to tribal jurisdiction. The court declines to analyze the facts under the Second Montana exception and makes no determination as to whether it applies.

4

Mazaska Complaint Exhibit 3
230

CASE NO. CIV-2022-0388                                    ORDER 05/30/24

**and tribal law, and the law of the state in which the Property is located."** It is difficult to imagine a stronger connection between the allegations in the *Complaint* and Respondent *Mazaska's* consent to jurisdiction than the one that is presented here. *See Sac & Fox Tribe*, 609 F.3d at 941. Petitioner *Montileaux* has claimed that Respondent *Mazaska* has breached financial contracts it executed with her. These alleged breaches stem from the very financial documents that include clauses that explicitly submit Respondent *Mazaska* to tribal jurisdiction. There is little question that this scenario comfortably fits within the Eighth Circuit test under *Sac & Fox. Mazaska's* counsel stated in oral argument that the agreements pre-dated their involvement in the case. Even so, Tribal court jurisdiction is at its apex when tribal lands are involved. *Waterwheel* et seq.

### *The Tribe's Business Code Asserts Jurisdiction Over On-Reservation Businesses*

Further, Appellant is considered to be knowledgeable of the origins of the business relationship that arose under the Tribe's Business Code Chapter 44 et seq., which expressly states:

Section 44-2-1.03 (1) of Chapter 44 (OST Ord. No 07-25) states, in pertinent part, that

> The purpose of the OST Business Codes are to establish the policy framework through which the Tribe, its entities, private businesses and individuals may conduct business activities within the territorial and governmental jurisdiction of the Tribe. The Policies set forth in this Part shall apply to each of the Acts contained in Parts 2 to 8 of Chapter 44 of the Oglala Sioux Tribal Law and Order Code. The provisions of the OST Business Code shall be liberally constructed and applied to promote its underlying purposes and policies.

Chapter 44 of the Tax Law and Order Code further states:

> To the maximum extent consistent with due process of law, *all domestic entities and all foreign entities doing business on the reservation, and all directors, officers, managers, members, partners and shareholders of such entities shall be subject to the jurisdiction of the Tribal Court in all actions which arise out of the acts, omissions or participation of such persons in connection with the affairs of such entities*; provided, however that this section shall not apply to entities which are owned in whole or in part by the Tribe or which are controlled by the Tribal Council, or to the directors or officers of such entities.

Appellant's lack of awareness of the Business Code, or failure to request a copy of the Tax code, or to have *read* the code is no excuse. We conclude that given these circumstances, Appellant should have reasonably anticipated that its *consensual* relationship with the Tribe, would fall within the Tribe's regulatory jurisdiction.[4]

### *Waterwheel v. LaRance*

Tribal court jurisdiction ca In Water Wheel, the ninth circuit concluded that a tribe's inherent sovereign power to exclude nonmembers from tribal land provides an independent basis upon which a tribe may "regulate" the conduct of nonmembers on tribal land. But, a tribe's power to exclude is not the only source of its regulatory authority over nonmembers on tribal land. See *Brendale*, 492 U.S. at 425 ("An Indian tribe's [] power to exclude nonmembers of the

---

[4] It makes no difference in the analysis whether the Code existed at the time of entering the initial contract or subsequent contracts that extend to the present. It was appellant's duty to remain informed of code changes.

5

CASE NO. CIV-2022-0388                                                    ORDER 05/30/24

tribe from its lands is not the only source of Indian regulatory authority."). "[T]ribes have inherent sovereignty independent of that authority arising from their power to exclude." Id. (citing *Merrion*, 455 U.S. at 141; see also *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 592 (9th Cir. 1983) ("The power to exercise tribal civil authority over [nonmembers] derives not only from the tribe's inherent powers necessary to self-government and territorial management, but also from the power to exclude nonmembers from tribal land." (citing Merrion, 455 U.S. at 141–44))n be found under another precedent, the right to exclude, under *Waterwheel Camp Recreational Area, Inc. v. LaRance*, 642 F3rd 802 (9ᵗʰ Cir. 2011) *per curium*. In addition to the power to exclude, we have the Montana Court's acknowledgment that Indian tribes retain their inherent sovereign power to protect tribal self-government and to control internal relations. 450 U.S. at 564. "[I]n accordance with that right tribes 'may regulate nonmember behavior that implicates [these sovereign interests].'" *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 936 (8th Cir. 2010) (quoting *Plains Commerce Bank*, 554 U.S. at 335). Subsequent to Montana, in *Merrion*, the Court affirmed that Indian tribes have inherent sovereign power to regulate nonmember conduct on tribal land independent of that authority arising from their power to exclude. *Merrion*, 455 U.S. at 144. The Court in Merrion concluded that a tribe's power to tax nonmember mining and drilling on tribal land derived from its inherent "power to govern and to pay for the costs of self-government," and concluded that such regulatory authority was also within the tribe's inherent power to condition the continued presence of nonmembers on tribal land. Id. at 144–45. These varied sources of tribal regulatory power over nonmember conduct on the reservation were affirmed by the Court in Plains Commerce Bank. 554 U.S. at 337 ("[T]he regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations.")

Here, it is unequivocal that the Tribe can and may regulate the conduct of non-member *Mazaska*. This authority arises due to *Mazaska's* unique relationship with tribal members and Oglala Sioux tribal lands, of which *Mazaska's* business model seeks to assist with on reservation tribal land homeownership and improvements to them. One cannot think of a more important tribal interest then homes and home improvements for its on-reservation membership.

**Response to Dissent.**

Justice Thompson dissents pursuant to the belief that it is "impossible" to determine whether tribal law is preempted here. This belief is not supported by established precedent. The RESPA does not interfere with express adjudicative prohibitions, in that nowhere in RESPA does it provide for exclusive federal jurisdiction over RESPA claims. In fact, the documents reviewed expressly state that actions can be commenced in federal and state courts. Further, one of the documents cited to claims being adjudicated by an administrative agency. Additionally, during oral argument the court asked whether the RESPA was a law of general applicability? *Mazaska's* counsel stated "No." If RESPA is not a law of "generally applicability, it is only applicable to the Tribe if the law specifically states that "it is applicable to Indian tribes"[5], otherwise it is inappropriate to apply the federal law when: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended the law not to apply to Indians on their reservations. *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1119 (9th Cir. 1985) (internal quotations and citation omitted). *Mazaska's* use of a lien on tribal lands as surety for the loan may violate (1) and (2). Here, the Treaty of Ft. Laramie, the penultimate treaty that created the great Sioux Nation may be instructive. Article II of the Treaty states:

**ARTICLE II.**
**The United States agrees that the following district of country, to wit, viz: commencing on the east bank of the Missouri river where the 46th parallel of north latitude crosses the same, thence along low-water mark down said east bank to a point opposite where the northern line of the State of Nebraska strikes the river, thence west across said river, and along the northern line of Nebraska to the 104th degree of longitude west from Greenwich, thence north on said meridian to a point where the 46th parallel of north latitude intercepts the same, thence due east**

---

[5] RESPA does not expressly require federal adjudication as some federal statutes require.

6

Mazaska Complaint Exhibit 3 232

CASE NO. CIV-2022-0388                                          ORDER 05/30/24

along said parallel to the place of beginning; and in addition thereto, all existing reservations of the east back of said river, shall be and the same is, set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no persons, except those herein designated and authorized so to do, and except such officers, agents, and employees of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article, or in such territory as may be added to this reservation for the use of said Indians, and henceforth they will and do hereby relinquish all claims or right in and to any portion of the United States or Territories, except such as is embraced within the limits aforesaid, and except as hereinafter provided.

Pursuant to the Treaty's language the Pine Ridge Reservation was created for the absolute and undisturbed use of the Indians therein named. Further, the Treaty states that only certain federal officers, agents and officials may pass over, settle upon or reside in the territory described in the article. The question remains whether the lien on trust lands not only violates federal laws in the absence of Interior Department approval and whether it violates the Treaty of Ft. Laramie's restrictions on who can and cannot occupy (realistically or figuratively) reservation lands? (See *Redbud Sioux Tribe v United States* 450 F. Supp. 3d 986 (D.S.D. 2020)

Finally, under *Montana's* rule of "jurisdiction plausibility", as enumerated in *Big Horn Electric Cooperative, Inc. v. Adams*, 219 F.3d 944 (9th Cir. 2000), all that is required for tribal jurisdiction is for jurisdiction to be *plausible*. In *Big Horn Electric*, free communication services to the tribe was enough to satisfy Montana's requirement of *consensual* relations. Several written contracts between the parties, as analyzed previously, more than satisfy this requirement. (See *Dish Network Corp. v. Tewa*, No. CV 12-8077-PCT-JAT (D. Ariz. Nov. 1, 2012). As such, tribal subject matter jurisdiction over *Mazaska* appears available under several alternate theories.

## ORDER

THIS COURT ORDERS:

1. The appeal is DENIED.
2. The lower court decision is UPHELD.
3. The case is remanded back for further fact finding consistent with this decision.
4. This Order shall become FINAL upon issuance.

## IT IS SO ORDERED.

Dated this 30th day of May 2024.

Jack Duran, Jr., Chief Justice
Oglala Sioux Tribe Supreme Court

Attest
Clerk of Supreme Court
OSN Supreme Court

7

Mazaska Complaint Exhibit 3
233

CASE NO. CIV-2022-0388                                              ORDER 05/30/24

**Concurrence of Associate Justice Serebrov**

While I concur in the Chief Justice's decision there are several issues in this appeal that I find very disturbing. First, the Appellant, after benefiting from its on-reservation business relationship, attempts to use RESPA to divest the trial court of jurisdiction. However, as the Chief Justice indicates the mortgage and note clearly vests jurisdiction with the court. What is more concerning is the absolute lack of any disclosure in the documents signed by Appellee warning the Appellee that some other law could mandatorily apply. While this could be an oversight on the Appellant's part, it was *Mazaska* that drafted these documents. Second, and most troubling, as indicated in the Amicus Brief and admitted by Appellant's attorney during oral argument, the land secured by the note is not leasehold but trust land requiring all owners and the Secretary of Interior to approve the mortgage under 25 U.S.C. 177. While there is no record evidence whether the proper approvals were obtained, if the Appellant failed to do so not only would the mortgage be invalid but there could be additional legal repercussions.

**Dissent, Thompson, Associate Justice.**

I respectfully dissent.

All parties agree that a court can competently adjudicate a dispute only if it has both personal and subject-matter jurisdiction. All parties agree that the Oglala courts have personal jurisdiction over non-member Mazaska because of *Montana's* first exception.

The question, then, is whether the Oglala courts have subject-matter jurisdiction over Appellee's claims. On this record, it is impossible to determine whether it does. In my opinion, the resolution of the subject-matter-jurisdiction question depends on whether RESPA regulates Appellant and these mortgages. Determining whether RESPA applies requires factual findings absent from this record. Therefore, I would remand this matter to the trial court with instructions to adjudge RESPA's applicability.



8

Mazaska Complaint Exhibit 3
234