CASE NO. CIV-2022-0388                                                                        ORDER 05/30/24

**OGLALA SIOUX TRIBE**

**SUPREME COURT**

IN THE MATTER OF:                                                                  Case No. CIV-2022-0388

MAZASKA OWECASO OTIPI FINANCIAL, INC.                              DECISION ON APPEAL
  Appellant

V.

LILLIAN "TONI" MONTILEAUX
  Appellee

---

    Before the court is the appeal of *Mazaska Owecaso Otipi Financial, Inc. Mazaska* is a South Dakota formed corporation conducting business within the interior boundaries of the Oglala Sioux's South Dakota reservation at Pine Ridge. "*Mazaska*" is operated by tribal members and provides loans for improvements to tribal land. *Mazaska's* Articles of Organization at Article III state that it is "acting as a CDFI, to provide loans, grants to individuals or organizations working to develop the community, to provide information, technical assistance and housing counseling   to the residents of the Pine Ridge concerning the methods and resources available for the construction of new housing…." (emphasis in the original). *Mazaska's* most recent corporate filing (2024) lists both its corporate offices an agent for service as being located at the same address in Pine Ridge, South Dakota. *Mazaska* challenges the tribal court's assertion of subject matter and personal jurisdiction. The Supreme Court, after reviewing the record on appeal and performing additional research, denies the appeal and upholds the lower court's decision for the following reasons set forth below. The Court also remands this case back to the lower court for additional review and findings consistent with this Order.

    *Statement of Facts and Procedure*

    This matter is a breach of contract and good faith and fair dealing action involving a series of mortgages executed between *Lillian Montileaux* ("Petitioner *Montileaux*"), as the mortgagee, and *Mazaska Owecaso Otipi Financial, Inc.* ("Respondent *Mazaska*"), as the mortgagor. The mortgages permitted Petitioner *Montileaux* to receive certain cash advances from Respondent *Mazaska*. As collateral for the loans, Respondent received a security interest in leasehold property Petitioner *Montileaux* holds within the exterior bounds of Pine Ridge Indian Reservation ("Pine Ridge Reservation") in Oglala Lakota County, South Dakota.[1] The majority of the allegations concern alleged financial irregularities with Petitioner *Montileaux's* account and *Mazaska's* accounting practices.  Interestingly, subsequent to *Mazaska* being served with *Montileaux's* complaint it filed an answer as opposed to immediately challenging jurisdiction. *Mazaska* thereafter requested a scheduling order be issued and

---

[1] Although the leases themselves are not before the court, the court questions their legitimacy when considering the leases attempt to encumber trust land.

1

Mazaska Exhibit 4
001

CASE NO. CIV-2022-0388                                                                                          ORDER 05/30/24

then filed a motion to dismiss. The lower court found that it had jurisdiction over *Mazaska* pursuant to: (1) Montana's *consensual relations* test, (2) because it assented to the Tribe's jurisdiction in its written contracts with *Montileaux* and (3) because it acted as if it consented to jurisdiction by answering the complaint and requesting a scheduling order. In finding subject matter jurisdiction, the court appears, although absent precision, to have found both "regulatory" and "adjudicatory" authority over *Mazaska*.

### A. Court Jurisdiction and Standard of Review

Pursuant to established United States Supreme Court precedent, a non-tribal party must initially challenge the assertion of tribal court jurisdiction before the tribal forum, prior to seeking judicial review by the federal court. *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9 (1987) (federal question jurisdiction); *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985) (diversity jurisdiction). As such, the Oglala Supreme Court has jurisdiction over this matter initially for purposes of determining the court's own jurisdiction. The standard of review for an appeal of subject matter jurisdiction under a 12 (b)(1) motion *is de novo*.

### B. Analysis - Subject Matter Jurisdiction

"To exercise its inherent civil authority over a defendant, a tribal court must have both subject matter jurisdiction—consisting of regulatory and adjudicative jurisdiction—and personal jurisdiction." *Water Wheel*, 642 F.3d at 809. "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers." *United States v. Wheeler*, 435 U.S. 313, 323 (1978). "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Id.* In *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, the Court recognized that "[t]he tribes also retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America." 471 U.S. 845, 851 (1985) (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 55–56 (1978)). The Court went on to say that under 28 U.S.C. § 1331, a federal court may determine "whether a tribal court has exceeded the lawful limits of its jurisdiction." *Id.* at 853. Thus, the outer boundaries of tribal court jurisdiction are a matter of federal common law.

The Supreme Court has long recognized that as part of their residual sovereignty, tribes retain the inherent power to exclude nonmembers from tribal lands. *See Water Wheel*, 642 F.3d at 808; *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on [tribal land] is [] well established."). "From a tribe's inherent sovereign powers flow lesser powers, including the power to regulate [nonmembers] on tribal land." *Water Wheel*, 642 F.3d at 808–09 (citing *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993)). The Court has made clear, however, "that once tribal land is converted into fee simple [land], the tribe loses plenary jurisdiction over it . . . . As a general rule, then 'the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land.'" *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 328–29 (2008) (quoting *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 430 (1989) (plurality opinion)). In *Montana v. United States*, the Court recognized two exceptions to this general rule. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565.

Second, a tribe may exercise civil authority over the conduct of nonmembers on fee lands within its reservation when "that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or

2

Mazaska Exhibit 4
002

welfare of the tribe." *Id.* at 566. "Since deciding *Montana*, the Supreme Court has applied those exceptions almost exclusively to questions of jurisdiction arising on [non-tribal] land." *Water Wheel*, 642 F.3d at 809. The exception is *Nevada v. Hicks*, 533 U.S. 353 (2001). *Water Wheel*, 642 F.3d at 809. In *Hicks*, the Court addressed a tribal court's jurisdiction over claims against state officers arising from the execution of a search warrant on tribal land for alleged violations of state poaching laws—specifically, the killing of bighorn sheep off the reservation. 533 U.S. at 356–57. Both the state court and then the tribal court issued search warrants. *Id.* at 356. The Court stated that although ownership status of the land "may sometimes be a dispositive factor" in determining a tribe's authority to regulate nonmember activity on tribal land, the tribe's power to exclude nonmembers from tribal land was "not alone enough to support" the tribe's regulatory jurisdiction over the state officers' activities when the state had a competing interest in executing a warrant for an off-reservation crime. *Id.* at 360. The Court applied *Montana* and concluded that "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations" while "[t]he State's interest in execution of process is considerable." *Id.* at 364.

Although some jurisdictions have interpreted *Hicks* as eliminating the right-to-exclude framework as an independent source of regulatory power over nonmember conduct on tribal land, we have declined to do so. In *Water Wheel*, we observed that *Hicks* "expressly limited its holding to 'the question of tribal-court jurisdiction over state officers enforcing state law.'" *Water Wheel*, 642 F.3d at 813 (quoting *Hicks*, 533 U.S. at 358 n.2). Indeed, the *Hicks* Court specifically "le[ft] open the question of tribal-court jurisdiction over nonmember defendants in general." *Hicks*, 533 U.S. at 358 n.2. In *Water Wheel*, we held that a "tribe's status as landowner is enough to support regulatory jurisdiction" except "when the specific concerns at issue [in *Hicks*] exist." 642 F.3d at 813. "Doing otherwise would impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government." *Id.* at 813.

In *Hicks*, the defendants were state officers enforcing a state-court-issued search warrant, so there was a significant state interest at stake. By contrast, the present case involves a private, consensual business relationship between Appellant Grocery Store and the Tribe, for which the Tribe's members utilize for food, goods and services. There are no significant competing state interests, as in *Hicks*. Accordingly, *federal* precedent compels the conclusion that the Tribe possesses regulatory jurisdiction over Plaintiff/Respondent's claims against Appellant, *Mazaska, Inc.* Since *Hicks*'s limited holding, the Court in *Plains Commerce Bank* held that a tribal court did not have jurisdiction to adjudicate a discrimination claim concerning a non-Indian defendant's sale of fee land. *Plains Commerce Bank*, 554 U.S. at 323, 340–41. The land in question was sold as part of the 1908 Allotment Act and was owned by a non-Indian party for at least 50 years. *Id.* at 331, 341. The Court found that the discrimination law that the plaintiffs were attempting to enforce operated as a restraint on alienation and had the effect of regulating the substantive terms on which the non-Indian bank was able to offer its fee land for sale. *Id.* at 331. The Court stated that while "*Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests," that case "does not permit Indian tribes to regulate the sale of non-Indian fee land," as neither of the *Montana* exceptions applies. *Id.* at 332. By contrast, in the present case the nonmember defendant *allegedly located on fee lands, entered into a consensual relationship* with a tribal member for purposes of selling goods and services to its members that improve the tribe's trust and allotment lands. Plaintiff is a member of the Oglala Sioux Tribe.

*The Montana v. U.S. Analysis*

    i.    **First *Montana* Exception**

*Montana*'s consensual relationship exception recognizes that tribes have jurisdiction to regulate consensual relations "through taxation, licensing, or other means." 450 U.S. at 565. Courts have recognized that tort law, under which the Tribe's claims against Defendant arose, constitutes a form of regulation. *See Attorney's Process*, 609 F.3d at 938 (stating that if a tribe retains the power under *Montana* to regulate nonmember conduct, it does not make any difference

Mazaska Exhibit 4
003

CASE NO. CIV-2022-0388                                                                   ORDER 05/30/24

whether it does so through precisely tailored regulations or through civil claims). However, *Montana*'s consensual relationship exception requires that "the regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001). "A nonmember's consensual relationship in one area thus does not trigger tribal civil authority in another." *Id.*

### *Appellant's Arguments*

Appellant argues that the Court lacks jurisdiction because Plaintiff is making a claim pursuant to the Real Estate Settlement Procedures Act ("RESPA"). Appellant argues that the RESPA is the only means of relief for Plaintiff and absent RESPA, which it argues *supersedes* tribal jurisdiction, Plaintiff has no claim. In sum, under Defendants theory all Indians who engage with CDFI's on a reservation, related to Indian lands, must seek recourse in the federal court under RESPA - this is not the law. In making this argument, Appellant does not cite to a single case involving an Indian, Indian lands and the RESPA to support its argument. Rather, *Mazaska* merely analogizes to other federal laws that have found federal jurisdiction. *Mazaska's* argument can be summed up as follows:(1) Montana's first prong, *consensual* relations, is inapplicable because, although there exists a nexus to reservation lands, specifically, Oglala tribal lands, a tribal member plaintiff, an on-reservation non-member business location and an on-reservation agent for service of process, that civil liability is outside the scope of contemplated adjudication under *Montana* and federal jurisprudence. In arriving at its theory Appellant ignores RESPA includes language indicating that RESPA claims may be adjudicated in state law forums, which in this case the Tribe's forum would be akin to a "state" forum for RESPA purposes.[2] The Court finds Appellant's argument unpersuasive, bordering on the ridiculous, under the facts and established law.

### *Montana's First Prong - Consensual Relations*

Examining the facts of this case, we conclude that the Tribe has regulatory authority over Appellant's conduct, for purposes of tribal court adjudicating civil conduct, in this case under *Montana*'s consensual relationship exception. The conduct that the Tribe seeks to regulate through civil law arises directly out of the consensual business relationship between a tribal member and Appellant. Moreover, given the circumstances, Appellant should have reasonably anticipated that its conduct might "trigger" tribal authority. *WaterWheel*, 642 F.3d at 818 (quoting *Plains Commerce Bank*, 554 U.S. at 338). Appellant is a business that appears to have purposely located in an area to serve the Oglala Sioux community, its Articles of Incorporation state that the non-profit sole purpose was to provide financial assistance and counseling to tribal members related to improvements to tribal lands, specifically home building and refurbishing. This is not a situation as held in *Atkinson Trading* where the Tribe desires to assert regulatory authority over non-member hotel patrons, on fee land within a reservation. The land at issue here is tribal lands, specifically housing for tribal members. Appellant's patrons are by and large almost exclusively Oglala Sioux tribal members. Appellant cannot evade *Montana's* first prong by narrowly construing the business relationship by saying a tribal member can only sue under RESPA.[3]

### *Mazaska's Contractual Consent to Tribal Court Jurisdiction*

*Mazaska* contractually consented to tribal jurisdiction; it executed three (3) promissory notes that contain language explicitly subjecting it to tribal court jurisdiction. These notes -executed on July 7, 2010, December 1, 2010, and May 11, 2011, respectively-explicitly provide that **"[t]he courts of the Tribe shall have <u>sole</u> and <u>exclusive</u> jurisdiction</u> with respect to <u>all controversies</u> or <u>claims *related to or arising out of* this Note</u>**." (emphasis in the original). Similarly, the mortgage agreements, also dated July 7, 2010, December 1, 2010, and May 11, 201, explicitly reference each promissory note and state, **"This Security Instrument shall be governed by federal law,**

---

[2] Appellant admitted at oral argument that there is no legislative history indicating that RESPA would be applicable to Indian lands.
[3] Appellant's argument ignores the fact that the notes signed by Montileaux expressly state that Mazaska submits to tribal jurisdiction. The court declines to analyze the facts under the Second Montana exception and makes no determination as to whether it applies.

Mazaska Exhibit 4
004

CASE NO. CIV-2022-0388                                                    ORDER 05/30/24

**and tribal law, and the law of the state in which the Property is located."** It is difficult to imagine a stronger connection between the allegations in the *Complaint* and Respondent *Mazaska's* consent to jurisdiction than the one that is presented here. *See Sac & Fox Tribe*, 609 F.3d at 941. Petitioner *Montileaux* has claimed that Respondent *Mazaska* has breached financial contracts it executed with her. These alleged breaches stem from the very financial documents that include clauses that explicitly submit Respondent *Mazaska* to tribal jurisdiction. There is little question that this scenario comfortably fits within the Eighth Circuit test under *Sac & Fox*. *Mazaska's* counsel stated in oral argument that the agreements pre-dated their involvement in the case. Even so, Tribal court jurisdiction is at its apex when tribal lands are involved. *Waterwheel* et seq.

### *The Tribe's Business Code Asserts Jurisdiction Over On-Reservation Businesses*

Further, Appellant is considered to be knowledgeable of the origins of the business relationship that arose under the Tribe's Business Code Chapter 44 et seq., which expressly states:

Section 44-2-1.03 (1) of Chapter 44 (OST Ord. No 07-25) states, in pertinent part, that

> The purpose of the OST Business Codes are to establish the policy framework through which the Tribe, its entities, private businesses and individuals may conduct business activities within the territorial and governmental jurisdiction of the Tribe. The Policies set forth in this Part shall apply to each of the Acts contained in Parts 2 to 8 of Chapter 44 of the Oglala Sioux Tribal Law and Order Code. The provisions of the OST Business Code shall be liberally constructed and applied to promote its underlying purposes and policies.

Chapter 44 of the Tax Law and Order Code further states:

> To the maximum extent consistent with due process of law, *all domestic entities and all foreign entities doing business on the reservation, and all directors, officers, managers, members, partners and shareholders of such entities shall be subject to the jurisdiction of the Tribal Court in all actions which arise out of the acts, omissions or participation of such persons in connection with the affairs of such entities*; provided, however that this section shall not apply to entities which are owned in whole or in part by the Tribe or which are controlled by the Tribal Council, or to the directors or officers of such entities.

Appellant's lack of awareness of the Business Code, or failure to request a copy of the Tax code, or to have *read* the code is no excuse. We conclude that given these circumstances, Appellant should have reasonably anticipated that its *consensual* relationship with the Tribe, would fall within the Tribe's regulatory jurisdiction.[4]

### *Waterwheel v. LaRance*

Tribal court jurisdiction ca In Water Wheel, the ninth circuit concluded that a tribe's inherent sovereign power to exclude nonmembers from tribal land provides an independent basis upon which a tribe may "regulate" the conduct of nonmembers on tribal land. But, a tribe's power to exclude is not the only source of its regulatory authority over nonmembers on tribal land. See *Brendale*, 492 U.S. at 425 ("An Indian tribe's [] power to exclude nonmembers of the

---

[4] It makes no difference in the analysis whether the Code existed at the time of entering the initial contract or subsequent contracts that extend to the present. It was appellant's duty to remain informed of code changes.

5

Mazaska Exhibit 4
005

CASE NO. CIV-2022-0388    ORDER 05/30/24

tribe from its lands is not the only source of Indian regulatory authority."). "[T]ribes have inherent sovereignty independent of that authority arising from their power to exclude." Id. (citing *Merrion*, 455 U.S. at 141); see also *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 592 (9th Cir. 1983) ("The power to exercise tribal civil authority over [nonmembers] derives not only from the tribe's inherent powers necessary to self-government and territorial management, but also from the power to exclude nonmembers from tribal land." (citing Merrion, 455 U.S. at 141–44))n be found under another precedent, the right to exclude, under *Waterwheel Camp Recreational Area, Inc. v. LaRance*, 642 F3rd 802 (9th Cir. 2011) *per curium*. In addition to the power to exclude, we have the Montana Court's acknowledgment that Indian tribes retain their inherent sovereign power to protect tribal self-government and to control internal relations. 450 U.S. at 564. "[I]n accordance with that right tribes 'may regulate nonmember behavior that implicates [these sovereign interests].'" *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 936 (8th Cir. 2010) (quoting *Plains Commerce Bank*, 554 U.S. at 335). Subsequent to Montana, in *Merrion*, the Court affirmed that Indian tribes have inherent sovereign power to regulate nonmember conduct on tribal land independent of that authority arising from their power to exclude. *Merrion*, 455 U.S. at 144. The Court in Merrion concluded that a tribe's power to tax nonmember mining and drilling on tribal land derived from its inherent "power to govern and to pay for the costs of self-government," and concluded that such regulatory authority was also within the tribe's inherent power to condition the continued presence of nonmembers on tribal land. Id. at 144–45. These varied sources of tribal regulatory power over nonmember conduct on the reservation were affirmed by the Court in Plains Commerce Bank. 554 U.S. at 337 ("[T]he regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations.")

Here, it is unequivocal that the Tribe can and may regulate the conduct of non-member *Mazaska*. This authority arises due to *Mazaska's* unique relationship with tribal members and Oglala Sioux tribal lands, of which *Mazaska's* business model seeks to assist with on reservation tribal land homeownership and improvements to them. One cannot think of a more important tribal interest then homes and home improvements for its on-reservation membership.

**Response to Dissent.**

Justice Thompson dissents pursuant to the belief that it is "impossible" to determine whether tribal law is preempted here. This belief is not supported by established precedent. The RESPA does not interfere with express adjudicative prohibitions, in that nowhere in RESPA does it provide for exclusive federal jurisdiction over RESPA claims. In fact, the documents reviewed expressly state that actions can be commenced in federal and state courts. Further, one of the documents cited to claims being adjudicated by an administrative agency. Additionally, during oral argument the court asked whether the RESPA was a law of general applicability? *Mazaska's* counsel stated "No." If RESPA is not a law of "generally applicability, it is only applicable to the Tribe if the law specifically states that "it is applicable to Indian tribes"[5], otherwise it is inappropriate to apply the federal law when: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended the law not to apply to Indians on their reservations. *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1119 (9th Cir. 1985) (internal quotations and citation omitted). *Mazaska's* use of a lien on tribal lands as surety for the loan may violate (1) and (2). Here, the Treaty of Ft. Laramie, the penultimate treaty that created the great Sioux Nation may be instructive. Article II of the Treaty states:

**ARTICLE II.**
The United States agrees that the following district of country, to wit, viz: commencing on the east bank of the Missouri river where the 46th parallel of north latitude crosses the same, thence along low-water mark down said east bank to a point opposite where the northern line of the State of Nebraska strikes the river, thence west across said river, and along the northern line of Nebraska to the 104th degree of longitude west from Greenwich, thence north on said meridian to a point where the 46th parallel of north latitude intercepts the same, thence due east

---
[5] RESPA does not expressly require federal adjudication as some federal statutes require.

Mazaska Exhibit 4
006

CASE NO. CIV-2022-0388                                                                ORDER 05/30/24

along said parallel to the place of beginning; and in addition thereto, all existing reservations of the east back of said river, shall be and the same is, set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no persons, except those herein designated and authorized so to do, and except such officers, agents, and employees of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article, or in such territory as may be added to this reservation for the use of said Indians, and henceforth they will and do hereby relinquish all claims or right in and to any portion of the United States or Territories, except such as is embraced within the limits aforesaid, and except as hereinafter provided.

Pursuant to the Treaty's language the Pine Ridge Reservation was created for the absolute and undisturbed use of the Indians therein named. Further, the Treaty states that only certain federal officers, agents and officials may pass over, settle upon or reside in the territory described in the article. The question remains whether the lien on trust lands not only violates federal laws in the absence of Interior Department approval and whether it violates the Treaty of Ft. Laramie's restrictions on who can and cannot occupy (realistically or figuratively) reservation lands? (See *Redbud Sioux Tribe v United States* 450 F. Supp. 3d 986 (D.S.D. 2020)

Finally, under *Montana*'s rule of "jurisdiction plausibility", as enumerated in *Big Horn Electric Cooperative, Inc. v. Adams*, 219 F.3d 944 (9th Cir. 2000), all that is required for tribal jurisdiction is for jurisdiction to be *plausible*. In *Big Horn Electric*, free communication services to the tribe was enough to satisfy Montana's requirement of *consensual* relations. Several written contracts between the parties, as analyzed previously, more than satisfy this requirement. (See *Dish Network Corp. v. Tewa*, No. CV 12-8077-PCT-JAT (D. Ariz. Nov. 1, 2012). As such, tribal subject matter jurisdiction over *Mazaska* appears available under several alternate theories.

## ORDER

THIS COURT ORDERS:

1. The appeal is DENIED.
2. The lower court decision is UPHELD.
3. The case is remanded back for further fact finding consistent with this decision.
4. This Order shall become FINAL upon issuance.

IT IS SO ORDERED.

Dated this 30th day of May 2024.

_____
Jack Duran, Jr., Chief Justice
Oglala Sioux Tribe Supreme Court

Attest
_____
Clerk of Supreme Court
OSN Supreme Court

Mazaska Exhibit 4
007

CASE NO. CIV-2022-0388                                                    ORDER 05/30/24

**Concurrence of Associate Justice Serebrov**

    While I concur in the Chief Justice's decision there are several issues in this appeal that I find very disturbing. First, the Appellant, after benefiting from its on-reservation business relationship, attempts to use RESPA to divest the trial court of jurisdiction. However, as the Chief Justice indicates the mortgage and note clearly vests jurisdiction with the court. What is more concerning is the absolute lack of any disclosure in the documents signed by Appellee warning the Appellee that some other law could mandatorily apply. While this could be an oversight on the Appellant's part, it was *Mazaska* that drafted these documents. Second, and most troubling, as indicated in the Amicus Brief and admitted by Appellant's attorney during oral argument, the land secured by the note is not leasehold but trust land requiring all owners and the Secretary of Interior to approve the mortgage under 25 U.S.C. 177. While there is no record evidence whether the proper approvals were obtained, if the Appellant failed to do so not only would the mortgage be invalid but there could be additional legal repercussions.

**Dissent, Thompson, Associate Justice.**

I respectfully dissent.

All parties agree that a court can competently adjudicate a dispute only if it has both personal and subject-matter jurisdiction. All parties agree that the Oglala courts have personal jurisdiction over non-member Mazaska because of *Montana's* first exception.

The question, then, is whether the Oglala courts have subject-matter jurisdiction over Appellee's claims. On this record, it is impossible to determine whether it does. In my opinion, the resolution of the subject-matter-jurisdiction question depends on whether RESPA regulates Appellant and these mortgages. Determining whether RESPA applies requires factual findings absent from this record. Therefore, I would remand this matter to the trial court with instructions to adjudge RESPA's applicability.



Mazaska Exhibit 4
008